**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC., a Massachusetts corporation,<br><br>        Plaintiff,<br><br>v.<br><br>GAMESTOP CORPORATION, a Delaware corporation,<br><br>        Defendant. | Case No.: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff The Boston Consulting Group, Inc. ("BCG") hereby alleges against Defendant GameStop Corporation ("GameStop," or "the company") as follows:

### INTRODUCTION

1.     This action arises out of GameStop's bad faith refusal to pay fees owed to BCG under an express, written agreement.

2.     Once a highly profitable company, GameStop's profits and financial prospects had fallen precipitously by the mid-2010s and by 2019 GameStop was on life support.  Hemorrhaging customers and unable to grow its business, GameStop reported net operating losses of almost $800 million in 2018, including a $970.7 million "goodwill impairment charge" to account for the loss of value from its brand.  Due to these huge losses, GameStop eliminated its dividend and by August 2019, GameStop's common shares had fallen to $3.32 per share from its prior high of approximately $55.  Already one of the most heavily shorted stocks relative to its float in early 2019, GME (GameStop's stock ticker) became the most heavily shorted stock in the United States by the first quarter of 2020.

3.     GameStop's 2020 10-K filing with the Securities and Exchange Commission disclosed 34 different material risk factors for investors to consider with respect to the company's operations and confirmed the grim picture of the company's financial performance.  In the report,

GameStop also compared the value of its shares to that of the S&P 500 and an index of comparable specialty retailers over the previous five years, showing that GameStop significantly underperformed its peers and the marketplace as a whole.  To put the decline in perspective, an investor who purchased $100 of GameStop's common stock on January 30, 2015 would have had only $14.64 five years later.  Investors in a cross-section of other comparable specialty retailers, however, would have nearly doubled their initial investment:[1]



4.      In addition to its mounting financial losses, GameStop was also in a period of significant operational turmoil.  GameStop had three different Chief Executive Officers in 2018 alone in addition to other executive changes.

5.      Realizing that the company was in need of significant help, GameStop engaged BCG in 2019 to evaluate its operations and develop solutions that would enable a corporate transformation to ensure its continued viability.  Together, the parties identified an ambitious target of generating an additional $200 million or more in profit per year going forward, based on their agreed-upon plan to make substantial changes across numerous aspects of GameStop's business.

6.      Negotiations regarding the details of this massive profit expansion program were conducted primarily between BCG and Daniel Kaufman, GameStop's General Counsel, who became the company's Chief Transformation Officer in May 2019.  Like many of GameStop's

---

[1] GameStop's 2020 10-K filing is available here:  https://sec.report/Document/0001326380-20-000022/

other executives, however, Mr. Kaufman is no longer with the company.  Mr. Kaufman left GameStop in 2020 after 18 years of employment there.

7.      In August 2019, after BCG had worked alongside Mr. Kaufman and other GameStop leaders for approximately four months, the parties memorialized their relationship by executing a written contract, entitled "Statement of Work for BCG Support of GameStop's profit expansion program" (the "SOW").  Under the SOW, BCG would provide support to GameStop in connection with ten (10) different workstreams, spread across a broad range of business areas and opportunities.  The parties also had the option of identifying additional savings opportunities and profit improvement initiatives along the way, which could be incorporated into an existing workstream or allocated to a newly-created workstream, as agreed upon by the parties.

8.      Pursuant to the SOW, BCG analyzed the existing structure and operations of the GameStop business, worked with GameStop to formulate strategies for setting the company on a more sustainable path going forward, and provided detailed plans for reinvigorating and improving the profitability of the company, all of which were tethered to specific proposals and estimated profit improvements.  Given the significant challenges facing GameStop at the time, the scope of BCG's work was extensive and involved nearly every area of GameStop's operations.

9.      The SOW provided that BCG would be compensated on the greater of a fixed fee, or a variable fee based upon projected profit improvement.  BCG's variable fee was not predetermined or capped as to the vast majority of the workstreams.  Rather, with one limited exception, which GameStop specifically negotiated, BCG's compensation was tied directly to the anticipated profit improvements resulting from its work (i.e., the best possible estimate of each initiative's expected impact at the time the decision to launch such initiative was made).  In other words, BCG's variable fees were based upon projections, **not** actual profit improvements.  Indeed, the SOW provided that even 2019 profit improvements, and BCG's resulting fee, were based upon projections.

