**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC., a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>GAMESTOP CORP., a Delaware corporation,<br><br>Defendant. | C.A. No. 22-00363-CJB<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiff The Boston Consulting Group, Inc. ("BCG") hereby alleges against Defendant GameStop Corp. ("GameStop") as follows:

**INTRODUCTION**

1. This action arises out of GameStop's bad faith refusal to pay fees owed to BCG under an express, written agreement.

2. Once a highly profitable company, GameStop's profits and financial prospects had fallen precipitously by the mid-2010s, and by 2019 GameStop was on life support. Hemorrhaging customers and unable to grow its business, GameStop reported net operating losses of almost $800 million in 2018, including a $970.7 million "goodwill impairment charge" to account for the loss of value from its brand. Due to these huge losses, GameStop eliminated its dividend and by August 2019, GameStop's common shares had fallen to $3.32 per share from its prior high of approximately $55. Already one of the most heavily shorted stocks relative to its float in early 2019, GME (GameStop's stock ticker) became the most heavily shorted stock in the United States by the first quarter of 2020.

3. GameStop's 2020 10-K filing with the Securities and Exchange Commission disclosed 34 different material risk factors for investors to consider with respect to the company's operations and confirmed the grim picture of the company's financial performance. In the report,

1

GameStop also compared the value of its shares to that of the S&P 500 and an index of comparable specialty retailers over the previous five years, showing that GameStop significantly underperformed its peers and the marketplace as a whole. To put the decline in perspective, an investor who purchased $100 of GameStop's common stock on January 30, 2015 would have had only $14.64 five years later. Investors in a cross-section of other comparable specialty retailers, however, would have nearly doubled their initial investment:[1]



4.  In addition to its mounting financial losses, GameStop was also in a period of significant operational turmoil. GameStop had three different Chief Executive Officers in 2018 alone in addition to other executive changes.

5.  Realizing that the company was in need of significant help, GameStop engaged BCG in 2019 to evaluate its operations and develop solutions that would enable a corporate transformation to ensure its continued viability. Together, BCG and GameStop identified an ambitious target of generating an additional $200 million or more in profit per year going forward, based on their agreed-upon plan to make substantial changes across numerous aspects of GameStop's business.

6.  Negotiations regarding the details of this massive profit expansion program were conducted primarily between BCG and Daniel Kaufman, GameStop's General Counsel, who

---

[1] GameStop's 2020 10-K filing is available here: https://sec.report/Document/0001326380-20-000022/

became the company's Chief Transformation Officer in May 2019. Like many of GameStop's other executives, however, Mr. Kaufman is no longer with the company. Mr. Kaufman left GameStop in 2020 after 18 years of employment there. According to LinkedIn, Mr. Kaufman resides in Philadelphia, Pennsylvania and negotiated GameStop's engagement of BCG with GameStop's outside counsel who is also located in Philadelphia.

7. In August 2019, after BCG had worked alongside Mr. Kaufman and other GameStop leaders for approximately four months, the parties memorialized their relationship by executing a written contract, entitled "Statement of Work for BCG Support of GameStop's profit expansion program" (the "SOW").[2] Under the SOW, BCG would provide support to GameStop in connection with ten (10) different workstreams, spread across a broad range of business areas and opportunities. The parties also had the option of identifying additional savings opportunities and profit improvement initiatives along the way, which could be incorporated into an existing workstream or allocated to a newly-created workstream, as agreed upon by the parties.

8. Pursuant to the SOW, BCG analyzed the existing structure and operations of the GameStop business, worked with GameStop to formulate strategies for setting the company on a more sustainable path going forward, and provided detailed plans for reinvigorating and improving the profitability of the company, all of which were tethered to specific proposals and estimated profit improvements. Given the significant challenges facing GameStop at the time, the scope of BCG's work was extensive and involved nearly every area of GameStop's operations.

