**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE BOSTON CONSULTING GROUP, INC.,
a Massachusetts corporation,

        Plaintiff,

    v.

GAMESTOP CORPORATION, a Delaware
corporation,

        Defendant.

C.A. No. 1:22-00363-CJB

PUBLIC VERSION OF D.I. 26
FILED JULY 8, 2022

**EXHIBIT 1 TO
DEFENDANT GAMESTOP CORP.'S OPENING
BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Trey Cox
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Tel: (214) 698-3256
tcox@gibsondunn.com

Dated:  June 22, 2022

ABRAMS & BAYLISS LLP
John M. Seaman (#3868)
E. Wade Houston (#6289)
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
Tel: (302) 778-1000
seaman@abramsbayliss.com
houston@abramsbayliss.com

*Attorneys for Defendant GameStop Corp.*

# EXHIBIT 1



August 20, 2019

Mr. Dan Kaufman
Executive Vice President, Chief Transformation Officer
GameStop Corp.
625 Westport Pkwy.
Grapevine, TX, 76051

### Re: Statement Of Work for BCG Support of GameStop's profit expansion program

Dear Dan,

Following our recent conversations, we are excited to partner with GameStop's management team on its Profit Expansion Program. This work is critical for the success of GameStop, as we believe it will add significant value to fund GameStop's transformation journey. The overall objective for the Program is twofold:

- a) Develop and implement a Video Game ecosystem strategy for GameStop, focusing on new revenue and partnership models with OEMs and Publishers;
- b) Capture globally $200M+ of near-term profit expansion to fund GameStop's overall transformation journey.

The purpose of this document – the "Statement Of Work" (hereafter referred to as this "**SOW**") – is to define a framework regarding the services to be provided by BCG to GameStop in supporting the Program, as well as the fees to be paid by GameStop to BCG for those services.

This SOW is effective as of April 29, 2019 ("**Effective Date**") and is made by and between GameStop Corp., on its own behalf and on behalf of its subsidiaries and controlled affiliates (hereinafter "**GameStop**"), and Boston Consulting Group, Inc. ("**BCG**") and, to the extent not inconsistent with the terms of this SOW, shall be governed by the terms of BCG's Standard Terms, which are attached to this SOW as **Exhibit A** (hereafter referred to as the "**Supplemental Terms**" and such Supplemental Terms, together with this SOW, are hereafter referred to collectively as the "**Agreement**"). GameStop and BCG are hereafter referred to collectively as the "**Parties**" and individually as a "**Party**."

### 1. Scope of work and services

1.1. GameStop engages BCG to support GameStop's profit expansion program (the "**Program**") across a broad range of levers and opportunities. BCG will accordingly perform the services set out in this SOW (collectively, the "**Services**"). The approach under the Program is to focus the efforts of the Parties across the 10 workstreams described below and hereafter referred to collectively as the "**Workstreams**" and individually as a "**Workstream**":

1.1.1. ███████████████████████████████████████████████████

1.1.2. **Org Efficiency & Effectiveness:** unlock both cost and operational improvements through a combination of organizational levers such as improved spans of control, a more effective reporting structure, and redesigned roles and responsibilities, among others. Note that in select instances, part of the organization might require an increase in resources and investments to position GameStop for sustainable success.

1.1.3. **Category Performance Improvement (CPI):** drive improvements in category profit $ through changes in category strategy ███████████████████████████████

and other variables that impact overall dollar profitability of categories.

1.1.4. **Pre-owned Electronics Strategy:** assess strategic fit and viability of GameStop's pre-owned/refurbished electronics business (primarily focusing on pre-owned phones), develop strategies to accelerate growth, test those strategies across stores and support implementation.



Mr. Dan Kaufman
August 20, 2019
Page 2

1.1.5. **Indirect Procurement**: drive savings in indirect procurement spend ████████████ ████████████ and other procurement levers.

1.1.6. **Pricing**: capture additional profit dollars for GameStop through ████████████ ████ and other pricing optimization levers.

1.1.7. **Global Enterprise**: identify and pursue holistic savings and profit improvement through a broad range of levers similar to the ones above, but applied to GameStop's global portfolio (ex-USA) of regions and countries. This team will focus specifically on ████ developing approaches and strategies that will help drive profit in those regions. In some instances, this might mean ████████████ ████████████████████████ Within this Workstream, BCG will support the anticipated sales process led by Rothschild or other advisors appointed by GameStop, but will not provide commercial due diligence services (i.e., an assessment of the overall market and GameStop's market position or an independent review of management's business plan. In the case of ████ ████████████████████ BCG will (i) support development of strategy with respect to such exit, (ii) provide thought leadership with respect to the exit and (iii) facilitate and support GameStop management decision-making. The Parties recognize that the scope of Services does not contemplate assistance with ████████████████ ████

1.1.8. **Loyalty**: design and implement strategies to ████████████ This team will provide analytical and operational support to optimize the ████ ████████████ and to investigate and operationalize new ways to customize marketing and promotional offers to GameStop customers. BCG will also provide thought partnership on GameStop's strategic redesign of its Loyalty program,

1.1.9. **Innovation**: provide select analytical support and strategic thought partnership for (i) the development and launch of the ████ initiatives and (ii) putting in place tools and metrics to help GameStop better internalize innovation capabilities.

1.1.10. **Omnichannel**: BCG agrees to bring internal experts to assess the type of support and scope of work most beneficial to GameStop based on its needs and level of urgency. BCG and GameStop will then jointly agree in writing on the specific areas and functions where BCG can add the most value for GameStop and the metrics to be used to measure the contributions from this Workstream to each of TYPPI, NYPPI and APPI (each as defined below), as applicable. Such metrics can include (but are not limited to): (i) improvement in online customer conversion rates, (ii) growth in online revenue, (iii) growth in online traffic, (iv) growth in 'Buy Online, Pick-Up in Store' (BOPUS) and (v) Growth in Hold Online, Pick-Up in Store (HOPUS). For additional clarity, the incremental online margin dollars referenced above will be assessed exclusively within the context of the Online sales ecosystem, without consideration for cannibalization of in-store sales.

1.2. In addition to the 10 Workstreams described above, the Parties will identify and pursue opportunistic savings and profit improvement initiatives and levers identified throughout the course of the Program on an ad-hoc basis, and such profit improvement initiatives and levers will either be allocated to an existing Workstream or to a newly-created workstream, as jointly agreed to in writing by the Parties. Such levers may be identified by either GameStop or BCG personnel and then submitted to GameStop and BCG leaderships for review and approval in accordance with the "governance" provisions of Sections 4.2.9, 4.2.10, 4.2.11,4.2.12 and 4.2.13 of this SOW. The GameStop and BCG leaderships may then jointly decide whether to pursue such levers. Examples of such

THE BOSTON CONSULTING GROUP



Mr. Dan Kaufman
August 20, 2019
Page 3

levers include but are not limited to profit expansion stemming from review of domestic store lease portfolio and potential store closure opportunities.

1.3.    The scope of the Program will remain flexible in terms of both topics and activities. The spirit will be to "follow the money" and deploy the BCG and GameStop teams to the places that have the highest and quickest payback (e.g., go deeper/shallower in specific CPI topics, consider additional Indirect Procurement categories, etc.). The BCG and GameStop employees will operate as one joint team with the same targets and objectives, and BCG leadership will work with GameStop leadership on a weekly basis to ensure that resources are deployed against the top priority opportunities.

1.4.    All profit improvement initiatives and activities within Workstreams and for which a decision to pursue was made between the Effective Date and the end date of this SOW will be considered as being part of the Program, and count towards GameStop's incentive plan (the "**Incentive Plan**") established under, and as detailed in, this SOW.

1.5.    To accelerate impact and ensure that tangible financial value is delivered to GameStop through the Workstreams, GameStop will include BCG in any deal or profit improvement activity that forms part of one or more of the Workstreams to augment the value achieved by such Workstream(s) over the duration of the Program, and the Parties will collaborate to optimize BCG's contribution to achievement of the targets for the Workstreams.

1.6.    The Parties have agreed that the following profit improvement initiatives, activities and levers (such initiatives, activities and levers being referred collectively to as "**Out of Scope Activities**") will be left out of scope of the Program and the Incentive Plan for BCG but will not necessarily be left out of scope for GameStop employees and their incentives:

1.    Any financial impact related to the divestiture of GameStop's corporate jet plane;
2.    Any financial impact related to the sale and divestiture of Simply Mac, including on account of savings through personnel reductions; and
3.    Any financial impact related to the sale and divestiture of the Spring Mobile division, including on account of savings through personnel reductions; provided that savings on account of reductions of GameStop personnel allocated to the Spring Mobile division will not be excluded if and to the extent the cost of such GameStop personnel were included in the cost baseline of the Org Efficiency & Effectiveness Workstream (as such baseline was approved by GameStop's head of HR).

