## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC., a Massachusetts corporation, | |
| Plaintiff, | |
| v. | C.A. No. 22-00363-CJB |
| GAMESTOP CORP., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## ANSWERING BRIEF IN OPPOSITION TO MOTION TO DISMISS

Plaintiff The Boston Consulting Group, Inc. ("BCG") hereby responds to the Motion to Dismiss filed by Defendant GameStop Corp. ("GameStop") (D.I. 43) as follows:

Dated: September 19, 2022

Edward Totino (*pro hac vice*)
Nancy Nguyen Sims (*pro hac vice*)
Michael T. Boardman (*pro hac vice*)
BAKER & McKENZIE LLP
10250 Constellation Blvd., Suite 1850
Los Angeles, California 90067
Tel: +1 310 201 4728
Fax: +1 310 201 4721
edward.totino@bakermckenzie.com
nancy.sims@bakermckenzie.com
michael.boardman@bakermckenzie.com

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
McCOLLOM D'EMILIO SMITH UEBLER LLC
2751 Centerville Road, Suite 401
Wilmington, Delaware 19808
Tel: (302) 468-5960
tuebler@mdsulaw.com
jchristensen@mdsulaw.com
awaskie@mdsulaw.com

*Attorneys for Plaintiff*
*The Boston Consulting Group, Inc.*

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS .................................................. 1

II.  SUMMARY OF ARGUMENT ................................................................................. 2

III. STATEMENT OF FACTS ........................................................................................ 3

    A.   GameStop Hires BCG to Reverse Its Financial Tailspin ................................ 3

    B.   BCG Spends Tens of Thousands of Man-Hours on the Project and GameStop
       Initially Performs Under the SOW ................................................................. 4

    C.   GameStop Fails to Perform under the Agreement and BCG Files Suit ........... 4

IV.  ARGUMENT ........................................................................................................... 4

    A.   Legal Standard .............................................................................................. 4

    B.   The FAC States a Claim for Breach of Contract ........................................... 5

        1.   The SOW Is a Detailed, Enforceable Agreement that GameStop Has In
           Fact Performed ................................................................................... 5

        2.   At a Minimum, the SOW Obligates GameStop to Work with BCG in Good
           Faith to Finalize the Calculation of BCG's Variable Fees ...................... 8

        3.   The SOW Does Not Give GameStop the Unilateral Ability to Deny BCG Its
           Fees .................................................................................................... 9

        4.   The FAC Properly Alleges that GameStop Breached the SOW by Failing to
           Pay Fees Owed. ................................................................................... 10

        5.   The FAC Properly Alleges that GameStop Breached the SOW by Failing to
           Provide Necessary Data and Access and Refusing to Attend Thermometer
           Meetings ............................................................................................ 12

        6.   The FAC Properly Alleges Damages .................................................... 14

    C.   The FAC Properly Alleges Breach of the Implied Covenant in the Alternative ........... 16

V.   CONCLUSION ........................................................................................................ 18

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agere Sys. Guardian Corp. v. Proxim, Inc.*,
  190 F. Supp. 2d 726 (D. Del. 2002)....................................................................14

*Amirsaleh v. Bd. of Trade of N.Y., Inc.*
  2008 Del. Ch. LEXIS 131 (Ch. Sep. 11, 2008, Civil Action No. 2822-CC)...........10

*Annuity Plan of Int'l Union of Operating Eng'rs Local No. 649 v. DEM/EX Grp.
  Inc.*,
  2008 WL 4723722 (C.D. Ill. Oct. 24, 2008)..........................................................10

*Arunachalam v. Pazuniak*,
  2016 WL 748005 (D. Del. Feb. 24, 2016)..............................................................10

*Cornell Univ. v. Illumina, Inc.*,
  No. 10-433-LPS-MPT, 2012 U.S. Dist. LEXIS 71877 (D. Del. May 23, 2012).....15

*Cox Communs., Inc. v. T-Mobile US, Inc.*,
  273 A.3d 752 (Del. 2022) ............................................................................. *passim*

*CrewFacilities.com, LLC v. HotelEngine, Inc.*,
  Civil Action No. 20-cv-1637-RGA, 2021 U.S. Dist. LEXIS 119769 (D. Del.
  June 28, 2021)........................................................................................................14

*CrowdStrike, Inc. v. NSS Labs, Inc.*,
  No. 17-146 (MN), 2018 U.S. Dist. LEXIS 215387 (D. Del. Dec. 21, 2018) ..........17

*Dunlap v. State Farm Fire & Cas. Co.*,
  878 A.2d 434 (Del. 2005) .......................................................................................16

*E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.*,
  383 F. Supp. 2d 642 (D. Del. 2005).........................................................................5

*Eastman Chem. Co. v. AlphaPet Inc.*,
  No. 09-971-LPS-CJB, 2011 U.S. Dist. LEXIS 127757 (D. Del. Nov. 4, 2011).....11

*Ecolab Inc. v. SC Johnson Prof'l Grp. Ltd. (F/K/A Deb Grp. Ltd.)*,
  No. 21-720-RGA, 2022 U.S. Dist. LEXIS 78867 (D. Del. Apr. 18, 2022).............14

*French v. Idaho State AFL-CIO*,
  164 F. Supp. 3d 1205 (D. Idaho 2016) ...................................................................11

*Gilbert v. El Paso Co.*,
    490 A.2d 1050 (Del. Del. Ch. 1984).................................................................10, 16

*Hydrogen Master Rights, Ltd. v. Weston*,
    228 F. Supp. 3d 320 (D. Del. 2017)..............................................................6