3

10.     The concept of basing BCG's variable fees on projected improvements rather than actual results was negotiated and agreed upon by the parties specifically to ensure that BCG and GameStop's incentives were aligned.   This structure was intended to: incentivize BCG to significantly improve profits; prevent BCG from taking credit for and/or being penalized for exogenous factors outside the parties' control; and to protect BCG from additional factors, such as GameStop's execution risk, i.e., GameStop failing to take the actions necessary to implement the plan and achieve the predicted results.[2]

11.     BCG spent tens of thousands of hours working on this project and it overachieved, identifying and creating plans to capture substantially more profit improvement opportunities than what had been estimated in the SOW and what was contemplated in the SOW's original scope.

12.     Mr. Kaufman, in addition to negotiating the SOW, had served as the primary point of contact for GameStop and worked closely with BCG to manage the project until his departure on June 1, 2020.  With Mr. Kaufman at the helm for GameStop, the parties had a healthy working relationship, grounded in good faith.

13.     After Mr. Kaufman's departure, however, Jim Bell, GameStop's then-new (and now former) Chief Financial Officer, took over Mr. Kaufman's role in the profit improvement project and GameStop has since failed and refused to perform as required by the SOW. Specifically, under Mr. Bell's management and since his departure in March 2021, GameStop has refused to pay significant amounts of BCG's fees, despite there being no legitimate dispute over BCG's full performance and the fees coming due.  GameStop has also taken unreasonable positions, unilaterally demanding discounts on certain workstream fees with no justification, and refusing to continue contractually-obligated meetings to confirm profit improvement estimates and BCG's resulting fees.  For these reasons and others discussed below, GameStop has breached the SOW and the implied covenant of good faith and fair dealing, and therefore owes BCG approximately $30 million in unpaid fees.

---

[2] GameStop was allowed to withhold $2.8 million in fees based on an inability or failure to execute on BCG's plans.

## THE PARTIES

14.     BCG is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts.  BCG is a world-renowned business management consulting firm that is recognized as a leading provider of innovative business solutions with a collaborative approach to complex business issues across a wide range of industries.

15.     GameStop is a Delaware corporation with its principal office located in Grapevine, Texas.  As described above, prior to engaging BCG, GameStop was in a financial and strategic tailspin.  Its stock price had cratered, it had cycled through a series of executives, and had a heavy debt burden that was coming due.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and by virtue of GameStop residing in this state.

## FACTS COMMON TO ALL COUNTS

18.     On or about August 20, 2019, BCG and GameStop signed the SOW.  This written agreement formalized multiple months of collaboration between the parties and memorialized the terms for their continued work on a large program aimed at transforming the operations of GameStop and improving its earnings and profits.

19.     The SOW identified four (4) categories of financial improvement areas: (1) a Financial Year 2019 Target of $30 million ("This Year Predicted Profit Improvement" or "TYPPI"); (2) a 2019 Adjusted Operating Earnings Target Amount of $253 million[3]; (3) a

---

[3] This target was set as an incentive for GameStop employees and did not factor into BCG's compensation.

Financial Year 2020 Target of $100 million ("Next Year Predicted Profit Improvement" or "NYPPI"); and (4) a going-forward Run Rate target of $200 million ("Annualized run-rate Predicted Profit Improvement" or "APPI").  As the names indicate, three of the four areas were based on predicted values.

20.     These financial improvement estimates were based upon work arising out of ten (10) workstreams, which spread across multiple areas of GameStop's business.  The workstreams were intended to focus the parties' efforts and included:

(1) **Video Game Ecosystem, Original Equipment Manufacturer (OEM)/Publisher Partnerships**, to identify new revenue models and partnership structures to improve GameStop's economic position and collaboration with OEM's and game publishers;

(2) **Org Efficiency & Effectiveness**, to unlock both cost and operational improvements through a combination of organizational levers such as improved spans of control, a more effective reporting structure, and redesigned roles and responsibilities, among others;

(3) **Category Performance Improvement (CPI)**, to drive improvements in category profit through changes in category strategy and customer value proposition, cost, vendor funding (including allowances, payment terms, etc.), brand mix, assortment expansion and rationalization, sales trajectory, and other variables that impact overall profitability;

(4) **Pre-owned Electronics Strategy**, to assess the strategic fit and viability of GameStop's pre-owned/refurbished electronics business, develop strategies to accelerate growth, test those strategies across stores, and support their implementation;

(5) **Indirect Procurement**, to drive savings in procurement spending through improved negotiations with suppliers and vendors, demand management, operational improvements, and other levers;