9. The SOW provided that BCG would be compensated on the greater of a fixed fee, or a variable fee based upon projected profit improvement for each workstream. BCG's variable fee was not predetermined or capped as to the vast majority of the workstreams. Rather, with one limited exception, which GameStop specifically negotiated, BCG's compensation was tied directly to the anticipated profit improvements resulting from its work (i.e., the best possible estimate of each initiative's expected impact at the time the decision to launch such initiative was made). In

---

[2] A copy of the SOW has previously been filed under seal as Dkt. No. 26.

other words, BCG's variable fees were based upon projections, **not** actual profit improvements. Indeed, the SOW provided that even 2019 profit improvements, and BCG's resulting fee, were based upon projections even though that year was already underway by the time the SOW was signed.

10. The concept of basing BCG's variable fees on projected improvements rather than actual results was negotiated and agreed upon by the parties specifically to ensure that BCG and GameStop's incentives were aligned. This structure was intended to: incentivize BCG to significantly improve profits; prevent BCG from taking credit for and/or being penalized for external factors outside the parties' control; and to protect BCG from additional factors, such as GameStop's execution risk, i.e., GameStop failing to take the actions necessary to implement the plan and achieve the predicted results.[3]

11. In reliance on the SOW, and on GameStop acting in good faith, BCG spent tens of thousands of hours working on this project and it overachieved, identifying and creating plans to capture substantially more profit improvement opportunities than what had been estimated in the SOW and what was contemplated in the SOW's original scope.

12. Mr. Kaufman, in addition to negotiating the SOW, had served as the primary point of contact for GameStop and worked closely with BCG to manage the project until his departure on June 1, 2020. With Mr. Kaufman at the helm for GameStop, the parties had a healthy working relationship, grounded in good faith.

13. Eventually, GameStop began failing and refusing to perform as required by the SOW. Specifically, GameStop has refused to pay significant amounts of BCG's fees, despite there being no legitimate dispute over BCG's full performance and the fees coming due because BCG's work unequivocally fulfilled its obligations under the SOW, resulting in significant projected profit improvements. In many cases, GameStop has refused to pay BCG's fees even after agreeing to the projected profit improvements.

---

[3] GameStop was allowed to withhold $2.8 million in fees based on an inability or failure to execute on BCG's plans.

14. GameStop has also taken unreasonable positions, unilaterally demanding discounts on certain workstream fees with no justification rather than pay BCG's valid invoices when due, refusing to provide necessary data and access to enable BCG to calculate its fees under the SOW, and refusing even to participate in contractually-obligated meetings to confirm profit improvement estimates and BCG's resulting fees. For these reasons and others discussed below, GameStop has breached the SOW and the implied covenant of good faith and fair dealing, causing BCG damages including approximately $30 million in unpaid fees.

## THE PARTIES

15. BCG is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts. BCG is a world-renowned business management consulting firm that is recognized as a leading provider of innovative business solutions with a collaborative approach to complex business issues across a wide range of industries.

16. GameStop is a Delaware corporation with its principal office located in Grapevine, Texas. As described above, prior to engaging BCG, GameStop was in a financial and strategic tailspin. Its stock price had cratered, it had cycled through a series of executives, and had a heavy debt burden that was coming due.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and by virtue of GameStop residing in this state.

## FACTS COMMON TO ALL COUNTS

19. On or about August 20, 2019, BCG and GameStop signed the SOW. This written agreement formalized multiple months of collaboration between the parties and memorialized the

terms for their continued work on a large program aimed at transforming the operations of GameStop and improving its earnings and profits.

20.     The SOW identified four (4) categories of financial improvement areas: (1) a Financial Year 2019 Target of $30 million ("This Year Predicted Profit Improvement" or "TYPPI"); (2) a 2019 Adjusted Operating Earnings Target Amount of $253 million[4]; (3) a Financial Year 2020 Target of $100 million ("Next Year Predicted Profit Improvement" or "NYPPI"); and (4) a going-forward Run Rate target of $200 million ("Annualized run-rate Predicted Profit Improvement" or "APPI").  As the names indicate, three of the four areas were based on predicted values.