1.7.    Under the umbrella of the Program, BCG's role is to provide analysis, support and advice. GameStop ultimately controls all of the decision-making, as well as interactions and negotiations with its vendors. BCG shall not have a direct presence or voice at the negotiation table or other forums where Program decisions or strategies are communicated.

1.8.    GameStop agrees to reasonably cooperate with BCG in the performance of the Services, including, without limitation, by providing BCG with reasonable facilities at GameStop facilities and timely access to data, information and GameStop personnel, timely decision-making, and keeping BCG's involvement confidential to external parties (except as required by law, regulation or stock exchange rules). BCG acknowledges that GameStop, as a public company, is subject to disclosure requirements, including as to executive compensation, and nothing herein limits GameStop in complying with such requirements.

1.9.    Each Party will be solely responsible for the performance of its employees and agents and for the accuracy and completeness of all data, instructions, information and communications provided by such party to the other party hereunder. BCG shall be entitled to rely on all data, instructions, information and communications and all decisions and approvals of the applicable GameStop representative or his or her designee.

THE BOSTON CONSULTING GROUP



Mr. Dan Kaufman
August 20, 2019
Page 4

1.10.  GameStop will not provide any personally identifiable information to BCG under this SOW unless GameStop deems it absolutely necessary for the performance of the Services by BCG. If GameStop provides personally identifiable information to BCG in accordance with this provision, the information shall be handled and protected in accordance with the Supplemental Terms.

1.11.  BCG personnel, upon entering GameStop property, will at all times be subject to GameStop's rules and regulations regarding safety, security, code of conduct, and protection of confidential information, as notified in writing to BCG personnel.

1.12.  GameStop commits to keep its relationship with BCG confidential to any external third parties and vendors who might be affected by the Program (except as required by law, regulation or stock exchange rules), and to communicate such commitment to all relevant GameStop stakeholders. BCG commits to keep its relationship with GameStop confidential to any external third parties and vendors who might be affected by the Program (except as required by law, regulation or stock exchange rules), and to communicate such commitment to all relevant BCG stakeholders.

## 2.   Alignment of incentives

2.1.  GameStop agrees to align its employees' objectives with the objectives of the Program, by:

2.1.1.  Establishing the Incentive Plan, which will provide monetary incentives to eligible parties based on the results of the Program. In the case of BCG, these monetary incentives, as described in Section 2.3 of this SOW and payable on and subject to the terms and conditions of the Agreement, shall constitute the sole and exclusive entitlement of BCG to compensation for the Services under the Agreement. All GameStop employees at the level of manager and above who are currently eligible for GameStop STI (excluding international employees and executive officers) are expected to be eligible to participate in the Incentive Plan. The Incentive Plan will set targets (identified below) that will be common to both GameStop employees eligible to participate in the Incentive Plan and BCG (each of such eligible GameStop employees and BCG being referred to, for purposes of the Incentive Plan, as an "**Eligible Party**"), except to the extent that targets for eligible GameStop employees also relate to Out of Scope Activities and except to the extent otherwise agreed in writing by the Parties. The Incentive Plan will be in place no later than on or about July 31, 2019, and eligible GameStop employees shall be notified of their eligibility under the Incentive Plan no later than on or about July 31, 2019.

2.1.2.  Communicating the launch of the Program, its objectives, and BCG's involvement, internally to all relevant GameStop stakeholders.

2.2.  The Incentive Plan will apply to Eligible Parties and will have four separate incentive components to motivate the GameStop organization, encourage collaboration, drive the right behaviors and align incentives across key stakeholders and participants in the Program. The four incentive components of the Incentive Plan are as follows:

2.2.1.  'FY2019 Target' incentive: the purpose of this incentive component is to instill a sense of urgency with the key stakeholders and demonstrate early momentum in the Program. The 'FY2019 Target' incentive will target $30M of This Year Predicted Profit Improvement ("**TYPPI**" – defined in Section 4 of this SOW) in FY2019, before BCG fees and before non-recurring costs, expenses and investments. The TYPPI of each of the various profit expansion activities will be determined and calculated in accordance with Section 4. The "**TYPPI Target Amount**" is $30M.

2.2.2.  'FY2019 Adjusted Operating Earnings Target' incentive: the purpose of this incentive component is to motivate the key stakeholders by incentivizing them on a metric that GameStop needs to deliver on at



Mr. Dan Kaufman
August 20, 2019
Page 5

the corporate level. The '2019 Adjusted Operating Earnings Target' incentive will target $253M of Adjusted Operating Earnings (as defined and tracked by GameStop Finance and Accounting departments) in FY2019, before BCG fees, with ultimate control over the computation of 2019 Adjusted Operating Earnings vested in GameStop provided that GameStop exercises such control reasonably and in a manner not inconsistent with any express provision of this SOW. The "**2019 Adjusted Operating Earnings Target Amount**" is $253M.

2.2.3.    'FY2020 Target' incentive: the purpose of this incentive component is to help drive the GameStop organization towards achieving $100M of profit expansion in 2020. The 'FY2020 Target' incentive will therefore target $100M of Next Year Predicted Profit Improvement ("**NYPPI**" – defined in Section 4 of this SOW) in FY2020, before BCG fees and before non-recurring costs, expenses and investments. The NYPPI of each of the various profit expansion activities will be determined and calculated in accordance with Section 4. The "**NYPPI Target Amount**" is $100M.

2.2.4.    'Run-Rate Target' incentive: the purpose of this incentive component is to encourage retention and align the GameStop organization towards driving sustainable run-rate profit expansion. The 'Run-Rate Target' Incentive will target $200M of annualized run-rate Predicted Profit Improvement ("**APPI**" – defined in Section 4 of this SOW), before BCG fees and before non-recurring costs, expenses and investments. The APPI of each of the various profit expansion activities will be determined and calculated in accordance with Section 4. The "**APPI Target Amount**" is $200M.

2.3.    The amount earned by an Eligible Party in respect of each of the four components specified above will be proportional to the percent of the applicable Target Amount of such component actually achieved (the "**Percent Target Achieved**"), and shall be calculated using the following formula:

amount earned = the greater of:

a)    the Fixed Fee (as specified in the table in Section 2.3.2 below) for such incentive component; or
b)    the Variable Fee (as specific in the table in Section 2.3.2 below) for such incentive component multiplied by the Percent Target Achieved for such incentive component (the aggregate of the amounts earned pursuant to this clause b are referred to herein as the "**Variable Fee**").

2.3.1.    In the scenario where the Eligible Party is BCG, the Percent Target Achieved: (i) will not be capped for the FY2019 Target incentive component or the FY2020 Target incentive component; and (ii) will be capped at 100% for the Run Rate Target incentive component. However, to encourage delivering value above and beyond the $200M APPI Target Amount, BCG will be entitled to earn (as part of the Variable Fee) 14% of any achieved APPI in excess of $200M, Notwithstanding anything in this Agreement to the contrary, in no event shall the total amount earned by BCG or payable by GameStop under this Agreement exceed 8.625% of the aggregate sum of (i) achieved TYPPI, (ii) achieved APPI and (iii) the lesser of (a) achieved NYPPI and (b) $140 million.  For the avoidance of doubt, the VG Caps provided for in Section 4.2.4 shall apply to, and thereby limit, achieved TYPPI, achieved NYPPI and achieved APPI.

2.3.2.    In the scenario where the Eligible Party is BCG, the amounts set forth below for the line item "Variable Fee Component Target Amount" represent the target amounts for each of the four components of the

THE BOSTON CONSULTING GROUP



Mr. Dan Kaufman
August 20, 2019
Page 6

Variable Fee and (ii) the amounts set forth below for the line item "Fixed Fee Component Amount" represent the fixed amounts payable on account of each of the four components of the Fixed Fee:

|  | 'FY2019 Target' incentive | 'FY2019 Adjusted Operating Earnings' incentive | 'FY2020 Target' incentive | 'Run-Rate Target' incentive |
|---|---|---|---|---|
| Variable Fee Component Target Amount | $7.0M | $5.6M | $7.7M | $7.7M |
| Fixed Fee Component Amount | $4.125M | $3.3M | $4.538M | $4.538M |

2.3.3.    In the scenario where the Eligible Party is a GameStop employee (except executive officers and international employees of GameStop), (i) the Fixed Fee shall be $0 for each of the four incentive components, (ii) the Variable Fee Component Target Amount for each of the four incentive components thereof and timing of payment applicable to each incentive component shall be determined by GameStop leadership, with input from BCG, and (iii) the Percent Target Achieved will be capped at 120% for each of the four incentive components or such higher percentage as GameStop may determine in its discretion. The intent is for the incentives of GameStop employees who are Eligible Parties under the Incentive Plan to be as closely aligned as possible to the incentives of BCG under the Incentive Plan.