*Icard Stored Value Sols., L.L.C. v. W. Suburban Bank*,
    2008 WL 619236 (E.D. Mo. Mar. 3, 2008) ...............................................17

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007)...............................................................14

*Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*,
    2010 WL 716105 (E.D. Mo. Feb. 24, 2010)................................................10

*Montrose Envtl. Grp., Inc. v. Yeddula*,
    Civil Action No. 20-834-RGA-SRF, 2020 U.S. Dist. LEXIS 133393 (D. Del.
    July 28, 2020)......................................................................................5

*Omega Capital Mgmt., Partners, LLC v. Schrage*,
    No. 20-1735(MN), 2021 U.S. Dist. LEXIS 96806 (D. Del. May 21, 2021) ......................6, 7

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)...........................................................................5

*SIGA Techs., Inc. v. Pharmathene, Inc.*,
    67 A.3d 330 (Del. 2013) ................................................. *passim*

*Templeton v. EmCare, Inc.*,
    868 F. Supp. 2d 333 (D. Del. 2012)................................................................17

*Trianco, LLC v. IBM*,
    347 F. App'x 808 (3d Cir. 2009) ....................................................................7

*Umland v. Planco Fin. Servs. Inc.*,
    542 F.3d 59 (3d Cir. 2008).............................................................................5

*VLIW Tech., L.L.C. v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) ..........................................................................5, 16

*Wilmington Leasing v. Parrish Leasing Co., L.P.*,
    C.A. No. 15202, 1996 Del. Ch. LEXIS 123 (Del. Ch. Sep. 25, 1996) ....................................11

**Statutes**

Federal Labor Management Relations Act ...........................................................................12

**Other Authorities**

Fed. R. Civ. Proc. 8(a) ..............................................................................................16, 18

Fed. R. Civ. Proc. 12(b)(6) ........................................................................................2, 5, 6

## I.      NATURE AND STAGE OF THE PROCEEDINGS

In its First Amended Complaint ("FAC") (D.I. 28), Plaintiff Boston Consulting Group, Inc. ("BCG") asserts claims of breach of contract and, in the alternative, breach of the covenant of good faith and fair dealing, against defendant GameStop Corp. ("GameStop").  These claims arise out of a detailed, written Statement of Work ("SOW") that governed GameStop's engagement of BCG in 2019 to reverse GameStop's financial woes through a massive corporate transformation project. (D.I. 28 at ¶¶ 1-8.)  While the project initially ran smoothly, GameStop eventually stopped paying BCG's fees, failed to provide the data and information necessary for BCG to do its work and refused to negotiate or confirm projected profit improvements in good faith, including refusing even to attend meetings that the SOW required take place for that purpose.  BCG therefore brought suit to recover its damages and unpaid fees, which amount to approximately $30 million.

In response, GameStop filed a motion to dismiss under Rule 12(b)(6), which argues that the FAC fails to state a claim for breach of contract or the implied covenant of good faith and fair dealing.[1]  As to the FAC's contract claim, GameStop argues that (1) the SOW is unenforceable because it required the parties to further negotiate projected profit improvement details; (2) even if BCG achieved predicted profit improvements, its resulting fees need not be paid because GameStop had the unilateral discretion to refuse to pay them; and (3) BCG has not alleged recoverable damages.  (D.I. 44.)  As explained below, GameStop is incorrect.  The SOW is enforceable under Delaware law and does not give GameStop the discretion to refuse to pay BCG's fees.  The FAC also clearly alleges that BCG is entitled to its fees, calculated using the formulas set forth in the SOW.  As to the covenant of good faith and fair dealing claim, GameStop argues first that the SOW controls and no implied covenant is necessary (despite previously arguing that the SOW is unenforceable), and then that no specific implied terms are alleged.  These arguments also fail.

---

[1] GameStop previously filed a motion to dismiss the original complaint in this matter, which was mooted by the FAC. (*See* D.I. 21.)

## II.     SUMMARY OF ARGUMENT

1.      The SOW is an enforceable contract, not an unenforceable "agreement to agree." It is a final, executed agreement that details the scope of work to be performed and how BCG's resulting fees will be calculated.  It further requires that GameStop provide the data and access necessary for BCG to perform its work.  The FAC properly alleges a breach of those obligations, including to pay fees that are due and owing.

2.      The FAC alleges that GameStop breached the SOW by failing to pay fees owed, failing to honor its obligations to work with BCG in good faith to confirm predicted profit improvements, and failing to provide necessary data and access to enable BCG to do its work and confirm the resulting predicted profit improvements, resulting in damages to BCG of approximately $30 million.

3.      To the extent the SOW leaves any material terms regarding the final calculations of predicted profit improvements to future negotiation, the SOW is nonetheless enforceable to, at a minimum, require that GameStop negotiate in good faith.  *See SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 344, 349 (Del. 2013) (agreements that "do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework" are enforceable as "Type II" agreements); *Cox Communs., Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 762 (Del. 2022) (Type II agreements "bind[] the parties to good-faith negotiations on open terms.")

4.      GameStop is incorrect that it can unilaterally decide not to pay BCG's fees.  BCG's fees are calculated via a mathematical formula using the methodologies detailed in the SOW.  Fees themselves are not "discretionary," or even negotiable.  Rather, the SOW required that the parties jointly determine the underlying profit improvement projections upon which fee calculations are based.  GameStop refused to do so.