(6) **Pricing**, to facilitate GameStop's ability to capture additional profit through revamped pricing strategies, including revised pricing algorithms, markdown optimization, historical look at promotions, and other optimization levers;

(7) **Global Enterprise**, to identify and facilitate savings and profit improvement through a broad range of levers similar to the ones above, but applied to GameStop's global portfolio (ex-USA) of regions and countries, specifically in Europe;

(8) **Loyalty**, to design and help implement customer loyalty strategies to monetize GameStop's customer relationship;

(9) **Innovation**, to provide analytical and strategic assistance with respect to new innovation initiatives, putting in place tools and metrics to help GameStop better internalize innovation capabilities; and

(10) **Omnichannel**, under which BCG would use its expertise to identify additional work that would be most beneficial to GameStop based on its needs and the level of urgency. Ultimately, the parties agreed to perform the Omnichannel work under a separate agreement.

21.     Under each of these workstreams, the parties agreed upon specific initiatives, from which the parties would calculate projected profit improvements.

22.     In addition to the ten enumerated workstreams, the SOW provided that the project would be flexible and that additional initiatives and/or workstreams would likely be identified as the program progressed and would be incorporated into the SOW.

23.     Under the SOW, BCG's compensation was to be the greater of: (1) the fixed fee set forth in the contract, or (2) a variable fee, which was to be calculated based upon the profit improvements identified for each of TYPPI, NYPPI, and APPI.  BCG's fees were not capped for any profit improvement area other than the Video Game Ecosystem, OEM/Publisher Partnerships workstream, which limited each of TYPPI, NYPPI and APPI to $40,000,000, given GameStop's view that this workstream could be extremely impactful.  Additionally, NYPPI in total was capped at $140 million.

24.     The SOW provided that BCG's fixed fee was to be invoiced on a monthly basis, including amounts incurred dating back to May 2019, when BCG's work actually began.  Indeed,

BCG worked for four months before the formal signing of the SOW.  Once BCG qualified for payment of the variable fee (because it exceeded the fixed fee), any fixed fee amounts paid by GameStop would be credited against the variable fees due.  Stated differently, the SOW provided that BCG, at a minimum, would be paid its fixed fee, and would also be entitled to additional variable fees based on anticipated profit improvements.

25.     In order to calculate the anticipated profit improvements, and thus determine the amount of BCG's variable fees, the SOW expressly required GameStop to cooperate with BCG in its performance of the services, including to provide timely access to data.  The SOW also required that the BCG team and GameStop leadership "hold regular sessions: (i) to address validation, approvals, testing and commencement and execution of the various initiatives so that all of the foregoing can be handled in a timely manner and (ii) to address financial target and planning coordination."  These sessions were commonly referred to as "Thermometer Meetings."  At all Thermometer Meetings, the SOW mandated the attendance of GameStop's Chief Transformation Officer and Chief Financial Officer (or their designees), as well as the GameStop officer responsible for execution of the initiative being discussed.  The purpose of these meetings was to discuss and, as required by the SOW, agree upon financial baselines for each workstream and the ***anticipated*** profit improvement to each workstream, which would determine BCG's fees.  Thus, as explained above, to minimize any disputes about factors outside of either party's control, BCG's fees were to be assessed based upon agreed-upon ***projected*** profits that GameStop was anticipated to achieve against agreed-upon baselines, not actual profits realized.

26.     The SOW also required that GameStop pay BCG's invoices within 30 days.

27.     BCG performed all or substantially all of its obligations under the SOW.  Indeed, BCG dedicated substantial resources and spent tens of thousands of hours working with GameStop across the various workstreams to analyze, develop, and support the implementation of strategies across multiple areas of GameStop's business to increase profits.

28.     As a result of these efforts, BCG not only met initial expectations for profit improvement, it exceeded them.  As just one example, BCG designed and implemented strategies to improve and monetize the customer relationship, including revamping GameStop's customer loyalty program and adjusting the company's marketing initiatives to maximize its impact with high-spending customers.  Prior to BCG's involvement, GameStop's loyalty program was in a steep decline, with its membership base dropping by 20% per year.  BCG transformed the loyalty program, reversing the trend, and increasing membership sign-ups by more than 40% above the baseline.  This revamp of the program resulted in an estimated run-rate profit improvement of $73 million, well beyond the original expectation.