21.     These financial improvement estimates were to be based upon work arising out of ten (10) workstreams spread across multiple areas of GameStop's business.  The workstreams were intended to focus the parties' efforts and included:

(1) **Video Game Ecosystem, Original Equipment Manufacturer (OEM)/Publisher Partnerships**, to identify new revenue models and partnership structures to improve GameStop's economic position and collaboration with OEM's and game publishers;

(2) **Org Efficiency & Effectiveness**, to unlock both cost and operational improvements through a combination of organizational levers such as improved spans of control, a more effective reporting structure, and redesigned roles and responsibilities, among others;

(3) **Category Performance Improvement (CPI)**, to drive improvements in category profit through changes in category strategy and customer value proposition, cost, vendor funding (including allowances, payment terms, etc.), brand mix, assortment expansion and rationalization, sales trajectory, and other variables that impact overall profitability;

(4) **Pre-owned Electronics Strategy**, to assess the strategic fit and viability of GameStop's pre-owned/refurbished electronics business, develop strategies to accelerate growth, test those strategies across stores, and support their implementation;

---

[4] This target was set as an incentive for GameStop employees and did not factor into BCG's compensation.

(5) **Indirect Procurement**, to drive savings in procurement spending through improved negotiations with suppliers and vendors, demand management, operational improvements, and other levers;

(6) **Pricing**, to facilitate GameStop's ability to capture additional profit through revamped pricing strategies, including revised pricing algorithms, markdown optimization, historical look at promotions, and other optimization levers;

(7) **Global Enterprise**, to identify and facilitate savings and profit improvement through a broad range of levers similar to the ones above, but applied to GameStop's global portfolio (ex-USA) of regions and countries, specifically in Europe;

(8) **Loyalty**, to design and help implement customer loyalty strategies to monetize GameStop's customer relationship;

(9) **Innovation**, to provide analytical and strategic assistance with respect to new innovation initiatives, putting in place tools and metrics to help GameStop better internalize innovation capabilities; and

(10) **Omnichannel**, under which BCG would use its expertise to identify additional work that would be most beneficial to GameStop based on its needs and the level of urgency. Ultimately, the parties later agreed as to the scope of the Omnichannel work.

22. Under each of these workstreams, the parties agreed upon specific initiatives, from which the parties were required by the SOW to calculate projected profit improvements. These projections -- **not** actual realized profits -- would determine the amount of BCG's fees.

23. In addition to the ten enumerated workstreams, the SOW provided that the project would be flexible and that additional initiatives and/or workstreams would likely be identified as the program progressed and would be incorporated into the SOW.

24. Under the SOW, BCG's compensation was to be the greater of: (1) the fixed fee set forth in the contract, or (2) a variable fee, which was to be calculated based upon the projected profit improvements identified for each of TYPPI, NYPPI, and APPI. BCG's fees were not capped for any profit improvement area other than the Video Game Ecosystem, OEM/Publisher

Partnerships workstream, which limited each of TYPPI, NYPPI and APPI to $40,000,000, given GameStop's view that this workstream could be extremely impactful. Additionally, NYPPI in total was capped at $140 million.

25. The SOW provided that BCG's fixed fee was to be invoiced on a monthly basis, including amounts incurred dating back to May 2019, when BCG's work actually began. Indeed, BCG worked for four months before the formal signing of the SOW. Once BCG qualified for payment of the variable fee (because it exceeded the fixed fee), any fixed fee amounts paid by GameStop would be credited against the variable fees due. Stated differently, the SOW provided that BCG, at a minimum, would be paid its fixed fee, and would also be entitled to additional variable fees based on anticipated profit improvements.

26. Section 4.2.5 of the SOW provided that projected profit improvements "will be determined by projecting the tangible financial benefit of organizational changes, improved vendor funding and costs, assortment changes, price adjustments and other levers, into standard financial variables applicable to measurement of profitability (e.g., volume, sales, margin rate, supplier funding, decreased write offs, investment impact, etc.), and then subtracting any recurring costs and expenses associated with capturing those benefits (e.g., profit decreases due to SKU rationalization, etc.)."

27. Section 4.3 of the SOW also provided detailed methodologies for calculating projected profit improvements that would determine BCG's resulting variable fee for each workstream.

28. The SOW further required that GameStop cooperate with BCG in the delivery of services, including to "provide data about [GameStop's] needs, business, operations, personnel, customers, technology and/or [GameStop] data, as necessary for BCG to successfully deliver the Services," provide access to GameStop's computer networks and software, to "provide timely iteration, feedback and approval of goals, timelines, requirements and outputs," and to "provide such other reasonable assistance as necessary for BCG to successfully deliver the Services."