2.4.    For further clarification, illustrative examples of the amounts that would be earned by BCG in specified scenarios in line with the formula specified in Section 2.3 are detailed in the grid attached to this SOW as **Exhibit B**.

2.5.    No GameStop employee shall be a third party beneficiary of this SOW or have any rights arising under this SOW.

## 3.    Timing of the effort and BCG professional fees

3.1.    The term of this SOW will be deemed to have commenced on April 29, 2019 and will end on January 30, 2021 (i.e., the last day of GameStop's 2020 fiscal year) unless extended in writing by the Parties or terminated earlier in accordance with Section 5 of this SOW or Section 2 of the Supplemental Terms.

3.2.



THE BOSTON CONSULTING GROUP



Mr. Dan Kaufman
August 20, 2019
Page 7



3.4. All market research expenses are additional and passed through at cost. If any of these are required during the Program and amount to a total over $100k, BCG will review them in advance with GameStop to secure GameStop approval upfront. Notwithstanding the foregoing, the market research expenses passed through at cost to GameStop shall not exceed $200k. BCG will coordinate with GameStop's Marketing team to assess the availability of existing market research, and leverage such research as appropriate. For clarity, market research expenses subject to this Section 3.4 are separate from the "BCG Fees and Expenses" (as defined in Section 5.1 of this SOW).

3.5. GameStop shall pay BCG invoices within thirty (30) days from the date of a valid invoice, ███████████

4. **Determinations of This-Year Predicted Profit Improvement (TYPPI), Next-Year Predicted Profit Improvement (NYPPI) and Annualized run-rate Predicted Profit Improvement (APPI)**

4.1.



Mr. Dan Kaufman
August 20, 2019
Page 8



4.2.

4.2.1.

4.2.2.

4.2.3.

4.2.4.



Mr. Dan Kaufman
August 20, 2019
Page 9



4.2.5.    TYPPI, NYPPI and APPI will be determined by projecting the tangible financial benefit of organizational changes, improved vendor funding and costs, assortment changes, price adjustments and other levers, into standard financial variables applicable to measurement of profitability (e.g., volume, sales, margin rate, supplier funding, decreased write offs, investment impact, etc.), and then subtracting any recurring costs and expenses associated with capturing those benefits (e.g., profit decreases due to SKU rationalization, etc.).

In addition, other general improvements to profitability within Workstreams such as, but not limited to, the ones listed below shall count towards TYPPI, NYPPI and APPI:

- Tangible financial benefits stemming from improving payment terms;
- Tangible financial benefits stemming from reducing working capital and inventory;
- Tangible financial benefits stemming from stopping business-related activities
- Tangible financial benefits stemming from shutting down or selling businesses.

Additional provisions in this Section 4.2 and in Section 4.3 provide additional examples of typical sources of profitability improvement, as well as details on how TYPPI, NYPPI and APPI will be measured for each of the Workstreams.

4.2.6.    



Mr. Dan Kaufman
August 20, 2019
Page 10

4.2.7. ████████████████████████████████████████████████████
████████████████████████

• ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████
████████████████████████

•

████████████████████████████████████████████████████
████████████████████████████████████████████████████
██

████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████
████████████████████████████████████████████

4.2.8. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

4.2.9. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

4.2.10. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

4.2.11. ████████████████████████████████████████████████████
████████████████████████████████

4.2.12. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████



Mr. Dan Kaufman
August 20, 2019
Page 11

4.2.13.



4.3.    For better clarity and specificity, the following subsections provide additional examples of typical sources of profitability improvement, as well as details on how TYPPI, NYPPI and APPI will specifically be measured for each of the Workstreams:

    4.3.1.    **For Org Efficiency & Effectiveness:** Measurement of TYPPI, NYPPI and APPI will be made by assessing the difference in fully loaded, end-state cost of the General Office and Field Management teams relative to the organizational baseline, for US GameStop Entities. The organizational baseline will include open roles or planned organizational investments as of the baseline date, as established in April 2019. Organizational cost will be determined as the sum of base compensation, benefits, and annual incentives/bonuses, but exclude any long-term cash or non-cash incentives. TYPPI, NYPPI and APPI for Org Efficiency & Effectiveness will not include any one-time costs of the organizational transformation, including severance or other employee assistance programs.

    As examples, the following shall be taken into account in the computation of TYPPI, NYPPI and APPI except insofar as they relate to Out of Scope Activities:

        •    Reductions in fully loaded cost due to

        •    Reduction in fully loaded cost due to
        •    Changes in fully loaded cost due to

        •    Changes in fully loaded cost resulting from

    4.3.2.    **For CPI:** Measurement of TYPPI, NYPPI and APPI will be made by projecting the tangible financial benefits of improved cost, vendor funding, assortment changes, sales and volume improvements, etc. into standard financial variables that affect category profitability (e.g., volume, sales, margin rate, supplier funding, etc.), and then subtracting any recurring and jointly agreed-upon non-recurring costs, expenses and investments associated with capturing those benefits (e.g., profit decreases due to SKU rationalization, reduced vendor funding from a change in volume, etc.).The BCG and GameStop teams



Mr. Dan Kaufman
August 20, 2019
Page 12

will work together at the onset of each initiative to develop the baseline from which to calculate savings.

As examples, the following shall be taken into account in the computation of TYPPI, NYPPI and APPI:

- Multi-year deals based on annual average over the duration of the deal;
- Profit improvement from ████████████ ;
- Voiding or delaying ████████ ers;
- Any change in ████████████████████████ ;
- Impact of ████████████████████ t;
- Profit improvement from promo changes (activity or funding) resulting from ████████ ████████ ;
- Private label tactical moves such as ████████████████ ;
- Agreement compliance: gaining greater compliance to existing agreements;
- Pricing moves on ████████ ;
- Capital spend reductions annualized based on their respective depreciation schedules
- Inventory reductions multiplied by GameStop's cost of capital;
- 1-time payments to GameStop ████████████████████████ .

4.3.3.  **For Indirect Procurement:** Measurement of TYPPI, NYPPI and APPI will be made by estimating the tangible financial benefits of improved cost and sourcing changes into standard financial variables that affect profitability, and then subtracting any recurring costs associated with capturing those benefits (e.g. additional labor, lower rebate driven by a reduction in volume, etc.). The BCG and GameStop teams will work together at the onset of each initiative to develop the baseline from which to calculate savings.

As examples, the following shall be taken into account in the computation of TYPPI, NYPPI and APPI:

- Profit improvement from ████████ 
- Demand management: ████████████████ 
- Specification changes: ████████████████ 
- Agreement compliance: gaining greater compliance to existing agreements
- ████████████████████ 
- Process changes: measureable and quantifiable benefits
- Voiding or delaying ████████ 
- Capital spend reductions annualized based on their respective depreciation schedules
- 1-time payments to GameStop ████████████████ 

4.3.4.  **For Pricing:** ████████████████████████████ 
████████████████████████████████████ 
████████████████████ 

████████████████████████████████████ 
████████████████████████████████████ 
████████████████ 
████████████████████ :



Mr. Dan Kaufman
August 20, 2019
Page 13



4.3.5.  **For Pre-owned Electronics Strategy**: Measurement of TYPPI, NYPPI and APPI will be made by projecting the tangible financial benefit of any financial and operational levers used to improve the performance of the pre-owned electronics business (increase in trade-in volume, increase in pre-owned electronics sales, better price realization, improved terms with wholesalers, etc.) into standard financial variables that affect profitability, and then subtracting any recurring costs, expenses and investments associated with capturing those benefits (e.g. additional labor, additional store associates' incentives, marketing investment to drive awareness, etc.).

This will be done by extrapolating the impact of changes made on a partial scale (i.e. "**Field Tests**") to the full business. The value associated with the full-business extrapolation is what will be considered in determining TYPPI, NYPPI and APPI. The BCG and GameStop teams will work together at the onset of each initiative to develop the baseline from which to calculate savings.

For the purpose of assessing the impact of the Field Tests, the methodologies described in Sections 4.3.4.1 and 4.3.4.2 apply.

4.3.6.  **For Global Enterprise**: This Workstream will encompass a broad range of levers similar to the ones listed above, but applied to GameStop's global portfolio. Given this, measurement of TYPPI, NYPPI and APPI for this Workstream will be measured using the same methodologies described above, depending on which specific levers are at play.