4.      In the alternative, to the extent the SOW does not specifically impose duties upon GameStop to act in good faith, the SOW like all contracts includes an implied covenant to act in good faith and engage in fair dealing, and the FAC alleges a breach of that covenant because

GameStop acted in clear bad faith by refusing to negotiate predicted profit improvements, refusing even to attend required meetings for that purpose, and unjustifiably claiming that predicted profit improvements had not been achieved.

## III.    STATEMENT OF FACTS

### A.  GameStop Hires BCG to Reverse Its Financial Tailspin

By 2018 and going into 2019, GameStop, a public company incorporated in Delaware, was in a downward financial spiral.  To reverse its fortunes, GameStop hired BCG to help engineer a dramatic return to profitability.  (D.I. 28 at ¶ 5.)  The parties engaged in lengthy negotiations, spanning multiple months, over the terms of GameStop's engagement of BCG.  (*Id*. at ¶¶ 6-7.) Ultimately, the parties reached agreement and, in August 2019, signed the SOW which included detailed plans to dramatically increase GameStop's profitability, both in 2019 and going forward. (*Id*.)

Specifically, as alleged in the FAC, the SOW identified ten "workstreams," each focused on different parts of GameStop's business.  (*Id*. at ¶21.)  Under these workstreams, the parties would identify various initiatives (levers) and the parties would "work together" to determine appropriate financial baselines and resulting profit improvements that would be expected to arise from those initiatives. (*See, e.g.,* D.I. 26 at § 4.2.13.)  To ensure that the parties were aligned and that neither bore undue risk from factors outside of either party's control, performance under the SOW was to be assessed based upon ***projected*** (as opposed to actual) profits that GameStop was anticipated to achieve against agreed-upon baselines.  (*Id*. at ¶ 29.)

For its work, BCG would be paid the greater of a fixed fee or variable fees, which would be calculated as a percentage of the predicted profit improvements.  (*Id*. at ¶ 9.) The SOW explains in detail how those calculations would be made as to each workstream.  (*see* D.I. 26 at § 4.3.)  To further ensure that the parties were aligned and the project ran smoothly, the parties, including high level executives at GameStop, were obligated to meet regularly "(i) to address validation, approvals, testing and commencement and execution of the various initiatives so that all of the foregoing can be handled in a timely manner and (ii) to address financial target and planning

coordination." (D.I. 28 at ¶ 29.) The parties were also generally required to "work together" to develop profit improvement baselines "from which to calculate savings" and complete a sign-off process to agree on baselines, key assumptions, methodologies and profit predictions (D.I. 26 at § 4.2.13).

**B. BCG Spends Tens of Thousands of Man-Hours on the Project and GameStop Initially Performs Under the SOW**

For many months, GameStop and BCG worked together under the terms of the SOW to effectuate the transformation project. BCG's consultants spent tens of thousands of hours developing business strategies based upon data that was provided by GameStop, the parties agreed in good faith as to predicted profit improvements and GameStop paid BCG the resulting fees. (D.I. 28 at ¶¶ 30, 33.) While it did so late, GameStop paid BCG's first series of invoices, which included amounts allocated for variable fees, confirming that BCG had exceeded the threshold set for those payments. (*Id.*)

**C. GameStop Fails to Perform under the Agreement and BCG Files Suit**

GameStop eventually began defaulting on its obligations to provide necessary financial and operational data and refused to attend contractually-required meetings, through which the parties would confirm profit improvement projections and BCG's resulting fees. (D.I. 28 at 36, 42.) GameStop also began asserting unsupported demands to reduce profit projection numbers without providing factual support, when in fact BCG's efforts had empirically and conclusively established specific projected profit improvements. (D.I. 28 at ¶ 32.) Ultimately, GameStop refused to further engage with BCG to complete the project and establish final profit projections, and refused to pay BCG's remaining fees owed, which at that point totaled approximately $30 million. (*Id.* at ¶ 37.). BCG therefore initiated this lawsuit on March 22, 2022.

**IV.     ARGUMENT**

**A. Legal Standard**

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all well pleaded factual allegations in the complaint and view them in the light most favorable to the

plaintiff.  *See Umland v. Planco Fin. Servs. Inc*., 542 F.3d 59, 64 (3d Cir. 2008).  "Detailed factual allegations are not required"; rather, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Montrose Envtl. Grp., Inc. v. Yeddula*, Civil Action No. 20-834-RGA-SRF, 2020 U.S. Dist. LEXIS 133393, at \*9 (D. Del. July 28, 2020) (quoting Fed. R. Civ. P. 8(a)(2).); *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2009)) (A claim is facially plausible, and therefore sufficient to withstand a motion to dismiss under Rule 12(b)(6), when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged).  The Federal Rules of Civil Procedure "do[] not impose a probability requirement at the pleading stage," but instead "simply call[] for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Id*. (c*iting Twombly*, 550 U.S. at 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).)  Ultimately, "[a] court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp*., 383 F. Supp. 2d 642, 645 (D. Del. 2005) (*citing Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 (1984).)

**B.  The FAC States a Claim for Breach of Contract**

To state a claim for breach of contract under Delaware law, a plaintiff must allege facts plausibly demonstrating: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., L.L.C. v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003).  The FAC meets this standard.

**1.  The SOW Is a Detailed, Enforceable Agreement that GameStop Has in Fact Performed**

GameStop argues that the SOW fails to plausibly state a claim for breach of contract because (1) the SOW requires that the parties work together after signing to agree on profit baselines and the exact amount of projected profit improvements from BCG's work, (2) GameStop

refused to do so, and (3) as a result the SOW is unenforceable.  GameStop's argument is both factually and legally wrong.