29.     GameStop, however, has breached both the SOW and the implied covenant of good faith and fair dealing in multiple ways, including but not limited to the following:

     a.  GameStop failed and refused to pay BCG the full amount owed under the SOW, including variable fees of approximately $30 million that remain due and owing;

     b.  When GameStop has paid amounts due under the SOW, it has done so late, in some cases by over eight months even on fixed fees which were agreed-upon upfront;

     c.  GameStop's former Chief Financial Officer, Jim Bell, often demanded various unsupported reductions to BCG's fees, despite BCG's unequivocal satisfaction of the agreed-upon profit improvements, and often refused to pay at all based on spurious and unsupported defenses; and

     d.  GameStop ceased its attendance at Thermometer Meetings, despite the fact that such meetings are mandatory under the SOW.  GameStop's cancellation of these meetings prevented the parties from engaging in discussions to confirm fees owed to BCG, despite the indisputable fact that BCG successfully completed work that would entitle BCG to its variable fees under the SOW.

## COUNT I

### Breach of Contract

30.     BCG hereby repeats and re-alleges the allegations set forth in Paragraphs 1 through 29 as if set forth fully herein.

31.     BCG and GameStop formally entered into the SOW on or about August 20, 2019.

32.     As alleged above, the SOW established the scope and terms of BCG's work, including that the parties would meet to determine anticipated profit improvements for the various workstreams identified in the SOW and agreed upon by the parties, as judged against TYPPI, NYPPI, and APPI.  GameStop was then to pay, within 30 days of receiving an invoice, BCG's fees for its services.  BCG's fees were the greater of the fixed or variable fee, as described above.

33.     As described above, GameStop has breached the SOW, with no legitimate excuse or justification, by failing to pay BCG's properly invoiced fees, improperly demanding discounts for BCG's fees, and refusing to conduct contractually required Thermometer Meetings.

34.     As a direct and proximate result of GameStop's failure to perform its obligations under the SOW, BCG has been harmed.  In total, GameStop's breaches have resulted in significant harm to BCG under the SOW, including unpaid fees of approximately $30,000,000.  The exact amount of the variable fees owed to BCG is undetermined at this time, due to GameStop's refusal to hold Thermometer Meetings or otherwise furnish the data necessary to determine certain profit improvements.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

35.     BCG hereby repeats and re-alleges the allegations set forth in Paragraphs 1 through 34 as if set forth fully herein.

36.     By its conduct, GameStop has deprived BCG of the benefits BCG reasonably expected to obtain at the time the SOW was made.

37.     By failing to attend Thermometer Meetings, refusing to finalize in good faith the achievement rate to TYPPI, NYPPI, and APPI resulting from BCG's services under the SOW, raising spurious defenses to payment, and demanding unsupported deductions from the agreed-upon metrics from which to determine BCG's fees, GameStop has breached the covenant of good faith and fair dealing inherent in the SOW.

38.     As a direct and proximate result of GameStop's breaches, BCG has sustained and will incur further damages, including but not limited to damages reflecting its unpaid fees and costs incurred to perform its work under the SOW.   These damages total approximately $30,000,000, including amounts for which GameStop has unlawfully refused to recognize BCG's achievements to TYPPI, NYPPI, and/or APPI.  The exact amount of BCG's damages is unknown at this time, due to GameStop's refusal to hold Thermometer Meetings or otherwise furnish the data necessary to determine certain profit improvements.

**PRAYER FOR RELIEF**

WHEREFORE, BCG prays for judgment and relief against GameStop as follows:

1.      For judgment in favor of BCG and against GameStop on all causes of action;

2.      For damages according to proof in an amount in excess of the jurisdictional requirements;

3.      For prejudgment and post-judgment interest at the maximum legal rate;

4.      For costs of suit; and

5.      For any other and further relief that the Court may deem just and proper.

Dated: March 21, 2022                              Respectfully submitted,

**DLA PIPER LLP (US)**

By:/s/ *Edward J. McAndrew*
    Edward J. McAndrew (DE Bar No. 5638)
    1201 North Market Street, Suite 2100
    Wilmington, DE 19801-3046
    Telephone: (302) 468-5685
    Facsimile: (302) 394-2341

ed.mcandrew@us.dlapiper.com

Nancy Nguyen Sims (*pro hac vice pending*)
nancy.sims@us.dlapiper.com
Michael T. Boardman(*pro hac vice pending*)
michael.boardman@us.dlapiper.com
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: 310.595.3000
Fax: 310.595.3300

Attorneys for Plaintiff
The Boston Consulting Group, Inc.