29. Section 4.2.9 of the SOW further required that the parties hold regular sessions "(i) to address validation, approvals, testing and commencement and execution of the various initiatives so that all of the foregoing can be handled in a timely manner and (ii) to address financial target and planning coordination." These sessions were commonly referred to during the project as "Thermometer Meetings." At all Thermometer Meetings, the SOW mandated the attendance of GameStop's Chief Transformation Officer and Chief Financial Officer (or their designees), as well as the GameStop officer responsible for execution of the initiative being discussed. The purpose of these meetings was to discuss and, as required by the SOW, agree upon financial baselines for each workstream and the *anticipated* profit improvement to each workstream, which would determine BCG's fees. Thus, as explained above, to minimize any disputes about factors outside of either party's control, BCG's fees were to be assessed based upon agreed-upon *projected* profits that GameStop was anticipated to achieve against agreed-upon baselines, not actual profits realized. GameStop could not simply disagree with BCG's calculations to avoid paying fees. It had to present legitimate reasons for any disagreements, supported by relevant data. Failure to do so would constitute a breach of at least Sections 4.1 and 4.2 of the SOW.

30. BCG performed all or substantially all of its obligations under the SOW. Indeed, BCG dedicated substantial resources and spent tens of thousands of hours working with GameStop across the various workstreams to analyze, develop, and support the implementation of strategies across multiple areas of GameStop's business to increase profits.

31. As a result of these efforts, BCG not only met initial agreed-upon expectations for profit improvement, it exceeded them. As just one example, BCG designed and implemented strategies to improve and monetize the customer relationship, including revamping GameStop's customer loyalty program and adjusting the company's marketing initiatives to maximize its impact with high-spending customers. Prior to BCG's involvement, GameStop's loyalty program was in a steep decline, with its membership base dropping by 20% per year. BCG transformed the loyalty program, reversing the trend, and increasing membership sign-ups by more than 40% above

the baseline.  This revamp of the program resulted in an estimated run-rate profit improvement of $73 million, well beyond the original expectation.

32.     Because BCG's efforts empirically and conclusively established specific projected profit improvements, BCG met the threshold to recover variable fees under the SOW and sent invoices to GameStop for certain variable fees.  Under Section 3.5 of the SOW, these invoices were required to be paid within 30 days.

33.     GameStop has agreed that BCG is entitled to variable fees and has paid portions of BCG's variable fees.  GameStop has failed to pay all fees due and owing, however, even despite their specific agreement as to the underlying projected profit improvements for certain workstreams.

34.     When GameStop has paid amounts due under the SOW, it has done so late, in further breach of the SOW, even on fixed fees which were agreed-upon upfront.  In some cases, GameStop failed to pay BCG's invoices for over eight months.

35.     For certain workstreams, GameStop has failed and refused to pay BCG's fees, but has never provided any supporting data from which to refute the projected profit improvements. GameStop has instead simply demanded reductions without any data or analysis to support them, despite BCG's unequivocal satisfaction of the agreed-upon profit improvements and despite the SOW's requirement in at least Section 1.3 of the SOW's Terms that GameStop cooperate in good faith to timely approve goals and projections.

36.     GameStop has also refused to attend Thermometer Meetings, despite the fact that such meetings are mandatory under the SOW.  GameStop's cancellation of these meetings prevented the parties from engaging in discussions to confirm fees owed to BCG.

37.     GameStop's bad faith and unlawful conduct has resulted in BCG being damaged by not receiving approximately $30 million in fees owed under the SOW, which remain due and owing as of the filing of this complaint.

10

## COUNT I

### Breach of Contract

38. BCG hereby repeats and re-alleges the allegations set forth in Paragraphs 1 through 37 as if set forth fully herein.

39. BCG and GameStop formally entered into the SOW on or about August 20, 2019, although substantial performance occurred before that date that the parties agreed would be covered under the SOW.

40. As alleged above, the SOW formalized the scope and terms of BCG's work, including that the parties would determine anticipated profit improvements for the various workstreams identified in the SOW, as judged against agreed-upon baseline projections (*i.e.*, TYPPI, NYPPI, and APPI). BCG's fees were the greater of the fixed or variable fee, as described above. GameStop was then required to pay BCG's fees for its services within 30 days of receiving an invoice.