In a scenario where business operations that are operating at a loss are stopped or reduced as an outcome of this Workstream, it is agreed that the avoidance of the operating loss that GameStop would have incurred throughout FY2020 from such business operations but for such cessation or reduction will count as a positive impact towards NYPPI and APPI, and, if applicable, the avoidance of the operating loss that GameStop would have incurred in FY2019 from such business operations but for such cessation or reduction will count as a positive towards TYPPI. The projected avoided operating loss will be based on FY2020 momentum EBIT projections before profit improvement initiatives, as assessed in PWC's Quality of Earnings report, and subject to a cap and floor of +/-20% from the BCG momentum case shown in the table below.



Mr. Dan Kaufman
August 20, 2019
Page 14

| EBIT $m | Min (-20%) | Momentum | Max (+20%) |
|---------|-----------|----------|-----------|
| France | 4.7 | 5.9 | 7.0 |
| Italy | -18.4 | -15.4 | -12.3 |
| DACH | -26.5 | -22.1 | -17.7 |
| Ireland | -6.0 | -5.0 | -4.0 |
| Nordics | -20.1 | -16.8 | -13.4 |
| Europe | -66.4 | -53.4 | -40.3 |

In a scenario where business operations are sold as an outcome of this Workstream, the contribution, if any, of the sale to TYPPI, NYPPI and APPI, as applicable, shall be (without duplication) the avoidance of operating losses as calculated above of each region sold (as offset by any positive EBIT of any region sold as calculated above), plus an equivalent profit contribution from the sale, which shall be the higher of (a) actual trailing 12-month EBITDA last reported prior to execution of the binding sales agreement and (b) the transaction Enterprise Value ("Sales Price") divided by 2.5. In the case where GameStop makes a contribution to the buyer in any sale transaction (rather than receive a sales price), the Sales Price will be deemed to be $0 for purposes of this calculation.

The profit impact for TYPPI and NYPPI will be assessed based on the timing of the sale or exit, taking into account seasonality and other business factors. The trigger point for recognition of operating losses avoided of any region as a contribution to TYPPI, NYPPI and APPI shall be the earlier of (i) execution of a binding sale agreement that contemplates the sale of such region, or (ii) the start of administrator proceedings with respect to such region. The trigger point for recognition of any profit contribution from a sale in accordance with the foregoing paragraph shall be the consummation of the sale transaction. In the case of an orderly wind-down, the profit improvement is phased in line with the avoided losses as operations are downsized. Profit improvement through growth, commercial, operations, org or indirect cost initiatives will be included in TYPPI and NYPPI for the period before a sale or exit event, but shall be excluded from APPI.

Non-recurring costs, expenses, advisor fees, employee incentives and investments are not included in the calculation of profit improvement.

For levers outside of the ones described above, GameStop and BCG will work together to define a fair assessment of the TYPPI, NYPPI and APPI.

4.3.7. **For Video Game Ecosystem, OEM/Publisher Partnerships**: Given the variety of profit expansion levers and new revenue models to be considered in this Workstream, the measurement framework for this Workstream will need to retain some flexibility.

For this Workstream, measurement of TYPPI, NYPPI and APPI will be tentatively made by projecting tangible financial benefits of any financial and operational levers used to improve the performance of the Video Game software and hardware business (increase in revenues, revised revenue agreements with OEMs and publishers, improved vendor terms, etc.) into standard financial variables that affect profitability, and then subtracting any recurring costs and expenses associated with capturing those benefits.

GameStop and BCG will work together throughout the effort to develop and refine the baseline from which to calculate this Workstream' savings and profit improvements.

4.3.8. **For Loyalty**: measurement of TYPPI, NYPPI and APPI will be made by projecting the tangible financial benefit of any financial and operational levers used to improve the margin generated from our loyalty program members. The levers used will be primarily focused on the pricing structure and



Mr. Dan Kaufman
August 20, 2019
Page 15

benefits of our Loyalty program, as well the personalization of marketing and promotional offers to GameStop loyalty program members. We expect those levers to generate, for the loyalty members affected, increases in spend, increases in trip frequency, increases in online sales, better response to promotional offer, etc., which will then be translated into standard financial variables that affect profitability, and then subtracting any recurring costs and expenses associated with capturing those benefits (e.g. marketing investment, etc.).

The final sizing of the impact will be done by extrapolating the impact of changes made on a partial scale (i.e. "Field Tests" on a representative set of loyalty program members) to the full business. The value associated with the full-business extrapolation is what will be considered as the APPI, and adjustments based on the expected timing of the full-business implementation will be made in order to calculate the TYPPI and NYPPI. The BCG and GameStop teams will work together at the onset of each initiative to develop the baseline from which to calculate savings.

For the purpose of assessing the impact of the Field Tests, the methodologies described in Sections 4.3.4.1 and 4.3.4.2 apply.

4.3.9.   **Other Margin Expansion Levers**: Given the potential breadth and variety of levers to be considered in this Workstream, GameStop and BCG agree to jointly work together throughout the effort to develop the right measurement methodologies and to agree on a set of realistic assumptions most likely to reflect the future state and performance of the businesses impacted, as well as define a fair baseline from which to calculate savings and profit improvements.

5.   **Triggering Events**

5.1.   Upon a GameStop Triggering Event that has had or could reasonably be expected to have a material adverse impact on BCG's or GameStop's capacity to achieve the objectives of the Program, then BCG may, within 40 days from the occurrence of the Triggering Event, elect in writing to convert (in whole but not in part) its entitlement to compensation based on the Fixed Fee or Variable Fee, as the case may be, to a "time and materials" compensation arrangement and, in the event of such an election, BCG will invoice GameStop on a monthly basis for all BCG fees at BCG's standard rates (plus a 13% mark-up on such standard rates) in full satisfaction of any and all of BCG's services and out-of-pocket expenses (collectively, "**BCG Fees and Expenses**") incurred in connection with its services under this SOW, but in no event shall the aggregate amount of BCG Fees and Expenses for Services rendered through the period ending January 31, 2020 exceed $35M unless the Parties otherwise agree in writing. In the event of an election by BCG as described in this Section 5.1., then all amounts previously paid by GameStop to BCG under this SOW shall be a credit against, and offset dollar-for-dollar, the amounts payable by GameStop on account of BCG Fees and Expenses. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.2.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.3.   ▮▮▮▮▮▮▮

5.3.1.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Mr. Dan Kaufman
August 20, 2019
Page 16



5.3.2.

5.4.

## 6.    Additional Provisions – "CPI Code of Conduct"

BCG often provides support to its retail clients to help drive general category profitability improvement. Improvements in category performance result from changes in macro or micro space allocation, brand mix (including private label), assortment, pricing/promo, as well as negotiated improvements to product costs.

Determining sound recommendations typically requires substantial analysis concerning category/SKU/brand economics, insights on market dynamics, competitive benchmarking, and consumer research to understand purchase behavior and brand preference.

Attached as **Exhibit C** to this SOW is the "Code of Conduct for Category Performance Improvement (CPI) cases" document that governs the activities of BCG case teams regarding appropriate methodologies, the vendor negotiations process, staffing rules, and other topics that can raise issues in CPI initiatives. It also includes several guidelines to be understood and agreed upon by BCG's clients to ensure that BCG's support on these efforts remain fully consistent with BCG's values and overall organization-wide Code of Conduct.

## 7.    Working with BCG: Supplemental Terms

This SOW is subject to the Supplemental Terms under which BCG will operate; provided that in the event of an inconsistency between terms of this SOW and terms of the Supplemental Terms, the terms of this SOW shall control.

THE BOSTON CONSULTING GROUP



Mr. Dan Kaufman
August 20, 2019
Page 17

Dan,

We are very excited to support you and the entire GameStop leadership team on this effort. We are confident in our ability to add significant value to the business and help fund GameStop's transformation journey.

Best regards,

Christopher Cromer
*Partner and Managing Director*
*Boston Consulting Group*

Brian Harris
*Senior Partner and Managing Director*
*Boston Consulting Group*

David Welch
*Partner and Managing Director*
*Boston Consulting Group*

Accepted for GameStop Corp.:

Signature

Name          George Sherman

Title         CEO

Date          8/20/2019

\*\*\*

THE BOSTON CONSULTING GROUP



**BCG Standard Terms**

The following terms (these "**Terms**") apply to the provision of services by BCG to the Company as set out in the Statement Of Work. Capitalized terms have the meanings ascribed to each of them in the body of these Terms or as set out in Schedule 1.

1. **SERVICES**

   1.1. **Contract Formation**. By signing the Statement Of Work, the Company engages BCG to provide, and BCG agrees to provide, the Services to the Company as described in such Statement Of Work (the "**Engagement**"). The Statement Of Work and these Terms together constitute the "**Agreement**" in respect of the Engagement between the Company and BCG. In the event of conflict between these Terms and the Statement Of Work, the provisions of the Statement of Work will prevail.