The SOW is the result of months of back and forth between the parties and sets forth the terms of their agreement in meticulous detail.  (D.I. 28 at ¶¶ 7, 19, 25.)  It is not a letter of intent or some other preliminary agreement to sit down at a negotiating table.  Indeed, GameStop clearly understood that the SOW was intended to be -- and in fact was -- an enforceable agreement because it negotiated the SOW over the course of four months, spent over a year performing under it and paid BCG over $22 million in fees pursuant to the SOW's terms, including multiple millions of dollars in variable fees.  (D.I. 28 at ¶¶ 7, 11, 12, 19, 25.).  Until GameStop decided to renege and refuse to pay its bills as the project neared completion, there was never any question that the SOW was sufficiently detailed, final and enforceable.  (*Id*. at ¶¶ 12-13.)  GameStop cannot now be heard to complain that the same provisions of the SOW that it previously accepted and performed are no longer binding.  *See Trianco, LLC v. IBM*, 347 F. App'x 808, 811 (3d Cir. 2009) ("[a]lthough Trianco, which substantially performed its duties under the Teaming Agreement, now seeks to have the agreement declared not binding, this partial performance evidences an intent to be bound").

Tellingly, GameStop can cite only inapposite authority for its recent and contrived reversal. In *Omega Capital Mgmt., Partners, LLC v. Schrage*, No. 20-1735(MN), 2021 U.S. Dist. LEXIS 96806 (D. Del. May 21, 2021), the plaintiff was a prospective litigation funder who attempted to enforce an "option" agreement with the defendant to invest money in the defendants' litigation efforts in the future.  The agreement "contain[ed] neither the amount to be funded nor the return to be owed thereupon."  *Id* at *3.  With respect to the parties' ultimate contractual relationship, the option document stated that "a structure would be set out in a final comprehensive integrated funding document which will replace th[e] [option] Agreement in its entirety."  *Id*.  The option document further provided that if plaintiff ultimately decided to make an investment, the investment would be "as contemplated in an ultimate funding and management agreement ... the terms of which Omega may decide to be bound at some future time."  *Id*.  As such, the Court found

6

that the option agreement did not contain any material terms related to the potential investment or value thereof that could be enforceable.  *Id*.

The SOW at issue here is nothing like the inchoate and preliminary option agreement at issue in *Omega*.  It is a comprehensive 34-page agreement that governed tens of thousands of hours of work spanning more than a year.  (D.I. 28 at ¶¶ 7, 11, 12, 19, 25.).  It defines exactly what work will be at issue in the transformation project, (D.I. 26 at §§ 1.1 and 4.3), what work will be excluded (at § 1.6), exactly how profit improvement projections shall be calculated (at § 4), and how much money BCG will be paid as a result (at §§ 2.3 and 3).  The SOW even specifically details the parties' agreement as to how to account for variables like GameStop hiring additional employees and paying severance packages (at §4.2.6) and explains the methodologies for calculating profit improvement baselines (*see, e.g.*, §§ 4.3.4.1-4.3.4.2.)  It further provides that payment is to be made within 30 days.  (*Id*. at § 3.5.)  While the agreement does require that the parties work together to set profit baselines and confirm the expected impact of the various profit improvement levers, this agreement for future cooperation to determine the data from which the exact amount of BCG's variable fees will be calculated does not leave the door open to future negotiation.  The SOW provides that BCG is to receive a fixed fee and a further variable fee that amounts to approximately 8% of profit improvement projections that will be revealed during the course of the work. (*Id*. at §§ 2.3.2, 3.2-3.3 and Exhibit B).  That the precise dollar amount of BCG's fees is to be determined later does not render this structure unenforceable.  It would have been impossible to know exactly how much GameStop's projected profits would be improved at the outset of the project.  As with any other commission-based compensation structure, BCG's fees are to be determined by simply applying the formula set forth in the SOW to the profit improvement numbers.  The SOW clearly is not a "template for a later formal contract" or a document "without any reasonably objective controlling standards," like the agreements at issue in *Omega*.  For this reason alone, the Court should deny GameStop's motion.

### 2. At a Minimum, the SOW Obligates GameStop to Work with BCG in Good Faith to Finalize the Calculation of BCG's Variable Fees

Even assuming that certain material terms were left for additional negotiation, Delaware law is clear that the SOW is still enforceable. In *SIGA Techs., Inc. v. Pharmathene, Inc*., 67 A.3d 330, 344 (Del. 2013), the Delaware Supreme Court found that "an express contractual obligation to negotiate in good faith is binding on the contracting parties." Specifically, the Court found that agreements which leave certain terms open to further discussion and negotiation are enforceable as "Type II" agreements. *Id*.[2] The Delaware Supreme Court then reaffirmed that such agreements are enforceable in *Cox Communs., Inc. v. T-Mobile US, Inc*., 273 A.3d 752, 762 (Del. 2022), finding that an agreement that contemplates additional work between the parties is not unenforceable and can still "bind[] the parties to good-faith negotiations on open terms."