41. As described above, BCG achieved projected profit improvements that exceeded the threshold to receive variable fees.

42. GameStop has breached the SOW, with no legitimate excuse or justification, by, among other things:

   a. failing to pay BCG's fees, even for work that resulted in projected profit improvements that the parties have expressly agreed upon;

   b. failing to pay BCG's fees for work that resulted in projected profit improvements that GameStop has been unable to challenge with any supporting data;

   c. failing to pay BCG's fees for work that resulted in projected profit improvements that GameStop has never disputed at all;

   d. failing and refusing to provide necessary data, feedback and approvals of projected profit improvements as required by the SOW; and

    e. failing and refusing to even attend contractually-required thermometer meetings to validate projected profit improvements and BCG's fees.

43. As a direct and proximate result of GameStop's failure to perform its obligations under the SOW, BCG has been damaged. In total, GameStop's breaches have resulted in significant damages to BCG under the SOW, including owed but unpaid fees of approximately $30,000,000. The exact amount of BCG's damages cannot be determined at this time, due to GameStop's refusing to furnish to BCG the data necessary to determine certain projected profit improvements, refusing to attend Thermometer Meetings, and otherwise interfering with BCG's ability to calculate the full amount of its fees owed, but will become calculable once necessary discovery is conducted in this action.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

44. BCG hereby repeats and re-alleges the allegations set forth in Paragraphs 1 through 37 as if set forth fully herein.

45. By its conduct, GameStop has deprived BCG of the benefits of the SOW that BCG reasonably expected to obtain at the time the SOW was made.

46. By failing to participate in Thermometer Meetings in good faith (and in some cases, at all), refusing to finalize in good faith the projected achievement rate to TYPPI, NYPPI, and APPI resulting from BCG's services under the SOW, raising spurious defenses to payment, and demanding unsupported deductions from the agreed-upon metrics upon which BCG's fees were based in order to hold payment of BCGs fees in limbo and prevent final resolution of the project, GameStop acted in bad faith and has breached the covenant of good faith and fair dealing inherent in the SOW.

47. As a direct and proximate result of GameStop's breaches, BCG has sustained damages, and will incur further damages, including but not limited to damages reflecting its unpaid but owed fees and costs incurred to perform its work under the SOW. These damages total approximately $30,000,000, including amounts for which GameStop has unlawfully refused to

12

recognize BCG's achievements to TYPPI, NYPPI, and/or APPI. The exact amount of BCG's damages cannot be determined at this time, due to GameStop's refusing to furnish to BCG the data necessary to determine certain projected profit improvements, refusing to attend Thermometer Meetings, and otherwise interfering with BCG's ability to calculate the full amount of its fees owed, but will become calculable once necessary discovery is conducted in this action.

## PRAYER FOR RELIEF

WHEREFORE, BCG prays for judgment and relief against GameStop as follows:

1. For judgment in favor of BCG and against GameStop on all causes of action;

2. For damages according to proof in an amount in excess of the jurisdictional requirements;

3. For prejudgment and post-judgment interest at the maximum legal rate;

4. For costs of suit; and

5. For any other and further relief that the Court may deem just and proper.

Dated: July 1, 2022

Respectfully submitted,

/s/ Thomas A. Uebler
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Adam J. Waskie (#6217)
MCCOLLOM D'EMILIO SMITH UEBLER LLC
2751 Centerville Road, Suite 401
Wilmington, Delaware 19808
Tel: (302) 468-5960
tuebler@mdsulaw.com
jchristensen@mdsulaw.com
awaskie@mdsulaw.com

Nancy Nguyen Sims (*pro hac vice*)
Edward Totino (*pro hac vice*)
Michael T. Boardman (*pro hac vice*)
BAKER & MCKENZIE LLP
10250 Constellation Blvd.
Suite 1850
Los Angeles, California 90067

13

Tel: +1 310 201 4728
Fax: +1 310 201 4721
nancy.sims@bakermckenzie.com
edward.totino@bakermckenzie.com
michael.boardman@bakermckenzie.com

*Attorneys for Plaintiff*
*The Boston Consulting Group, Inc.*