   1.2. **Provision of Services.** BCG will provide the Services for the Engagement in accordance with the Agreement. BCG will perform the Services with reasonable care and skill in a proper and professional manner consistent with industry best practice. Any claim by the Company against BCG under this paragraph must be made within one year from the end of the Term of the Engagement.

   1.3. **Company responsibilities.** The Company agrees to cooperate in the delivery of the Services, Deliverables and any BCG Tools and, in furtherance of the foregoing, will (a) provide data about the Company's needs, business, operations, personnel, customers, technology and/or Company data, as necessary for BCG to successfully deliver the Services; (b) provide materials and services such as office space, furniture, facilities, and utility services, as required and maintain such materials or services during the Term; (c) provide access to the Company's computer network and software to the extent necessary to perform the Services; (d) provide timely iteration, feedback and approvals of goals, timelines, requirements and outputs; (e) to the extent within the Company's control, cooperate with BCG to ensure that the Services are performed in accordance with laws and regulations applicable to Company; and (f) provide such other reasonable assistance as necessary for BCG to successfully deliver the Services.

   1.4. **BCG Relief.** BCG will not be responsible for any delay, failure to perform, or alteration of the Services or Deliverables, or any loss or corruption of Company Data due to: (a) any breach by the Company of the Agreement, including any failure by the Company to comply with its obligations under Section 1.3 of these Terms, or (b) the occurrence or continuation of any Force Majeure Event.

   1.5. **Use of Subcontractors and Third-Party Suppliers**. The Company consents to BCG's use of subcontractors, as well as third party consultants and experts to provide the Services, Deliverables and/or the BCG Tools; and agrees that BCG may subcontract, outsource, or otherwise delegate responsibility for the performance of the Services in whole or in part. Any subcontractors or third party consultants or experts BCG uses to perform the Services will be under BCG's direction and will comply with all applicable provisions of the Agreement. BCG shall be solely responsible for any breach of the Agreement by any such subcontractors or third party consultants or experts.

2. **TERM AND TERMINATION**

   2.1. **Term.** The term of the Engagement (the "**Term**") is as set out in the Statement Of Work, unless terminated earlier pursuant to Section **2.2** (Termination) of these Terms or Section 5 of the SOW.

   2.2. **Termination**.

      2.2.1. The Engagement may be terminated by either Party prior to the end of the Term immediately upon written notice by such Party to the other Party, if the other Party (a) commits a material breach of the Agreement, and, where such breach is capable of remedy, the breaching Party fails to remedy that breach within a period of 30 days after being notified in writing to do so; (b) suffers an Insolvency Event; or (c) suspends or ceases to carry on all or a substantial part of its business or disposes of all its assets or a substantial part of its business. The foregoing

THE BOSTON CONSULTING GROUP



30-day period shall not commence until the applicable Party provides the other Party with a description in reasonable detail of the breach.

2.2.2. Where a Force Majeure Event continues for 30 days and has a material adverse impact on the Company's or BCG's capacity to achieve the objectives of the Agreement (as described in the Statement of Work), if the Parties are unable to agree to a revision of the terms of the Agreement within 30 days of such Force Majeure Event occurring, either Party may terminate the Agreement immediately upon written notice. Neither party shall be in breach of the Agreement nor liable for delay in performing, or failure to perform, any of its obligations under the Agreement if such delay or failure results from a Force Majeure Event.

2.2.3. The Engagement may also be terminated by the Company notwithstanding the absence of a circumstance covered in Section 2.2.1 or 2.2.3 at any time and for any reason on thirty days' prior written notice.

2.3.    **Effect of Termination**.

2.3.1.

2.3.2.



2.4.    Upon the expiration or termination of the Engagement, the Company's right to use the BCG Tools will immediately terminate unless renewed or extended by express written agreement of BCG.

3.    **INTELLECTUAL PROPERTY RIGHTS**

3.1.    **Pre-Existing Intellectual Property Rights.** Each Party owns and retains all rights, title and interests in and to its respective Pre-Existing Intellectual Property and Independent Intellectual Property.

3.2.    **Deliverables**.

3.2.1. Subject to Sections 3.1 and 3.3 of these Terms and upon payment of the Fees, BCG hereby (a) assigns to the Company the copyright in the Deliverables except for any Third Party Materials; and (b) to the extent the Deliverables contain any of BCG's Pre-Existing Intellectual Property or Third Party Intellectual Property, BCG grants to the Company and any Permitted Users, a worldwide, non-exclusive, non-transferable and non-sub-licensable, fully paid, license to use and copy such Pre-Existing Intellectual Property and Third Party Intellectual Property solely for the purpose of the Company using the Deliverables internally,



as contemplated by the Proposal and in accordance with the Agreement. Any films, sound and video recordings contained within the Deliverables which are owned or licensed by third parties will be referred to as **"Third Party Materials"**. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Company will have the right to copy, perform, use, transmit, broadcast, edit any segments of the Third Party Materials contained within the Deliverables as specified in the Statement Of Work. The Company agrees to comply with any licensing restrictions imposed by third parties regarding its use of the Third Party Materials within the Deliverables as notified by BCG to the Company in the Statement of Work or as mutually agreed by the parties in writing.

3.2.2.    The Company acknowledges and agrees that the Deliverables are prepared solely for the Company's internal use. The Company will not disclose the Deliverables or make the Deliverables available for use by any third party without the prior written consent of BCG, not to be unreasonably withheld, other than contractors or agents hired by and working at the direction of Company who have a need to use the Deliverables to perform services for Company. The Company will procure that any third party to which it wishes to disclose the Deliverables or any other BCG materials or work must first sign BCG's standard form of non-reliance letter. BCG can provide the Company with a copy of this form upon the Company's request. If BCG agrees to the Company disclosing the Deliverables to third parties, the Company agrees that BCG will not be responsible for any Losses incurred by the Company or any third party as a result of or in connection with such disclosure, or the third party's use of, or reliance on the Deliverables or any other aspect of BCG's work.

3.3.    **Company Data**.

3.3.1.    Company owns the Company Data and all rights, title and interest in and to any and all proprietary rights in the Company Data will remain with and be the exclusive property of the Company.

3.3.2.    Company hereby grants to BCG a worldwide, non-exclusive, fully paid license (including the right to grant sublicenses to BCG's Affiliates, subcontractors and consultants performing services for BCG under the applicable Engagement, provided in each case that the Affiliate, subcontractor or consultant has agreed in writing to protect the confidentiality of the Company Data), to access, use, copy, display, perform, store, host, retrieve, anonymize, process, aggregate, mine, analyze, and modify the Company Data, and to compile, combine or incorporate such Company Data with or into other data and information▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Company will obtain all rights necessary and permissions as is relevant or necessary for such purposes, and to the extent required, notify any individuals or entity who own or have an interest in Company Data to ensure that BCG can access and use Company Data in accordance with this Section 3.3 for the purposes of the Engagement. The Company acknowledges that BCG may use, and upload Company Data to, a secure cloud based solution and/or cloud-based file storage and sharing solutions when providing Services to the Company; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.4.    **BCG Tools**.

3.4.1.    BCG and/or BCG's licensors own and retain all rights, title and interests in and to or relating to the BCG Tools. BCG grants to the Company and any Permitted Users a limited, worldwide, non-exclusive, non-transferable, non-sub-licensable, revocable, license, to access and use the BCG Tools and to access, use and make a reasonable number of copies of the User Manual, in each case solely for Company's internal business purposes. These rights are conditional on Company having paid any applicable subscription fees and any related taxes, if any, as further detailed in the Statement Of Work.



3.4.2.    BCG agrees that it will: (a) give the Company a technical introduction to the Tool(s) to be licensed; (b) provide reasonable maintenance and technical support, pursuant to BCG's standard maintenance and support policies then in effect and as described in the Statement Of Work; and (c) to the extent the BCG Tools are used to process any Company Data, take commercially reasonable measures to protect such Company Data, which measures will be no less than the measures BCG takes to protect its own data. The Company acknowledges and agrees that, notwithstanding BCG taking reasonable security measures, which ensure a level of security appropriate to the risks inherent in its processing activities BCG cannot and does not guarantee the privacy, security, integrity or authenticity of any information, including but not limited to any Company Data, transmitted over or stored in any system connected to the Internet.

3.4.3.    The Company acknowledges and agrees that the BCG Tools and User Manual are made available to the Company for its internal use only. The Company agrees that it will: (a) limit access to the BCG Tools and User Manual to the Permitted Users; (b) not provide access to the BCG Tools or User Manual to any of Company's contractors or consultants, or to any other third party, without BCG's prior express and written consent; (c) be solely responsible for any breach of the Agreement by any of the Permitted Users, or any contractors, consultants or other Third parties to whom the Company gives access to the BCG Tools or User Manual; and (d) not decompile, disassemble, reverse engineer or otherwise attempt to obtain or modify the source code of the BCG Tools or otherwise reduce to human perceivable form all or any part of the BCG Tools for any reason.