The SOW includes multiple detailed provisions that expressly require the parties to cooperate in good faith to determine profit projections. (*See* D.I. 26 at § 1.5 ("the Parties will collaborate to optimize BCG's contribution to achievement of the targets for the Workstreams."); § 1.8 ("GameStop agrees to reasonably cooperate with BCG in the performance of the Services, including without limitation, . . . timely decision-making…"); §§ 4.2.4, 4.2.5, 4.2.7 (all requiring that the parties "agree to jointly define the most appropriate baseline to be used at the onset of each profit improvement activity…"); §§ 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.3.6, 4.3.7, 4.3.8, 4.3.9 (all requiring that the parties "work together" to develop profit improvement baselines "from which to calculate savings"); § 4.2.13 (requiring that the parties complete a sign-off process that culminates in written agreement on baselines, key assumptions, methodologies and profit predictions). Importantly, these provisions all require that the parties "collaborate," "cooperate" or "work together" as to the *inputs* to the SOW's detailed methodologies, which would then result in profit improvement

---

[2] Delaware law categorizes preliminary agreements into two types. Type I agreements "reflect a consensus on all the points that require negotiation but indicate the mutual desire to memorialize the pact in a more formal document." *Cox Communs., Inc. v. T-Mobile US, Inc*., 273 A.3d 752, 762 (Del. 2022). Type II agreements leave some terms open. They "do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *SIGA Techs., Inc. v. Pharmathene, Inc*., 67 A.3d 330, 344. at 349.

projections and BCG's fees.  Nothing in the SOW suggests that BCG's fees themselves or the methodologies for deriving them were somehow discretionary or negotiable.  And even if profit projections were to some extent open to future negotiation, Delaware law is clear that the SOW still would impose an enforceable obligation on GameStop to conduct those discussions in good faith.  *See SIGA Techs., Inc.,* 67 A.3d at 344; *Cox Communs., Inc.*, 273 A.3d at 762.  GameStop did not.  The Court should deny the motion to dismiss on this basis as well.

### 3.  The SOW Does Not Give GameStop the Unilateral Ability to Deny BCG Its Fees

GameStop argues that BCG's contract claim should be dismissed because the SOW allows GameStop to refuse to agree on profit projections, which determine BCG's resulting fees.  (D.I. 44 at ¶¶ 7-8)  According to GameStop, variable fees under the SOW are "discretionary" and therefore, if GameStop simply decides not to pay them (as it has), BCG has no recourse.  The Court should reject this argument for two reasons.

First the SOW clearly does not confer GameStop with the discretion to simply deny BCG's variable fees at will.  To the contrary, the SOW states that the parties are to "work together" to determine profit improvements no less than 14 times, including repeated references to "work[ing] together in good faith" and "to define a fair assessment of the TYPPI, NYPPI and APPI."  (*See, e.g.*, D.I. 26 at §§ 4.2.4, 4.3.4.)  The FAC alleges that GameStop denied the applicability of certain profit improvements with no basis in fact, failed to provide BCG with necessary data and access, and in many cases refused to participate in discussions with BCG at all.  (D.I. 28 at ¶¶ 35-42.)  In breach of the SOW, GameStop clearly did not "work together" with BCG to determine profit improvement projections.

Second, even if GameStop is correct -- which it is not -- that its obligation to pay variable fees earned by BCG is entirely "discretionary," the FAC still alleges a valid claim.  The law is clear that "if one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination." *Wilmington Leasing v. Parrish Leasing Co., L.P.*, C.A. No. 15202, 1996 Del. Ch. LEXIS 123, at *5 (Del. Ch. Sep. 25,

1996); *Gilbert v. El Paso Co*., 490 A.2d 1050, 1055 (Del. Del. Ch. 1984) ("The application of a good faith or subjective standard to the enforcement of conditions is appropriate where either the definition or the declaration of occurrence of the condition is left to the sole discretion of the invoking party."); *Amirsaleh v. Bd. of Trade of N.Y., Inc.* 2008 Del. Ch. LEXIS 131, at *1 (Ch. Sep. 11, 2008, Civil Action No. 2822-CC). ("the law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith."). Thus, even if the SOW provided GameStop with unilateral discretion to determine projected profit improvements (it did not), GameStop still  breached the SOW by failing to exercise its discretion in good faith. Indeed, the FAC's allegations that GameStop failed and refused to provide necessary data, failed to provide justification for its assertions and failed to attend meetings entirely, evidence a clear lack of good faith, in breach of the SOW.[3]

### 4.  The FAC Properly Alleges that GameStop Breached the SOW by Failing to Pay Fees Owed.

As with the inapposite authority GameStop cites to claim that the SOW is unenforceable, GameStop's proffered authority with respect to the alleged lack of facts evidencing GameStop's breaches is again wildly off base.  GameStop relies upon *Arunachalam v. Pazuniak*, 2016 WL 748005, at *7 (D. Del. Feb. 24, 2016), to argue that the FAC does not provide enough information for GameStop to understand why it has breached the SOW.  (D.I. 44 at 9.)[4] *Arunachalam* involved

---

[3] GameStop also devotes an entire section to its motion arguing that the SOW does not prohibit GameStop from demanding fee reductions without articulating any reasons for the reductions. (*See* D.I. 44 at 11-12.)  This is essentially the same argument -- that GameStop can, if it chooses, simply stonewall BCG or disagree that 2+2=4 -- and it fails for the same reasons.

[4] GameStop then goes on to cite cases from the Eastern District of Missouri, Central District of Illinois and District of Idaho with no explanation of how those cases are relevant.  They are not. In each of those cases, the complaint at issue failed to meet basic standards to allege "facts concerning the general nature of the contract and the alleged breach."  *Icard Stored Value Sols., L.L.C. v. W. Suburban Bank*, 2008 WL 619236, at *2 (E.D. Mo. Mar. 3, 2008).  In *Midwest Special Surgery, P.C. v. Anthem Ins. Cos*., 2010 WL 716105, at *6 (E.D. Mo. Feb. 24, 2010), the plaintiff failed even to identify a particular contract.  In *Annuity Plan of Int'l Union of Operating Eng'rs Local No. 649 v. DEM/EX Grp. Inc*., 2008 WL 4723722, at *2 (C.D. Ill. Oct. 24, 2008), the complaint did "not allege any dates or places" or even "allege that Defendant is a party to the

a *pro se* plaintiff who made a multitude of wild allegations against her former attorneys in patent litigations. The Court dismissed the breach of contract count because it was "badly pled as it contains a number of conclusory non-contract claims including fraud and legal malpractice." 2016 WL 748005 at * 7. As such it was unclear what was being alleged with respect to a contract claim. *Id*. The Court provided leave to amend because it found that there was a "kernel of a claim" related to vague allegations that the attorney had failed to properly disperse settlement payments, but the allegations did not provide any details about those payments including the amounts, why she had any entitlement to them, or when that entitlement arose. *Id*. Absent these foundational facts to establish the existence of a contract or a breach, the Court could not discern from the pleading presented which contract was at issue or how it was violated.