3.4.4.    Company will be solely responsible, and BCG will bear no responsibility for (a) correctly inputting Company Data to the BCG Tools; (b) decisions regarding data input (e.g., field definitions) in respect of the processing of Company Data by the BCG Tools; (c) the quality of, or errors or omissions in, Company Data; (d) the Company's choices with regard to configuring the BCG Tools' options (e.g., filters and groupings); (e) the Company's interpretation of the reports generated through the BCG Tools. Company warrants that, it shall use its commercially reasonable endeavors to ensure that all Company Data inputted to the BCG Tools will be free of any bugs, viruses or other malware.

3.4.5.    During the term of the Engagement, the Company grants BCG a license to use any of the Company's Intellectual Property required to perform the Services, provide the Deliverables and/or the BCG Tools, as contemplated by the Statement Of Work or as mutually agreed in writing by the Parties.

3.4.6.    BCG will own and retain all rights, title and interests in and to any and all Aggregate Data, including the rights to develop, test, maintain, improve, modify, create derivative works from, distribute, and otherwise commercialize Aggregate Data.

3.4.7.    Should a BCG Tool be utilized in the course of the Engagement, Company agrees to allow BCG to remotely collect, maintain, process, and use diagnostic, technical, usage and other related information with the aim of improving the applicable BCG Tool for any reason and in any way BCG sees fit, including, but not limited to, product enhancements or security evaluations. Any materials or data collected by BCG used to improve the BCG Tools or service offerings will be stored and used in a way that does not identify the source.

## 4.    FEES AND PAYMENT

4.1.    **Fees**.  The Company will pay to BCG the fees and any expenses for the performance of the Services as and to the extent set out in the Statement Of Work (the "**Fees**"), subject to Section 2.3 of these Terms.

4.2.    **Payment**. Timing of payment of the Fees is set forth in the Statement Of Work.

4.3.    **Taxes**. The Fees do not include the following taxes, and BCG will charge, and the Company will pay, if applicable, the following taxes: Sales, Harmonized Sales Tax (HST), Goods and Services Tax (GST),



Value Added Tax (VAT). In no event shall the Company be responsible for any income or franchise taxes of BCG or be charged by BCG for any taxes not otherwise expressly set forth in the immediately preceding sentence.

5.    **CONFIDENTIALITY**

5.1.    **Confidentiality**. Each Party will keep confidential and, save as set out in Sections **5.3** and **5.4** of these Terms, will not disclose to any third party, any Confidential Information of the other Party.

5.2.    **Exclusions**. Confidential Information will not include any information that (a) is previously known to the receiving Party without an obligation not to disclose such information or was previously in its possession; (b) is acquired by a receiving Party from a third party which was not, to the receiving Party's knowledge, under an obligation not to disclose such information; or (c) which the receiving Party can demonstrate was independently developed by or for the receiving Party without reliance on any Confidential Information of the other Party; or (d) becomes publicly known and made generally available, through no breach of the Agreement; or (e) consists of Aggregate Data, provided that such Aggregate Data will neither identify the disclosing Party as the source of any component of the Aggregate Data nor categorize information in a manner that would permit a third party to reasonably infer that any component of the Aggregate Data relates specifically to the disclosing Party.

5.3.    **Permitted Use**. Each Party may use or make copies of the Confidential Information of the other Party only to the extent reasonably necessary for purposes of performing or consuming the Services or for the Parties' discussions regarding actual or potential services. Each Party will protect the Confidential Information of the other Party in the same manner it protects the confidentiality of its own Confidential Information, but in no event using less than a reasonable standard of care. Each Party will restrict access in and to the Confidential Information of the other Party to those of its personnel (including personnel employed by its Affiliates) and subcontractors engaged in the performance, management, receipt, support, or use of the Services for the applicable Engagement. Such access is permitted provided that such personnel and third parties are bound by obligations of confidentiality substantially similar to the confidentiality provisions under these Terms.

5.4.    **Legal Proceedings**. If either Party receives a subpoena or other legal or judicial process requiring disclosure of the Confidential Information of the other Party, it will, to the extent legally permitted, promptly notify the disclosing Party. If requested by the disclosing Party, and to the extent legally permitted, the receiving Party will reasonably cooperate with the disclosing Party (at the disclosing Party's expense) to oppose such disclosure.

5.5.    **Company Personal Data**. For the purposes of the Agreement the following terms "**controller**", "**process**" and "**processor**" will have the meanings as given to them in the Directive and GDPR when it becomes applicable. The nature of the Services may require the Company to provide Company Personal Data to BCG or for BCG to collect or process Company Personal Data as a processor on Company's behalf. To the extent that BCG processes Company Personal Data on the Company's behalf as a processor in connection with the performance of the Services, Company and BCG agree to enter into a data processing agreement incorporating the terms required under article 28 of GDPR. Company as a controller alone will determine the purposes for which, and the manner in which, Company Personal Data is, or is to be, processed in the performance of the Services. When providing any Personal Data, Company confirms that it is doing so in accordance with all applicable data protection legislation including without limitation GDPR. BCG warrants that (i) it has implemented appropriate technical and organizational measures to protect Company's Personal Data against accidental or unlawful destruction, loss or alteration, unauthorized disclosure or access, and any other unlawful from of processing and (ii) it will take appropriate and reasonable precautions, using commercial grade anti-virus and malware recognition programs, to screen the Deliverables and the Services and any other websites owned or operated by BCG to conduct, market or promote its activities, for viruses and other malware, and to cause the Services and Deliverables and such websites to be free of any Disabling Devices (as defined below) or other malware. For purposes hereof, "Disabling Device" means any malware or other computer code (i) that is designed to disrupt, disable, harm, or otherwise impede in any manner the operation of any software program or code, or any computer system or network (commonly referred to as "malware", "spyware", "viruses" or "worms"); (ii) that would disable or impair the operation thereof

**BCG**

or of any software, computer system or network in any way based on the elapsing of a period of time or the advancement to a particular date or other numeral (referred to as " time bombs", "time locks", or "drop dead" devices); (iii) that is designed to or could reasonably be used to permit BCG or any third party to access any computer system or network (referred to as "trojans", "traps", "access codes" or "trap door" devices); or (iv) that is designed to or could reasonably be used to permit BCG or any third party to track, monitor or otherwise report the operation and use of any software program or any computer system or network by Customer, its customers, or contractors.

## 6.    WARRANTIES AND DISCLAIMER

6.1.    **Representations and Warranties**. Each Party represents and warrants that (a) it has the right, power, and authority to execute and deliver the Statement Of Work and to perform the Engagements and to fulfil any obligations set out in the Statement Of Work; and (b) the Statement Of Work, when duly authorized, executed, and delivered by such Party, constitutes the legal, valid, and binding obligation of such Party, and is enforceable against such Party in accordance with its terms. Company represents and warrants that (a) it has all necessary consents to allow BCG to use any and all Company Data; and (b) it will use the Services and/or the Deliverables in a manner consistent with the Agreement.

6.2.    **Warranty Disclaimer**. Except as otherwise expressly set forth in these Terms, BCG makes no express warranties of any kind. BCG hereby expressly disclaims, to the fullest extent permitted by applicable law, on its own behalf and on behalf of its third party suppliers, all express, implied and statutory warranties, including, but not limited to, any implied warranties of merchantability, fitness for a particular purpose, reliability, timeliness, quality, suitability, availability, accuracy or completeness and title. This section will survive the termination or expiry of any applicable Engagement.

## 7.    INDEMNITY

7.1.    BCG indemnifies, defends and holds the Company harmless from any actual or threatened claims, and any Losses incurred by the Company (including as a party or witness in any claim), arising from or related to (i) any claim by a third party that the Company's use of the Deliverables (including any Third Party Materials) or BCG Tools as contemplated by the applicable Proposal infringes any third party intellectual property right, provided always that the Company's use of such Deliverables and BCG Tools is in compliance with the Agreement and (ii) a breach of Section 5 of these Terms. If the Company's use of the Deliverables or BCG Tools as contemplated by the applicable Proposal and in accordance with the Agreement does infringe any third party intellectual property right, the Company agrees that BCG may take one of the following actions (at BCG's option): (i) procuring the Company's continued full use of the Deliverables as contemplated by the Engagement; (ii) substituting the infringing Deliverables for non-infringing Deliverables; or (iii) modifying the Deliverables appropriately so that they be non-infringing. This remedy will not apply if the Company is using any modified version of a Deliverable or BCG Tool that was not approved by BCG; if the Company uses the Deliverable or Tool for a purpose other than that contemplated by the Engagement; or if the Company uses a Deliverable or Tool in a manner not compliant with the Agreement.  The Company will use all reasonable endeavors to mitigate its Losses, arising out of any third party Intellectual Property Rights claim in accordance with this Section 7.1.