There is no such ambiguity here. The SOW is fully executed and describes the parties' obligations in great detail. The FAC further explains that GameStop breached those obligations by failing to pay fees owed; failing to provide required data, feedback and approvals; and failing and refusing to even attend contractually-required thermometer meetings to validate projected profit improvements and BCG's fees. (D.I. 28 at ¶¶ 33, 35, 36, 42.) These allegations are sufficient. Like the complaint in *Eastman Chem. Co. v. AlphaPet Inc.*, the detail alleged regarding the parties' obligations "bear[s] no resemblance" to the "vague references" to breaches of "agreed terms" that were never stated in the complaint in *iCard*, the authority relied upon by GameStop. *See Eastman Chem. Co. v. AlphaPet Inc.*, No. 09-971-LPS-CJB, 2011 U.S. Dist. LEXIS 127757, at *40 (D. Del. Nov. 4, 2011). Additional details regarding projected profit improvements arising out of the initiatives in dispute and the precise calculations on which BCG bases its fees can be addressed in discovery, which is already underway. *Phillips*, 515 F.3d at 234 (a complaint need only raise "a reasonable expectation that discovery will reveal evidence" of a breach.)

---

agreements." *French v. Idaho State AFL-CIO*, 164 F. Supp. 3d 1205, 1218 (D. Idaho 2016) is entirely irrelevant because the Court there found that the plaintiff's contract claim was pre-empted by the federal Labor Management Relations Act.

GameStop also claims, wrongly, that allegations that there could be no reasonable dispute over BCG's performance and fees coming due is "directly contradicted" by allegations that the parties did not agree in some instances as to fees. (D.I. 44 at 10.) There is no contradiction. The FAC alleges that BCG fully performed and that "BCG's efforts empirically and conclusively established specific projected profit improvements." (D.I. 28 at ¶ 32.) The fact that GameStop has refused to agree with mathematical calculations of projected profit improvements does not mean that a "reasonable dispute" arose. To the contrary, the FAC clearly alleges that GameStop's refusals to agree on the calculations behind the profit projections at issue -- and in many cases refusing even to engage with those calculations -- have been manifestly ***unreasonable*** and in breach of the SOW. (*Id* at ¶¶ 33, 35, 36, 42.)

Finally, GameStop cannot escape liability based on arguments that the parties did not sign written agreements regarding all of the projected profit improvements. (*See* D.I. 44 at 5 [arguing that BCG's fees were not owed because Section 4.2.13 of the SOW contemplates that "predictions of the dollar amount of contributions of a proposed initiative or profit improvement lever . . . culminate[] in [a] written agreement."].) First, the parties did in fact enter into written agreements on multiple workstreams and for many months "had a healthy working relationship, grounded in good faith." (D.I. 28 at ¶ 12.) Pursuant to those written agreements, GameStop paid the resulting fees. (*Id*. at ¶ 33.) Second, GameStop's attempt to avoid liability by claiming that subsequent written agreements were not signed as to fees for initiatives in dispute is merely a restatement of its incorrect argument that GameStop could thwart the SOW at will by simply refusing to perform in good faith. That argument fails under the plain terms of the SOW and Delaware law, as explained above. (*See* Section B.3, *supra*.)

### 5. The FAC Properly Alleges that GameStop Breached the SOW by Failing to Provide Necessary Data and Access and Refusing to Attend Thermometer Meetings

GameStop argues that the FAC cannot state a claim based on GameStop's failure to provide necessary data and access to information because it includes "only a solitary, ambiguous

allegation" on this topic.  (D.I. 44 at 13.)  This argument is curious, because the motion then cites two places in the FAC where the allegation is made.  In any event, BCG's claim as to GameStop's failures to provide data and access are clearly alleged.

Section 1.3 of the BCG Standard Terms, which are incorporated fully into the SOW (and alleged at ¶ 35 of the FAC) provides:

> **Company responsibilities**. The Company agrees to cooperate in the delivery of the Services, Deliverables and any BCG Tools and, in furtherance of the foregoing, will (a) provide data about the Company's needs, business, operations, personnel, customers, technology and/or Company data, as necessary for BCG to successfully deliver the Services; (b) provide materials and services such as office space, furniture, facilities, and utility services, as required and maintain such materials or services during the Term; (c) provide access to the Company's computer network and software to the extent necessary to perform the Services; (d) provide timely iteration, feedback and approvals of goals, timelines, requirements and outputs; (e) to the extent within the Company's control, cooperate with BCG to ensure that the Services are performed in accordance with laws and regulations applicable to Company; and (f) provide such other reasonable assistance as necessary for BCG to successfully deliver the Services. (D.I. 26-18.)