7.2.    The Company indemnifies, defends and holds BCG and BCG's Affiliates harmless from any actual or threatened claims, and any Losses incurred by BCG or its Affiliates (including as a party or witness in any claim), arising from or related to a) any disclosure of the Deliverables by the Company to a third party, or any use of, or reliance on, the Deliverables by such third party; (b)  any third party claim that BCG's use of the Company's Intellectual Property or Company Data in performance of the Services breaches any third party intellectual property right or the confidentiality of any third party, provided always that BCG's use of such Company's Intellectual Property or Company Data is in compliance with the Agreement; (c) any damage caused to the BCG Tools as a result of the inputting to, or processing of, Company Data by the BCG Tools (including but not limited to as a result of any  bug, virus or other malware contained in such Company Data and (d) a breach of Section 5 of these Terms by the Company.

THE BOSTON CONSULTING GROUP



7.3.    In the event that ▬▬▬ (the "producing Party") is required to produce documents, testify or otherwise serve as a witness in the context of legal disputes between the other Party (the "defendant Party") and other third parties and/or governmental investigations, the defendant Party agrees that, in such event, defendant Party will pay all reasonable out of pocket costs and fees that producing Party or its Affiliates incur to satisfy these obligations, including but not limited to reasonable fees for the retention of legal counsel to aid producing Party's or its Affiliates' compliance with such obligations. Such expenses will be incurred by producing Party or its Affiliates, and such amounts will be payable by the defendant Party, only after consultation between producing Party or its Affiliates and the defendant Party and will not include any costs incurred as a result of misconduct by producing Party or its Affiliates or any of their employees.

7.4.    Each Party's indemnification obligations will be contingent upon the indemnified party providing the indemnifying Party with prompt written notice of any claims such party seeks to have indemnified; provided that any failure to so notify will not limit any of the obligations of the indemnifying Party under this Section, except to the extent such failure materially prejudices the defense of such claims. A party seeking an indemnity will give the indemnifying Party sole authority to defend or settle the relevant claim and provide, at the indemnifying Party's expense, such information and cooperation as may be reasonably necessary to assist the indemnifying Party's defense of such claims. Each Party agrees on behalf of itself, and where applicable, on behalf of its Affiliates, that no settlement agreement will be entered into on terms that would impose liability on the other or increase its obligations hereunder, without the prior written consent of the other Party (not to be unreasonably withheld). Each Party's respective indemnification obligations do not apply to the extent any claim, loss, expense or the like is caused by the party seeking indemnification (or its subsidiaries, affiliates, shareholders, directors, officers, employees or agents), or arises as a result of such Party's breach of the Agreement.

## 8.    LIMITATION OF LIABILITY

8.1.    Subject to Section 8.4 of these Terms, in no event will either Party be liable to the other Party for any special, exemplary, incidental, or consequential damages, or for any direct or indirect loss of data, profits, goodwill, whether arising out of contract, tort (including negligence), strict liability or otherwise, resulting from or related to an Engagement (whether or not such party knew of should have known of the possibility of any such damages).

8.2.    Subject to Section 8.4 of these Terms, under no circumstances will either Party's aggregate liability to the other for any and all claims (including third party claims) arising from or in connection with or relating to the Engagement (whether in contract, tort (including negligence), strict liability or otherwise) exceed an amount equal to ▬▬▬▬▬▬▬▬ .

8.3.    Subject to Section 2.3 of these Terms, nothing herein limits the Company's obligation to pay BCG the Fees for Services rendered and Deliverables supplied.

8.4.    In respect of either Party, nothing in these Terms limits or excludes such Party's liability for: (i) personal injury or death suffered by the other Party caused by such Party's negligence; (ii) fraud; or (v) any matter for which it would be illegal for such Party to exclude or limit or to attempt to exclude or limit its liability under applicable law.

## 9.    GENERAL PROVISIONS

9.1.    **Diversity.** BCG believes that diversity contributes to excellence.  As a matter of policy, BCG staffs its teams with an appropriate mix of consultants from its offices around the world, without regard to gender, race, sexual orientation, religion or other protected class and/or characteristics.

9.2.    **Compliance with Law**. The Parties will comply with all laws and regulations applicable to their respective businesses including without limitation, all privacy, database, copyright, trademark, patent, trade secret, export and Anti-Bribery Laws.  Without limiting this provision, the Company will not permit the Services, Deliverables and/or BCG Tools to be used by any person or entity located in a jurisdiction that is subject to any export restrictions or which is otherwise barred from using the

Services, Deliverables and/or BCG Tools under applicable law, unless prior written authorization is obtained from the appropriate governmental or regulatory agency, and if so authorized, the Company will comply with the terms of such authorization. Additionally, the Company agrees to operate and utilize the Services, Deliverables and/or BCG Tools in a manner that complies with all laws and regulations that pertain to its and its Affiliates' operations and industries.

9.3.    **Dispute Resolution.** If any dispute arises out of or in connection with the Engagement, either Party will be entitled to refer the dispute by written notice (a "Dispute Notice") for resolution by the Parties' respective project managers who will meet to resolve the dispute within 15 Business Days of the date of such notice. If the Parties fail to resolve the dispute within 15 Business Days of the date of the date of the Dispute Notice, the dispute will then be automatically referred to a senior representative of each Party, who will meet to resolve the dispute within 30 Business Days of the date of the Dispute Notice. If the dispute cannot be resolved in accordance with this Section **9.3** within 30 Business Days of the date of the Dispute Notice, either Party may start proceedings in accordance with Section **9.6**. Nothing in these Terms will limit or in any way restrict the ability of either Party to seek injunctive or other equitable relief in a court or other judicial body. References to "**Business Day**" in these Terms means any day other than a Saturday, Sunday or legal holiday in the United States or a day on which banking institutions are authorized or required by law to close in New York, New York.

9.4.    **No Publicity.** Except as required by law or regulation, neither Party will make any public announcement nor press release regarding any Proposal nor any activities performed under it without the prior written consent of the other Party. Except as required by law or regulation, no reference may be made to BCG in any prospectus, proxy statement, offering memorandum or similar document or materials prepared for public distribution.

9.5.    

9.6.    **Governing Law.** The Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

9.7.    **Severability.** The provisions of the Agreement will be deemed severable, and the invalidity or unenforceability of any one or more of its provisions will not affect the validity and enforceability of its other provisions. If any such provision is held to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force. In lieu of any invalid provision, a substitute provision will apply retroactively which comes as close as legally and commercially possible to that intent which the Parties had or would have had, according to the spirit and purpose of the Agreement.

9.8.    **Notices.** All notices required or permitted under the Agreement will be in writing, reference the Statement Of Work and will be delivered to Parties at the addresses referenced in the Statement Of Work: (a) by hand (and will be deemed to have been received on signature of a delivery receipt or at the time the notice is left at the proper address); or (b) certified mail or deposit with a nationally recognized overnight carrier (and will be deemed delivered at 9.00 am (Central Time) on the second Business Day after depositing or, if earlier, the time recorded by the mail service); or (c) if sent by email, at the time



of transmission, or, if this time falls outside business hours in the place of receipt, when business hours resume.

9.9.    **Relationship of the Parties**. Pursuant to the Agreement, BCG is an independent contractor to the Company and neither of the Parties is a partner or agent of the other Party. Nothing in the Agreement will be interpreted or construed as creating or evidencing any partnership or agency between the Parties or as imposing any partnership or agency obligation or liability upon any Party. No Party is authorized to enter into or incur any agreement, commitment, obligation, or liability in the name of or on behalf of the other Party.

9.10.    **Third Party Beneficiaries**. The Agreement exists solely for the benefit of the Parties to the Statement Of Work. Only the Parties (or any Party), or in the case of BCG, its Affiliates, may enforce the terms of the Agreement in respect of the relevant Engagement. The Parties to each Proposal do not intend to confer any right or benefit in connection with such Proposal on any third party, except that BCG's Affiliates can enforce their rights to be indemnified pursuant to Sections **7.2** and **7.3**.

9.11.    **Waiver**. The delay or failure of a Party to insist upon or enforce another Party's strict performance of any provision herein, or to exercise any right or remedy under the Agreement, will not be interpreted or construed as a waiver to any extent of that Party's right to assert or rely upon any such provision, right or remedy in that or any other instance.

9.12.    **Force Majeure**. Except for the obligation to pay the applicable fees when due, no Party will be liable to any other Party for any failure or delay in performance caused by a Force Majeure Event, and such failure or delay will not constitute a material breach of the Agreement.