GameStop's claim that this section could not be breached because it applies to "'*delivery* of the Services'—not the fees for those services," is nonsense.  (D.I. 44 at 12 (emphasis in original).)  If GameStop fails to provide the data necessary for BCG to deliver the services, GameStop has by definition improperly prevented BCG from recovering the fees that would result from those services.

The SOW also states that "GameStop agrees to reasonably cooperate with BCG in the performance of the Services, including without limitation, by providing BCG with reasonable facilities at GameStop facilities and timely access to data, information and GameStop personnel, timely decision-making…"  (D.I. 26 at §1.8.)  It further provides that "[e]ach Party will be solely responsible for the performance of its employees and agents and for the accuracy and completeness of all data, instructions, information and communications provided by such party to the other party hereunder."  (*Id*. at §1.9.)  The FAC alleges that GameStop failed to provide the required access and data necessary for BCG to perform under the SOW and that GameStop has since used that failure as an excuse not to pay for the services.  (D.I. 28 at ¶¶ 35, 42(d).)  Such allegations are all

that the law requires at this stage.  *See, e.g.*, *Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726, 738 (D. Del. 2002) (denying motion to dismiss because arguments that a plaintiff will ultimately have to prove the elements of its claim "do[] not mean that the claim, as alleged, is futile."); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 633 (D. Del. 2007) ("this case is in its early stages, and at this juncture the Court declines to rule on the issue of breach of contract by Google in a dismissal motion.").

### 6.  The FAC Properly Alleges Damages

GameStop further attempts to avoid its obligations under the SOW based on claims that its failure to pay $30 million in fees, or even show up to required meetings to confirm those fees, somehow resulted in no recoverable harm to BCG.  This claim is absurd.

Under Delaware law, damages for breach of contract are "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."  *Ecolab Inc. v. SC Johnson Prof'l Grp. Ltd. (F/K/A Deb Grp. Ltd.)*, No. 21-720-RGA, 2022 U.S. Dist. LEXIS 78867, at *15 (D. Del. Apr. 18, 2022).  In contract actions such as this one, "the injured party need not establish the amount of damages with precise certainty where the wrong has been proven and injury established."  *SIGA Techs., Inc.*, 132 A.3d at 1131.  Rather, the plaintiff must plausibly allege harm.  *See* Fed. R. Civ. Proc. 8(a); *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (affirming proper allegations of generalized harm resulting from the use of confidential information).  Exact amounts of damages are subject to proof at trial. *See CrewFacilities.com, LLC v. HotelEngine, Inc.*, Civil Action No. 20-cv-1637-RGA, 2021 U.S. Dist. LEXIS 119769, at *9 (D. Del. June 28, 2021) ("Determination of the categorization of damages is not an issue that this Court will decide during a motion to dismiss").

The FAC clearly alleges that BCG has been harmed as the result of GameStop's breaches. The SOW requires that the parties work together to determine profit improvement baselines, including to hold meetings "to discuss and, as required by the SOW, agree upon financial baselines for each workstream and the anticipated profit improvement to each workstream, which would

determine BCG's fees." (D.I. 28 at ¶ 29.)  Contrary to GameStop's reliance on a footnote in *Cornell Univ. v. Illumina, Inc.*, No. 10-433-LPS-MPT, 2012 U.S. Dist. LEXIS 71877, at *17 n.67 (D. Del. May 23, 2012), the Court need not "strain to find inferences favorable" to BCG to understand that if GameStop refused to attend these meetings or otherwise failed to participate in good faith, then agreements as to profit improvement projections and resulting fees could not be reached, thereby damaging BCG.

In any event, GameStop cannot fault BCG for not being specific enough in its pleading as to damages because a "breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer."  *SIGA Techs., Inc.*, 132 A.3d at 1111.  BCG has properly alleged that, in total, its damages are approximately $30 million and that "[t]he exact amount of BCG's damages cannot be determined at this time, due to GameStop's refusing to furnish to BCG the data necessary to determine certain projected profit improvements, refusing to attend Thermometer Meetings, and otherwise interfering with BCG's ability to calculate the full amount of its fees owed."  (D.I. 28 at ¶43.)  Such allegations comply with Delaware law and Rule 8 of the Federal Rules of Civil Procedure.

Moreover, GameStop's argument is based upon the same faulty premise that the SOW somehow gave GameStop the unilateral ability to arbitrarily deny projected profit improvements and therefore it did not matter whether meetings were held because GameStop could simply declare at meetings that they did not agree.  (*See* D.I. 44 at [arguing that "GameStop … could have attended such meetings and still not have "confirm[ed] profit improvement estimates and BCG's resulting fees.").  This is incorrect, as explained above.  The SOW at a minimum imposes an obligation upon GameStop to work together with BCG in good faith.  (*See* Section B.3, *supra*). GameStop's breach of those obligations alone entitle BCG to damages, which GameStop cannot

challenge as too speculative, given its breaches of the SOW and creation of the "uncertain world" that it now seeks to use to its advantage.  *See SIGA Techs., Inc.* 132 A.3d at 1131.[5]

### C.  The FAC Properly Alleges Breach of the Implied Covenant in the Alternative

The FAC also alleges a breach of the covenant of good faith and fair dealing.  An implied covenant of good faith and fair dealing is inherent in every contract and "may preclude a party from avoidance of a contractual undertaking through invoking a condition which occurred by reason of his own actions."  *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054-55 (Del. Del. Ch. 1984).  As explained in *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005), "the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms."  *Dunlap*, 878 A.2d at 442 (citations omitted).