9.13.    **Survival**. All provisions of the Agreement which are by their nature intended to survive the expiration or termination of an Proposal will survive, including but not limited to Sections **2.3** (Effect of Termination), **3** (Intellectual Property Rights), **4** (Fees and Payment), **5** (Confidentiality), **7** (Indemnity), **8** (Limitation of Liability), **9.3** (Dispute Resolution), **9.4** (No Publicity), 9.5 (Restrictions on Personnel), 9.6 (Governing Law), 9.7 (Severability), 9.8 (Notices), 9.10 (Third Party Beneficiaries), 9.11 (Waiver), 9.13 (Survival), and 9.14 (Remedies Cumulative).

9.14.    **Remedies Cumulative**. Except as otherwise provided in the Agreement, the remedies specifically provided for herein are intended to be cumulative and will not be deemed to exclude any other right or remedy that a Party may have at law or in equity.

9.15.    **Assignment**. No Party will assign, voluntarily, by operation of law, or otherwise, any rights or delegate any obligations under the Agreement (other than the right to receive payments) without the prior written consent of the other Party, and any attempt to do so will be void. However, a Party may assign its rights under the Agreement to any person or entity in connection with a merger, acquisition or sale of all or substantially all of its assets. BCG may also assign its rights under the Agreement to any of its Affiliates. The Agreement will bind and inure to the benefit of the Parties and their respective successors and permitted assigns.

9.16.    **Entire Agreement**. The Statement Of Work signed by the Parties and referencing these Terms, contains the entire agreement and understanding by and between the Parties with respect to the relevant Engagement, and no prior representations, promises, agreements or understandings that are not set out in them (whether written or oral) will be of any force or effect. No change or amendment will be binding on any Party unless in writing and signed by both the Company and BCG.

9.17.    **Counterparts**. The Parties agree that the Statement Of Work may be executed in counterparts, each of which will be deemed an original, but which together constitute one and the same instrument.



## SCHEDULE 1
## DEFINITIONS

1.    "**Affiliate**" means with respect to either Party, any entity that, now or in the future, owns, or is owned by or is under common ownership with, such Party. For the purposes of this definition, "ownership" means control of more than a 50% interest of an owned entity or the ability to direct the actions of an owned entity according to the desires of the owning entity.

2.    "**Aggregate Data**" means de-identified, sanitized or anonymized data that is derived from Company Data and used for analytical and statistical reporting purposes, but excludes Company Personal Data.

3.    "**Anti-Bribery Laws**" means any applicable foreign or domestic anti-bribery and anti-corruption laws and regulations, including the UK Bribery Act 2010, the US Foreign Corrupt Practices Act 1977 and any laws intended to implement the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, each as amended and updated from time to time.

4.    "**BCG**" means the BCG entity providing the Services to Company, as set out in the Statement Of Work.

5.    "**BCG Tools**" means BCG proprietary tools, which BCG may grant access to, and use of by the Company during the course of an Engagement.

6.    "**Change of Control**" means any change in Company's ownership occurring when any person or company, directly or indirectly, becomes the beneficial owner of voting equity shares of Company (to the extent of more than 50 percent of the voting shares) or the rights to acquire such shares; any direct or indirect sale or transfer of substantially all of the assets of Company; a plan of entity liquidation or an agreement for the sale on liquidation is legally approved and completed; or (iv) the board or empowered managing committee (such as the Group Executive Committee) determines and declares that a Change of Control has occurred.

7.    "**Company**" means the entity named in the Statement Of Work, which will be the recipient of the Services provided by BCG.

8.    "**Company Data**" means the original data or information, in any form, that is provided to BCG by or on behalf of the Company (including Company Personal Data and excluding Aggregate Data).

9.    "**Company Personal Data**" means the information, in any form, that is provided to BCG by or on behalf of the Company that alone, or in combination with other information: (a) is considered personal data or personal identifiable information under the applicable data privacy laws; or (b) identifies or could be reasonably used to identify an individual data subject, including names, addresses, email addresses, telephone numbers, Social Security numbers, government identification numbers or any other personally identifiable information.

10.   "**Confidential Information**" means any trade secrets or other information that is disclosed by one Party to another Party under the Agreement and that is either (a) conspicuously marked or otherwise identified as confidential or proprietary at the time of disclosure; or (b) is reasonably understood to be confidential based upon the nature of the information disclosed or the circumstances of the disclosure. Confidential Information may be of a technical, business, or other nature (including, but not limited to, information which relates to a Party's technology, research, development, products, services, pricing of products and services, customers, employees, contractors, marketing plans, finances, contracts, legal affairs, or business affairs). For clarity, Confidential Information includes any information BCG discloses to Company regarding its pricing or rates, BCG Tools, but excludes Aggregate Data.

11.   "**Deliverable**" means any final versions of presentations, reports, films, sound and video recordings and other material that BCG provides to Company as described in the Statement Of Work, or as otherwise agreed in writing to be delivered by BCG as part of the Services.

12.   "**Directive**" means the EU Data Protection Directive (Directive 95/46/EC) (EU Directive.

THE BOSTON CONSULTING GROUP



13.    "**Force Majeure Event**" means an act of God, fire, flood, storm, revolution, act of terrorism, riot or civil commotion (but excluding strikes and industrial disputes of the affected Party or a subcontractor of that Party and any failures of power or other utilities).

14.    "**GDPR**" means the General Data Protection Regulation ((EU) 2016/679).

15.    "**Independent Intellectual Property**" means any Intellectual Property developed by a Party independently of an Engagement.

16.    "**Insolvency Event**" means in relation to a Party (a) that Party passes a resolution for its winding-up (except in connection with a solvent business reorganization) or a court of competent jurisdiction issues an order for the winding-up of that Party or the dissolution of that Party; (b) an administrator, receiver or an administrative receiver or manager is appointed over the whole or part of that Party's assets; (c) that Party makes an arrangement or composition with its creditors generally or makes an application to a court of competent jurisdiction for protection from its creditors generally; (d) that Party is unable to pay its debts (provided that there will be no need for a determination by a court); or any event occurs, or proceeding is taken, with respect to that Party in any jurisdiction to which it is subject that has an effect equivalent or similar to any of the events mentioned in (a) to (d) (inclusive) above.

17.    "**Intellectual Property**", "**Intellectual Property Rights**" and **IPR** mean all copyright, trademark, trade name, or patent rights (whether registered or unregistered, and any applications for the foregoing), trade secrets, inventions, know-how, and any other proprietary rights of any kind (and any rights to enforce the foregoing).

18.    "**Losses**" means any demand, losses, damages, costs (including reasonable legal costs and disbursements) and expenses;

19.    "**Permitted Affiliates**" means such of the Company's Affiliates listed in the Statement Of Work or otherwise agreed in writing by the Parties.

THE BOSTON CONSULTING GROUP

**BCG Payout - Based on Attainment of all four components**

| Target | | | | % Attainment | BCG Payout | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2019 Impact | 2019 Op Earns | 2020 Impact | Run Rate | (Average) | Fixed | Variable | Total | Total Impact | Fees as % |
| 30,000 | 253,000 | 100,000 | 200,000 | | | | | | |
| 25,000 | 165,000 | 80,000 | 150,000 | 77% | 16,500 | 4,921 | 21,421 | 255,000 | 8.400% |
| 28,000 | 165,000 | 100,000 | 180,000 | 89% | 16,500 | 8,316 | 24,816 | 308,000 | 8.057% |
| **30,000** | **253,000** | **100,000** | **200,000** | **100%** | **16,500** | **11,500** | **28,000** | **330,000** | **8.485%** |
| 32,000 | 165,000 | 160,000 | 220,000 | 114% | 16,500 | 17,310 | 33,810 | 412,000 | 8.625% |
| 30,000 | 165,000 | 180,000 | 220,000 | 118% | 16,500 | 17,138 | 33,638 | 430,000 | 8.625% |
| 32,000 | 165,000 | 160,000 | 250,000 | 118% | 16,500 | 19,898 | 36,398 | 442,000 | 8.625% |
| 28,000 | 165,000 | 160,000 | 280,000 | 119% | 16,500 | 22,140 | 38,640 | 468,000 | 8.625% |
| 30,000 | 165,000 | 160,000 | 280,000 | 121% | 16,500 | 22,313 | 38,813 | 470,000 | 8.625% |
| 32,000 | 165,000 | 200,000 | 300,000 | 136% | 16,500 | 24,210 | 40,710 | 532,000 | 8.625% |
| 32,000 | 165,000 | 200,000 | 340,000 | 141% | 16,500 | 27,660 | 44,160 | 572,000 | 8.625% |







gotiations, BCG w

*****