The SOW expressly states its "overarching purpose":  "The purpose of this document -- the 'Statement Of Work' (hereafter referred to as this 'SOW') -- is to define a framework regarding the services to be provided by BCG to GameStop in supporting the Program, as well as the fees to be paid by GameStop to BCG for those services." (D.I. 26 at 1.)  BCG has performed under that framework and GameStop has reaped the benefits of BCG's work, but GameStop has arbitrarily refused to pay the resulting fees by claiming only that the SOW did not expressly require them to agree to the empirical calculations supporting those fees.  That GameStop failed to attend meetings and otherwise prevented BCG and the parties from coming to agreement on certain profit projections is a clear breach of the covenant of good faith and fair dealing.  GameStop's refusal to participate in the calculations of the variable fees is the opposite of fair dealing.

---

[5] GameStop also argues that BCG has failed to allege damages arising out of late payments. (D.I. 44 at 14-15.)  BCG does not seek damages for late fees. Its allegations of breaches and resulting damages relate to unpaid fees.  (*See* D.I. 26 at ¶42.)

GameStop does not argue that the FAC fails to state a prima facie claim for breach of the implied covenant. Instead, it argues that the SOW controls and so enforcement of an implied covenant is unnecessary. (D.I. 44 at 15-16.) BCG does not necessarily disagree. As explained above, the SOW requires that GameStop "work together" with BCG to develop profit improvement baselines "from which to calculate savings," "hold regular sessions (1) to address validation, approvals, testing and commencement and execution of the various initiatives so that all of the foregoing can be handled in a timely manner and (ii) to address financial target and planning coordination," provide necessary data for BCG to deliver the services and accurately calculate profit improvements, and otherwise "work together in good faith" with BCG. (*See* D.I. 26 at §§ 1.8, 4.2.9, 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.3.6, 4.3.7, 4.3.8, 4.3.9 and Standard Terms § 1.3.) All of those provisions restrict GameStop from taking its current course of simply declaring that it does not agree with profit projections and therefore refusing to pay fees validly incurred.

It is black letter law that a party "may plead claims or defenses in the alternative or ones that are consistent with one another." *CrowdStrike, Inc. v. NSS Labs, Inc.*, No. 17-146 (MN), 2018 U.S. Dist. LEXIS 215387, at *10 (D. Del. Dec. 21, 2018) (*citing Indep. Enters. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) ("[Rule 8] permits inconsistency in both legal and factual allegations," especially when alternative claims "may require complex inquiries into the parties' intent."); *Templeton v. EmCare, Inc.*, 868 F. Supp. 2d 333, 340 (D. Del. 2012) (denying motion to dismiss asserting that implied covenant claim was duplicative). Therefore, to the extent that the SOW does not actually require GameStop to act in good faith or prevent GameStop from unilaterally negating BCG's entitlement to fees (it does), BCG has clearly alleged a violation of the covenant of good faith and fair dealing. As such, this count cannot be dismissed at this stage because it is not yet clear what GameStop's defenses will be and how the arguments and evidence will develop. If GameStop intends to argue, for example, that they have complied with the strict terms of the SOW, but the evidence nonetheless shows that GameStop acted in bad faith, BCG is still entitled to a remedy for that conduct.

GameStop's argument that the FAC should be dismissed because does not contain any specific implied obligation also misses the mark.  The FAC alleges that "GameStop has deprived BCG of the benefits of the SOW that BCG reasonably expected to obtain at the time the SOW was made," by taking multiple actions in violation of implied duties, including "failing to participate in Thermometer Meetings in good faith (and in some cases, at all), refusing to finalize in good faith the projected achievement rate to TYPPI, NYPPI, and APPI resulting from BCG's services under the SOW, raising spurious defenses to payment, and demanding unsupported deductions from the agreed-upon metrics upon which BCG's fees were based in order to hold payment of BCG's fees in limbo and prevent final resolution of the project."  (D.I. 28 at ¶¶45-46.)  To the extent they are not already an express part of the SOW, the implied obligations at issue are GameStop's obligations *to not do those things* but instead to attend meetings and work in good faith to arrive at mutually agreed-upon values for the projected profit improvements resulting from BCG's work so that BCG could be fairly and appropriately compensated.

## V.    CONCLUSION

GameStop's motion to dismiss ignores the plain terms of the SOW as well as Delaware law governing them.  GameStop is simply not authorized to unilaterally and arbitrarily deny fees that are duly owed under the SOW.  Accordingly, BCG respectfully requests that the Court deny GameStop's Motion to Dismiss.  If the Court is inclined to grant any portion of the Motion, BCG respectfully requests that it be granted leave to amend.


Dated: September 19, 2022                    Respectfully submitted,

                                             */s/ Thomas A. Uebler*
                                             Thomas A. Uebler (#5074)
                                             Joseph L. Christensen (#5146)
                                             Adam J. Waskie (#6217)
                                             MCCOLLOM D'EMILIO SMITH UEBLER LLC
                                             2751 Centerville Road, Suite 401
                                             Wilmington, Delaware 19808
                                             Tel: (302) 468-5960

tuebler@mdsulaw.com
jchristensen@mdsulaw.com
awaskie@mdsulaw.com

Edward Totino (pro hac vice)
Nancy Nguyen Sims (*pro hac vice*)
Michael T. Boardman (*pro hac vice*)
BAKER & MCKENZIE LLP
10250 Constellation Blvd.
Suite 1850
Los Angeles, California 90067
Tel: +1 310 201 4728
Fax: +1 310 201 4721
edward.totino@bakermckenzie.com
nancy.sims@bakermckenzie.com
michael.boardman@bakermckenzie.com

*Attorneys for Plaintiff*
*The Boston Consulting Group, Inc.*

19