**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE BOSTON CONSULTING GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 22-363-CJB |
| GAMESTOP CORP., | ) ) | |
| Defendant. | ) ) | |

Thomas A. Uebler, Joseph L. Christensen, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, DE; Edward Totino, Nancy Nguyen Sims, Michael T. Boardman, BAKER & MCKENZIE LLP, Los Angeles, CA; Attorneys for Plaintiffs.

John M. Seaman, E. Wade Houston, ABRAMS & BAYLISS, Wilmington, DE; Trey Cox, Paulette C. Miniter, GIBSON, DUNN & CRUTCHER LLP, Dallas, TX; Attorneys for Defendants.

**<u>MEMORANDUM OPINION</u>**

March 29, 2023
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

In this case filed by Plaintiff The Boston Consulting Group, Inc. ("Plaintiff" or "BCG")

against Defendant GameStop Corp. ("Defendant" or "GameStop"), presently pending before the

Court is GameStop's motion to dismiss (the "Motion"), filed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (D.I. 43)  For the reasons set forth below, the Motion is GRANTED-IN-

PART and DENIED-IN-PART.

# I.       BACKGROUND

## A.       Factual Background

Defendant GameStop was once a highly profitable company, but by 2019, its financial

prospects were in very poor shape.  (D.I. 28 at ¶¶ 2-4)  In order to reverse this trend, in that year

GameStop engaged BCG, a consulting company; BCG was to evaluate GameStop's operations

and develop solutions that would help GameStop remain viable.  (*Id*. at ¶ 5)  Together, BCG and

GameStop identified an ambitious target of generating an additional $200 million or more in

profit per year going forward—all as part of a plan to make substantial changes across numerous

aspects of GameStop's business.  (*Id.*)

After four months of working together, BCG and GameStop reached a written agreement

regarding many of the details of BCG's engagement.  (*Id*. at ¶ 7)  This agreement was titled

"Statement of Work for BCG Support of GameStop's profit expansion program" (the "SOW"),

and it was signed on August 20, 2019.  (D.I. 26 (hereafter, "SOW"))  The SOW described how

BCG would provide support to GameStop in connection with at least 10 different identified

"workstreams," which were spread across a broad range of GameStop's operations.  (D.I. 28 at

¶¶ 8, 21)  In return, the SOW stated that BCG would be paid either a fixed fee of $16.5 million,

or an amount of variable fees, whichever was greater.  (*Id*. at ¶¶ 9, 24; SOW at ¶¶ 2.3, 3.2)

Pursuant to the SOW, any variable fees owed were to be based on *projected* profit improvements (as opposed to *actual* profit improvements) resulting from BCG-led initiatives relating to the various workstream.  (D.I. 28 at ¶¶ 9, 22, 24)  The SOW set out a process by which the parties were to work together in the future in order to try to agree on what those projected profit improvements would be.  (*Id.* at ¶¶ 21, 29; SOW at ¶ 4)  These to-be-agreed-upon profit projections would, in turn, relate to four categories of financial improvement areas (or "incentive components"), three of which are relevant to the instant case:  (1) "This Year [meaning 2019] Predicted Profit Improvement" or "TYPPI"; (2) "Next Year [meaning 2020] Predicted Profit Improvement" or "NYPPI"; and (3) "Annualized run-rate Projected Profit Improvement" or "APPI."  (D.I. 28 at ¶ 20; SOW at ¶ 2.2)  The SOW contains detailed examples and data meant to guide the parties in their discussions as to how projected profit improvements relating to various BCG initiatives in each workstream (and, relatedly, to TYPPI, NYPPI and APPI) could be calculated and agreed upon.  (*See, e.g.*, SOW at ¶ 4.3)

The SOW required that the parties would "hold regular sessions" to address issues related to their work together, including as to "financial target and planning coordination."  (*Id.* at ¶ 4.2.9)  The parties referred to these sessions as "thermometer meetings."  (D.I. 28 at ¶ 29)  To the extent the parties ultimately agreed on projected profit improvements relevant to the workstreams (and in turn, to TYPPI, NYPPI and APPI), the SOW required that the parties reduce those agreements to writing.  (SOW at ¶ 4.2.13)

Both before and after the SOW was signed, BCG employees and GameStop employees worked together under the terms of the SOW.  (D.I. 28 at ¶ 30)  Indeed, BCG "spent tens of thousands of hours working with GameStop across the various workstreams to analyze, develop,

and support the implementation of strategies across multiple areas of GameStop's business to increase profits." (*Id*.)

It is undisputed that GameStop paid some portion of the fees that BCG earned due to its work with GameStop. (*Id*. at ¶ 33) According to the FAC, these amounts included some variable fees that GameStop had "agreed" that BCG was entitled to—that is, variable fees relating to "projected profit improvements for certain workstreams" that the parties had come to a "specific agreement" on. (*Id*.)[1]

Eventually, however, GameStop allegedly began to default on its SOW-related obligations in two primary ways. First, BCG alleges that GameStop breached the SOW by failing to pay it certain variable fees as to which the parties never reached agreement. According to BCG, relevant to this category of breaches are the following actions by GameStop: (1) failing to challenge with any "supporting data" (or otherwise failing to "dispute[]" at all) BCG's assertions as to certain projected profit improvements; (2) failing to "provide necessary data, feedback and approvals of projected profit improvements" that would have been needed in order to determine the amount of variable fees owed; and (3) failing to and/or refusing to "even attend" the "contractually-required thermometer meetings" that would have led to agreement on certain projected profit improvements and additional variable fees owed. (*Id*. at ¶¶ 14, 42(b)-(e)) Second, BCG alleges that GameStop breached the SOW by failing to pay variable fee amounts that it had previously agreed to pay (i.e., fee amounts as to which GameStop had agreed on the underlying related projected profit improvements). (*Id*. at ¶¶ 33, 42(a)) As a result of these

---

[1]  Although it is not referenced in the FAC, GameStop asserts (and it is not really disputed here) that to date, it has paid BCG at least the $16.5 million in fixed fees referenced in the SOW and approximately $6 million in variable fees owed, for a total of over $22 million. (D.I. 44 at 1 n.1, 5-6; Tr. at 47)

4

alleged breaches of the SOW, BCG asserts that GameStop owes it approximately $30 million in variable fees that should have been paid, but were not.  (*Id*. at ¶ 37)

The SOW is lengthy and (at least in the Court's view) somewhat complicated.  The Court has not attempted to summarize all of its contents in this Section.  Nor it is necessary to understand all of the SOW's provisions in order to resolve the Motion.  That said, additional relevant facts regarding the SOW or the parties' history will be set out in Section III below, to the extent relevant to the Motion.

### B.    Procedural Background

Plaintiff commenced this action on March 22, 2022, (D.I. 1); it filed the operative First Amended Complaint ("FAC") on July 1, 2022, (D.I. 28).  Defendant filed the instant Motion on August 15, 2022.  (D.I. 43)  The Motion was fully briefed as of October 12, 2022.  (D.I. 52)  The Court heard argument on the Motion on March 9, 2023.  (D.I. 75 (herein "Tr."))[2]

## II.    STANDARD OF REVIEW

The sufficiency of pleadings for non-fraud claims is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  If a Rule 12(b)(6) movant asserts that the plaintiff's complaint fails to plead sufficient facts necessary to set out a plausible claim, then the reviewing court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.

---

[2]        The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.  (D.I. 11)

Second, the court determines "whether the facts alleged in the complaint are sufficient to show

that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009)).[3]  In assessing the plausibility of a claim, the court must "'construe the

complaint in the light most favorable to the plaintiff, and determine whether, under any

reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Id.* at 210 (quoting

*Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III.   DISCUSSION

With its Motion, GameStop seeks dismissal of both counts of the FAC:  Count I, which

sets out a claim for breach of contract pursuant to Delaware law, and Count II, which sets out a

claim for the breach of the implied covenant of good faith and fair dealing under Delaware law.

The Court takes up the arguments as to each count in turn.

### A.   Breach of Contract (Count I)

The Court first assesses GameStop's arguments as to Count I's breach of contract claim.

Pursuant to Delaware law, a plaintiff states a claim for breach of contract by plausibly alleging

the following elements:  (1) the existence of a contract, whether express or implied; (2) the

breach of an obligation imposed by that contract; and (3) resultant damages to the

plaintiff.  *Pharm. Corp. of Am. v. Askari*, C.A. No. 16-1123-RGA-MPT, 2018 WL 2108200, at

---

[3]      In resolving a motion to dismiss, a court typically only considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice.  *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING Bank, fsb v. PNC Fin. Servs. Grp., Inc*., 629 F. Supp. 2d 351, 354 (D. Del. 2009).  In this Memorandum Opinion, the Court has and will cite freely to the SOW.  Although the SOW is not attached to the FAC, it is of course liberally referenced therein and integral thereto.

*5 (D. Del. May 7, 2018), *report and recommendation adopted*, 2018 WL 3768988 (D. Del.

Aug. 8, 2018); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).[4]

As the Court noted above, there are two primary ways in which Plaintiff is claiming that

GameStop breached the SOW:  (1) by failing to pay certain variable fees as to which the parties

never reached agreement; and (2) by failing to pay certain variable fees after GameStop had

agreed to do so.  (Tr. at 48, 115-17)  The Court will address these two types of breach claims in

turn below.

> **1.      Failure to Pay Certain Variable Fees as to Which the Parties Never Reached Agreement**

With regard to this first type of breach of contract claim, there are four primary questions

that the Court must answer in order to determine whether BCG has stated a claim.

> **a.      Question # 1:  Was the SOW (at Least as to Its Provisions Regarding Agreement on Projected Profit Improvements and Related Payment of Variable Fees Owed) a Contract that Is Indefinite as to Any of Its Essential or Material Provisions?**

First, the Court must assess what type of contractual obligation is being asserted here

(and how that impacts the nature of the Court's review).  BCG argues that, when it comes to its

allegations about GameStop's failure to pay certain variable fees as to which the parties never

reached agreement, the Court should examine the allegations just like it would with any other

---

[4]      The proper construction of a contract is purely a question of law, and if a contract's language is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of a contract, or to create an ambiguity.  *Exelon Generation Acquisitions, LLC v. Deere & Co*., 176 A.3d 1262, 1266-67 (Del. 2017).  Ambiguity is present only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co*., 616 A.2d 1192, 1196 (Del. 1992).  A contractual provision is not rendered ambiguous simply because the parties in litigation differ as to the proper interpretation. *City Investing Co. Liquidating Tr. v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

7

run-of-the-mill breach of contract claim.  (D.I. 50 at 5-7; Tr. at 124-25)  But in the Court's view, things are a bit more complicated than that.

The issue is that under Delaware's traditional rule, courts will not typically enforce a contract that is indefinite as to any of its material and essential provisions.  *Omega Cap. Mgmt. Partners, LLC v. Schrage*, No. 21-2924, 2022 WL 17847192, at *2 (3d Cir. Dec. 22, 2022) (citing *Cox Commc'ns, Inc. v. T-Mobile US, Inc*., 273 A.3d 752, 761 (Del. 2022)); *Echols v. Pelullo*, 377 F.3d 272, 275 (3d Cir. 2004) (citing *Hindes v. Wilmington Poetry Soc'y*, 138 A.2d 501, 503 (Del. Ch. 1958)).  In determining whether an enforceable contract existed, a court asks whether the plaintiff has demonstrated that a "reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that the agreement concluded the negotiations[.]"  *Suppi Const., Inc. v. EC Devs. I, LLC*, C.A. No. N18L-11-009 AML, 2022 WL 17494807, at *3 (Del. Super. Ct. Dec. 8, 2022); *see also Loppert v. WindsorTech., Inc*., 865 A.2d 1282, 1285 (Del. Ch. 2004).

The problem here for BCG is that—at least with regard to the SOW's provisions relating to how much BCG was entitled to earn in variable fees—the contract does not evidence finality on all essential terms.  To be sure, as will be further discussed below, the SOW does include many agreed-upon provisions that were to be used as a *framework* to help the parties try to reach final agreement on this subject.  But even so, the SOW still required the parties to negotiate and agree in the future on "baselines, key assumptions [and] the amounts of the credits to be made to each of TYPPI, NYPPI and APPI from the subject initiative(s)"—all so that the parties could then agree on "predictions of the dollar amount of contributions of a proposed initiative or profit improvement lever to TYPPI, NYPPI and APPI[.]"  (SOW at ¶ 4.2.13; *see also id.* at ¶¶ 4.1,

8

4.2.9; D.I. 28 at ¶ 29 (FAC noting that "as required by the SOW, [the parties were to use the thermometer meetings to] agree upon financial baselines for each workstream and the anticipated profit improvement to each workstream, which would determine BCG's fees") (emphasis omitted); D.I. 44 at 7; D.I. 50 at 7; Tr. at 12-17)  Only after the parties agreed on those projected profit improvement terms would the payment of related variable fees be possible.  (D.I. 52 at 2; Tr. at 12-17, 85)

The Court has no trouble concluding on this record that a reasonable negotiator would deem these to-be-agreed-upon contractual terms as "essential" or "material."  After all, under Delaware law, a provision specifying the amount of compensation owed is understood to be one of the most important or material aspects of any contract.  *See Hindes*, 138 A.2d at 503; *see also Echols*, 377 F.3d at 275 (noting that Delaware courts have held that the "general rule is that price is an essential ingredient of every contract") (internal quotation marks and citations omitted). And here, these key inputs (i.e., regarding certain baselines, assumptions and the amount of projected profit improvements relating to each initiative) had to be first agreed upon in order for the parties to know how much variable fee compensation BCG would receive, if any.  (Tr. at 130-31)  That such terms were "essential" or "material" seems especially clear here, where the variable fees in question would be owed in return for "tens of thousands of hours [that BCG had spent] working on this project[.]"  (D.I. 28 at ¶ 11)

This conclusion is supported by a key opinion of the Delaware Supreme Court that both sides cited to frequently in their briefing: *Cox Commc'ns, Inc. v. T-Mobile US, Inc*., 273 A.3d 752 (Del. 2022).  In *Cox*, plaintiff Cox Communications, Inc. ("Cox") had entered into a settlement agreement with Sprint Corporation ("Sprint"); at issue in the case was a single term found in the first sentence of Section 9(e) of that agreement ("Section 9(e)").  273 A.3d at 755.

9

In order to settle a prior dispute between the parties, Cox had agreed in Section 9(e) that before it offered wireless mobile services to its customers, it would enter into a definitive exclusive provider agreement with Sprint. *Id.* To that end, the first sentence of Section 9(e) read as follows:

> Before Cox or one of its Affiliates (the "Cox Wireless Affiliate")[] begins providing Wireless Mobile Service . . ., the Cox Wireless Affiliate *will enter* into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, *on terms to be mutually agreed upon* between the parties *for an initial period of 36 months* (the "Initial Term").

*Id.* at 756 (emphasis added). The next sentence of Section 9(e) defined "Preferred Provider" as an exclusive partner with Cox in the MVNO business. *Id.*

After negotiations between Cox and Sprint broke down, a dispute later arose between them about the meaning of this portion of Section 9(e)—and the degree to which it was enforceable under Delaware law. *Id.* at 755. The Delaware Supreme Court, reviewing a decision by the Delaware Court of Chancery, first explained that under the traditional rule in Delaware, the absence or indefiniteness of material terms generally renders an agreement unenforceable. *Id.* at 761. However, it noted that in *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013), it had recognized that parties could enter into two types of enforceable preliminary agreements. *Id.* "Type I agreements" reflect a consensus "'on all the points that require negotiation'" but indicate the mutual desire to memorialize the pact in a more formal document. *Id.* (citation omitted). In "Type II agreements," the parties "'agree on certain major terms, but leave other terms open for future negotiation.'" *Id.* (certain internal quotation marks and citation omitted). The *Cox* Court explained that Type I agreements are fully binding, but

10

that Type II agreements "'do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith.'"  *Id*. (citation omitted).[5]

The *Cox* Court went on to conclude that Section 9(e) was not a Type I agreement or otherwise a contract including agreement on all material and essential terms.  *Id*.  This was because "it leaves a number of terms open, *such as price*."  *Id*. (emphasis added).  The *Cox* Court explained that Section 9(e) expressly contemplated that a future "'definitive'" agreement would be reached as to Sprint's Preferred Provider status, on terms that would "'be mutually agreed upon between the parties.'"  *Id*. (citation omitted).

Just as in *Cox* (where the price that Sprint would pay to be a Preferred Provider was left unresolved), here the SOW also left unsettled the amount of variable fees that BCG could earn from its engagement with GameStop.  And just as in *Cox*, here the SOW surely contemplated that a future definitive agreement on that subject would need to be reached between the parties. (SOW at ¶ 4.2.13 (explaining that "[n]o predictions of the dollar amount of contributions of a proposed product initiative or profit improvement lever to TYPPI, NYPPI and APPI will be made, and no credits to TYPPI, NYPPI and APPI will be given, unless and until, in each instance, the Parties have completed a sign-off process that culminates in written agreement on baselines, key assumptions, the amounts of the credits to be made [] from the subject initiative(s) and, as applicable, specific testing and validation procedures applicable to the subject

---

[5]       A Type II agreement does not guarantee that the parties will reach agreement on a final contract because "'good faith differences in the negotiation of the open issues'" may preclude final agreement.  *SIGA Techs.*, 67 A.3d at 349 n.85.  A Type II agreement "'does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'"  *Id*.

initative(s)")  Therefore, as to variable fee payments for which the parties did not come to

agreement, the SOW does not include all settled "essential" or "material" terms.

> **b.      Question # 2:  Was the SOW (at Least as to Its Provisions Regarding Agreement on Projected Profit Improvements and Related Payment of Variable Fees Owed) a Type II Preliminary Agreement, Such that GameStop Had an Obligation to Negotiate Any Open Issues In Good Faith?[6]**

BCG argues that if the Court (as it has above) concludes that this portion of the contract

should not be treated as one where all essential terms have been agreed to, then the Court should

at least find that the agreement is still enforceable as a Type II preliminary agreement (hereafter,

"Type II agreement").  (D.I. 50 at 8-9)  Thus, the second key question the Court must answer

here is whether the SOW's provisions relating to variable fee payments amount to such a Type II

agreement.  In arguing that they do, BCG asserts that GameStop breached "'an express

contractual obligation to negotiate in good faith'" over the remaining un-agreed-upon terms.  (*Id*.

at 8 (quoting *SIGA Techs.*, 67 A.3d at 344))  GameStop disagrees; it argues that the SOW cannot

be read as a Type II agreement.

The Court ultimately sides with BCG on this point.  In explaining why, it again turns

back to the *Cox* decision.

The *Cox* Court explained that although Section 9(e) left "a number of terms open" that

were relevant to a future deal to make Sprint a Preferred Provider, the provision was also "not

completely open-ended[.]"  273 A.3d at 761.  This was because Section 9(e) did include an

"'agreed framework'" within which the parties could further negotiate regarding the Preferred

---

[6]      As to the Court's Questions # 1 and # 2, neither party has suggested that it would be inappropriate for the Court to resolve these legal issues now, on this record.  Indeed, the parties are asking the Court to do so via their arguments as to the instant Motion.

Provider issue. *Id*. at 762.  The key aspects of that "agreed framework" were that Section 9(e) required:  (1) that "any agreement will identify Sprint as a 'Preferred Partner'"; and (2) that the agreement must "run 'for an initial period of 36 months.'"  *Id*. at 761; *see also id*. at 762 ("In this case, the 'agreed framework' is that any MVNO partnership between Cox and Sprint will be exclusive for three years.").  The fact that Cox and Sprint had agreed in these respects was enough for the *Cox* Court to conclude that the parties had reached "agree[ment] on certain major terms"—even though the parties had also left "other terms open for future negotiation[.]"  *Id*. at 761 (internal quotation marks omitted).  As a result, Section 9(e) was properly considered a "Type II preliminary agreement" and "Cox's only obligation under Section 9(e) [was] to negotiate open terms in good faith within the bounds of a 36-month exclusive relationship with Sprint."  *Id*. (internal quotation marks omitted).

As in *Cox*, here the portion of the SOW at issue amounts to a Type II preliminary agreement.  Indeed, BCG and GameStop came to agreement in the SOW on a greater number of components of an "agreed framework" for future negotiations than did the parties in *Cox*.  In *Cox*'s Section 9(e), Cox and Sprint had resolved only that (1) Sprint would hold "Preferred" status as a cellular service partner and (2) the minimum length of the deal would be 36 months.  They left all other aspects of the agreement to be hashed out in the future.  Yet here, BCG and GameStop agreed on pages and pages worth of details relating to the process for negotiating projected profit improvements relevant to the payment of variable fees.  Among these details were that the SOW:  (1) identifies the 10 workstreams relevant to BCG's consulting efforts (work that would give rise to the ability to earn variable fees), (SOW at ¶¶ 1.1, 4.3); (2) notes what work will be excluded from the scope of the incentive plan, (*id*. at ¶ 1.6); (3) sets a cap on the amount of variable fees that can be earned and on the dollar amount of contributions from

13

one of the workstreams, (*id.* at ¶¶ 2.3.1, 4.2.4); (4) provides target amounts for the variable fees earned for each of TYPPI, NYPPI and APPI, (*id.* at ¶ 2.3.2); (5) sets a presumptive date by which variable fee payment amounts are expected to be fully earned, (*id.* at ¶ 3.3); (6) defines what TYPPI, NYPPI and APPI are meant to capture and how they will be determined, (*id.* at ¶¶ 4.2, 4.2.5, 4.2.6); and (7) set out very detailed examples of the typical sources of profitability improvement for each of the workstreams, as well as significant detail on how TYPPI, NYPPI and APPI will be measured for each of those workstreams, (*id.* at ¶ 4.3).

Now, of course, the SOW did also make clear that there was still work left to do.  Even after the SOW's execution—and even with the benefit of all of these guideposts—the parties still had to, *inter alia*:  (1) identify relevant initiatives in the various workstreams that BCG would undertake; (2) agree on the most appropriate baseline(s) and key assumptions to be used at the onset of each such activity; and (3) agree on relevant predicted profit improvements that would contribute to TYPPI, NYPPI and APPI.  (*Id.* at ¶¶ 4.2.7-4.2.13)  Only after they came to those further agreements could variable fees be earned.  Nevertheless, the amount and the importance of the agreed-upon terms relevant to the variable fee calculation process certainly seem sufficient to show that the parties reached "agree[ment] on certain major terms" as to that issue.  *Cox*, 273 A.3d at 761 (internal quotation marks and citation omitted).

In asserting that this portion of the SOW does *not* amount to a Type II agreement, GameStop makes two primary arguments.  Neither are availing.

First, GameStop asserts that the above-referenced agreed-upon terms in the SOW regarding projected profit improvements are simply not the type of "major terms" that *Cox* identified as necessary to give form to a Type II agreement.  *Id.* at 761; *see also* (D.I. 52 at 5 (distinguishing this case from *Cox* on the ground that "the SOW lacks major terms concerning

14

any future agreement on projected profits").  But as the Court has set out above, the number and the importance of those agreed-upon terms seem just as "major," if not more "major," than the relevant agreed-upon terms in *Cox*'s Section 9(e).  GameStop has not cited (and the Court has not found) caselaw indicating that agreed-upon terms like these are not "major" under the meaning of *Cox* and its progeny.  *Cf. Greentech Consultancy Co., WLL v. Hilco IP Servs., LLC*, C.A. No. N20C-07-052 AML CCLD, 2022 WL 1499828, at *12-13 (Del. Super. Ct. May 11, 2022) (concluding that a term sheet amounted to a Type II agreement, because it contained "certain major terms" regarding a transaction, such as "the general terms and conditions" of the deal, but still left open several key conditions relevant to closing, including negotiation and execution of certain transaction documents, receipt of certain approvals from a third party, and receipt of agreements on terms of payments for certain vendors).  And so this argument is not well-taken.

Second, GameStop argues that:  (1) in *SIGA Techs*., the Delaware Supreme Court indicated that a Type II agreement only exists where the contract at issue contains an "'*express* contractual obligation to negotiate in good faith[;]'"; but (2) the SOW does not contain this type of express provision.  (D.I. 52 at 3-5 (quoting *SIGA Techs.*, 67 A.3d at 344) (emphasis in original))  GameStop's point is that the SOW does not include a provision stating something like the following:  "The parties agree to further negotiate in good faith as to the open issues regarding projected profit improvements regarding all workstreams."  (*Id.*)  And it is true—the SOW does not use the words "good faith" in that manner.[7]  But this argument does not win the day for GameStop either.

---

[7]     As GameStop points out, the SOW does occasionally use the words "good faith" in other ways, such as when discussing certain other obligations that the parties have agreed to

In part that is because it is not clear to the Court that a Type II agreement must actually include an *express* "good faith negotiation" provision, in order for the parties to still be bound to negotiate open terms in good faith.  Some Courts, including the United States Court of Appeals for the Third Circuit and the Delaware Superior Court, have read *Cox* to stand for the proposition that Section 9(e) did *not* contain an express good faith negotiation provision, and therefore that "Delaware law *does not require* that a Type II agreement include an express contractual promise to negotiate in good faith."  *Omega Cap. Mgmt. Partners*, 2022 WL 17847192, at *2 n.3 (citing *Cox*, 273 A.3d at 761) (emphasis added); *see also Greentech Consultancy Co.*, 2022 WL 1499828, at *13 (reading *Cox* as discussing an agreement that "did not contain an express obligation of good faith" and that instead contained an "implied obligation to negotiate in good faith[,]" and concluding that nevertheless *Cox* "recognized [the agreement at issue] as a Type II preliminary agreement"); *see also 37celsius Cap. Partners, L.P. v. Intel Corp.*, Case No. 20-CV-621, 2022 WL 3100942, at *4 (E.D. Wis. Aug. 4, 2022) (examining *Cox*); *but see SIGA Techs.*, 67 A.3d at 343-44 (citing cases).  Obviously, if these courts are correct, and if the parties to an enforceable Type II agreement do not need to include an express provision in the agreement that requires future good faith negotiations in order for such an obligation to be binding, then any failure of the SOW to include such an express provision could not result in dismissal of Count I.

---

undertake.  (D.I. 52 at 5; *see also, e.g.*, SOW at ¶ 3.3 (noting that the parties will "in their good faith reasonable discretion" jointly determine what amount of money should be withheld in certain circumstances as to the "'Run Rate Target' incentive"); SOW at ¶ 4.2.4 (using the term "good faith" to discuss the parties' obligations as to certain aspects of variable fee discussions relevant to the "Video Game Ecosystem, OEM/Publisher Partnerships" workstream); SOW at ¶ 5.4 (noting that the parties will "work together in good faith" to agree in writing on the impact of any changes to the agreed scope, resources, timelines, or assumptions of the engagement))

But the Court need not resolve that issue here.  That is because even assuming that a Type II agreement must include express provisions requiring the parties to further negotiate open terms in good faith, here the SOW did so.  In the Court's view, it is possible that parties can expressly agree to negotiate open terms in good faith even if they do not use the words "good faith" when memorializing that type of requirement.  After all, there are different ways to say the same thing.  (Tr. at 79-82)  And the SOW includes just such wording.  For example, in order to agree on improvements for a workstream initiative, the parties first needed to determine what were the appropriate baselines to be used in the calculation process.  To that end, in Section 4.2.7 of the SOW, the parties "*agree[d] to jointly define* the most appropriate baseline to be used at the onset of each profit improvement activity" and in Section 4.3 (as to each of the workstreams at issue) the parties agreed to "*work together*" to develop the baseline from which to calculate savings or to define a fair assessment of TYPPI, NYPPI and APPI.  (SOW at ¶¶ 4.2.7, 4.3.2, 4.3.3, 4.3.4, 4.3.5, 4.3.6, 4.3.7, 4.3.8, 4.3.9 (emphasis added))  Next, Section 4.1 states that, with certain exceptions, the parties "will agree" on projected profit improvements for each relevant initiative.  (*Id*. at ¶ 4.1)  Section 4.2.9 then requires the parties to "hold regular sessions" (i.e., the thermometer meetings) to address, *inter alia*, "financial target and planning coordination[.]"  (*Id*. at ¶ 4.2.9)  And Section 4.2.13 states that no agreement on projected profit improvements or credits to TYPPI, NYPPI and APPI would have effect until the parties "have completed a sign-off process that culminates in [a] written agreement" on necessary parameters.  (*Id*. at ¶ 4.2.13)  The parties' agreement that they would "work together" to and "will agree" on projected profit improvements—and that they would "hold regular sessions" to do so in an effort to come to a "written agreement" on the matter—together amount to an express agreement that they would negotiate in good faith on these points.  *Cf. Brown v. Cara*, 420 F.3d 148, 158 (2d Cir. 2005) (in

17

concluding pursuant to New York law that a contract was a Type II preliminary agreement, noting that the parties agreed that they would "*work together* to develop, build, market, and manage [the property at issue]" and "*work together* in accordance with the terms and conditions outlined in the [agreement,]" and stating that "[w]e cannot imagine more clear evidence of an intention to be bound to the [agreement] as a general framework in which the parties will proceed in good faith toward the goal of developing the [property]") (internal quotation marks omitted, emphasis added); *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 228 (S.D.N.Y. Mar. 20, 2012) (concluding pursuant to New York law that the parties contractually obligated themselves to negotiate in good faith, in part because of a contractual provision reflecting an agreement by defendants to "'*work with*'" the plaintiff "'with respect to a possible transaction'") (emphasis added); *Data Ctrs., LLC v. 1743 Holdings, LLC*, C.A. No.: N15C-02-041 EMD CCLD, 2015 WL 9464503, at *9 (Del. Super. Ct. Oct. 27, 2015) (concluding under Delaware law that a letter of intent and other documents amounted to a Type II agreement, where the letter's "express contractual language" stated that a defendant agreed to "'*work with*'" the plaintiff to complete a Steam Sale Agreement) (emphasis added); *see also* (Tr. at 90-91, 132).

For all of these reasons, the Court concludes that the SOW contains a Type II preliminary agreement with regard to the duty to negotiate in good faith toward agreement on projected profit improvements and the payment of variable fees.

          **c.**        **Question # 3:  If (at Least as to Its Provisions Regarding Agreement on Projected Profit Improvements and Related Payment of Variable Fees Owed) the SOW Amounts to a Type II Preliminary Agreement, Did BCG Plead Sufficient Facts to Plausibly Allege that GameStop Breached its Duty to Negotiate the Open Issues in Good Faith?**

The third key question the Court must answer is:  If the SOW's provisions regarding agreement on projected profit improvements and variable fees owed amount to a Type II preliminary agreement, then has BCG actually pleaded facts plausibly alleging that GameStop breached its duty to negotiate in good faith?

GameStop says the answer to this question is "no."  In fact, it argues that any assertion that it breached a Type II agreement is a "new and unpled claim"; in its view, the FAC does not "allege that any of the SOW provisions listed in [BCG's brief] contain an obligation to negotiate in good faith about profit projections" or that "GameStop breached those provisions on that basis."  (D.I. 52 at 3; *see also id*. at 4, 6)

Here, the Court has some sympathy for GameStop.  It is not as if BCG ever makes reference in the FAC to a "Type II preliminary agreement."  Nor does the FAC use the term "good faith" in the body of Count I.  And surely BCG's factual allegations about this type of breach of contract claim could have been more fulsome.  But in the end, the Court concludes that the FAC does just enough to make out a viably-pleaded claim for breach of a Type II agreement.

For one thing, there *are* portions of the FAC that read as if BCG is making a "you failed to negotiate in good faith about projected profit improvements"-type of argument.  Those portions include at least the following:

- In paragraph 29, BCG notes that in the SOW, BCG's "fees were to be assessed based upon agreed-upon projected profits that GameStop was anticipated to achieve against agreed-upon baselines[.]"  (D.I. 28 at ¶ 29 (emphasis omitted))  It then asserts that "GameStop could not simply disagree with BCG's calculations to avoid paying fees" and instead "had to present legitimate reasons for any disagreements, supported by relevant data."  (*Id*.)  In paragraph 35, BCG goes on to allege that GameStop "never provided any supporting data from which to refute [BCG's] projected profit improvements" and has "simply demanded reductions without any data or analysis to

19

support them[.]"  (*Id.* at ¶ 35)  This, BCG alleges, violates the
SOW's requirements that "GameStop *cooperate in good faith*
to timely approve goals and projections."  (*Id.* (emphasis
added))[8]  Similar allegations are also repeated in the body of
Count I itself.  (*Id.* at ¶¶ 42(b)-(d))  The Court reads these
portions of the FAC as asserting that, pursuant to the SOW,
GameStop could not simply disagree with BCG's views about
projected profits *without making a good faith attempt to
negotiate in response to that view, or without providing a good
faith explanation as to why it disagreed.*  BCG is alleging that,
in order to meet its obligation to negotiate in good faith,
GameStop at least had to provide "reasons" or "data" or some
other feedback explaining why it had a contrary view about
certain profit projection numbers.  And it is suggesting that
GameStop did not do so.  (D.I. 50 at 10 n.3 (BCG explaining
that its allegation here is that GameStop could not "simply
stonewall BCG"))[9]

---

[8]        In this portion of paragraph 35, BCG cites for support to Section 1.3 of the "BCG
Standard Terms" ("Standard Terms") document, (D.I. 28 at ¶ 35), which is appended to the end
of the SOW, (SOW at Standard Terms at ¶ 1.3).  The Court has reviewed Section 1.3 of the
Standard Terms and has discussed it with the parties.  (Tr. at 136-42, 170)  Candidly, the Court
does not see how this section relates to the negotiation process regarding projected profit
improvements or variable fees owed.  Instead, the section seems to be discussing how GameStop
has agreed to cooperate with BCG regarding the delivery of BCG's consulting services—such as
how GameStop will provide BCG with access to certain data or materials or services, so that the
BCG consultants who are trying to perform work on agreed-upon initiatives can do their job.
(SOW at Standard Terms at ¶ 1.3; *see also* D.I. 44 at 12; Tr. at 140-41)  Yet even though Section
1.3 of the Standard Terms does not appear to be about the duty to negotiate over projected profit
improvements/variable fees in good faith, the remainder of paragraph 35 *is* pretty clearly
referring to that type of a duty—a duty that *is* described in other sections of the SOW.

[9]        In one portion of its opening brief, GameStop seemed to read these allegations
differently—i.e., that BCG was alleging that GameStop had breached the SOW because
GameStop *failed to agree* on certain projected profit improvements with BCG.  (D.I. 44 at 7-8)
However, that is clearly not the allegation that BCG is making here.  BCG does not claim that
the SOW required that the parties actually *had to end up agreeing* on certain variable fee-related
profit projections.  BCG knows that the SOW allowed for the possibility that the parties would
not agree on that score.  Instead, BCG is faulting GameStop for failing to sufficiently go through
the process of *attempting to obtain that agreement in good faith.*  (D.I. 50 at 9 ("[T]he SOW
clearly does not confer GameStop with the discretion to simply deny BCG's variable fees at will.
To the contrary, the SOW states that the parties are to 'work together' to determine profit
improvements . . . and 'to define a fair assessment of the TYPPI, NYPPI and APPI.'"))

- In paragraph 36, BCG asserts that GameStop also "refused to attend Thermometer Meetings, despite the fact that such meetings are mandatory under the SOW" and that GameStop's "cancellation of these meetings prevented the parties from engaging in discussions to confirm fees owed to BCG." (D.I. 28 at ¶ 36; *see also id.* at ¶ 14)  This allegation is repeated in the body of Count I as well.  (*Id.* at ¶ 42(e) (alleging that GameStop "fail[ed] and refus[ed] to even attend contractually-required thermometer meetings to validate projected profit improvements and BCG's fees"))  Surely these are portions of the FAC where BCG is faulting GameStop for failing to engage in good faith negotiations over variable fees.  If GameStop refused to attend the very meetings at which the parties were supposed to negotiate over projected profit improvements, how could the parties ever reach good faith agreement on that subject?

Additionally, there are portions of the FAC in which BCG references the very contractual provisions (discussed above) that give rise to GameStop's duty to negotiate in good faith.  In paragraph 27 of the FAC, BCG cites to the SOW's Section 4.3—the section in which the parties agree to "work together" to develop key assumptions that will guide agreement on projected profit improvements for the various workstreams.  (*Id.* at ¶ 27)  And in paragraph 29, BCG references Section 4.2.9's requirement that the parties must "hold regular sessions" to address, *inter alia*, "'financial target and planning coordination[.]'"  (*Id.* at ¶ 29 (citation omitted))

This all indicates that there is enough factual detail in the FAC to provide reasonable notice of the claim for breach of a Type II agreement.  Again, as noted above, the FAC asserts that GameStop "never provided any supporting data from which to refute [BCG's] projected profit improvements" and has "simply demanded reductions without any data or analysis to support them[.]"  (*Id.* at ¶ 35)  And it alleges that GameStop "refused to attend Thermometer Meetings" and "cancell[ed]" such meetings.  (*Id.* at ¶ 36)  Now, it is surely true that the FAC could have included more factual detail about these alleged breaches.  That is, the FAC could

have included reference to the dates on which these projected profit improvement proposals or demands for reductions were made, or the dates on which the relevant thermometer meetings were cancelled.  And it could have named the people who proposed those relevant profit improvements, or who demanded the reductions, or who cancelled the meetings.  But Rule 8 applies to these allegations, not Federal Rule of Civil Procedure 9(b).  *See Eastman Chem. Co. v. AlphaPet Inc*., Civ. Action No. 09-971-LPS-CJB, 2011 WL 5402767, at *11 (D. Del. Nov. 4, 2011) ("Defendants again seek to impose a heightened pleading burden on Plaintiff, which is at odds with the less stringent requirements of Rule 8."); *see also* (Tr. at 97).  And although they are a bit sparse at times, it is not as if the above-referenced allegations are entirely devoid of recognizable factual underpinnings.  They let GameStop know what types of acts are said to give rise to breach.  And those alleged breaching acts (such as the cancellation of specific types of meetings) do not seem to have been so ubiquitous as to leave GameStop in the dark about what is being referenced.  *Cf. Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, C.A. No. 7668-VCN, 2015 WL 394011, at *6 (Del. Ch. Jan. 29, 2015).

Therefore, the Court concludes that BCG has pleaded sufficient factual matter to allege a plausible claim for breach of a Type II agreement.

d.     **Has BCG Sufficiently Alleged Damages Relating to GameStop's Alleged Breach of the Type II Agreement?**

The fourth key question the Court must answer is whether, as to its claim for a breach of a Type II agreement, BCG has sufficiently alleged resultant damages.  In *SIGA Techs*., the Delaware Supreme Court explained that where parties have a Type II preliminary agreement to negotiate in good faith, the plaintiff can recover reliance damages or, if there is a finding that the

22

parties "would have reached agreement but for the defendant's bad faith negotiations[,]" the plaintiff can recover expectation damages.  *SIGA Techs.*, 67 A.3d at 350-51.

GameStop argues that—at least with regard to the allegations that it refused to attend or cancelled thermometer meetings—BCG has failed to plead a plausible claim to expectation damages.  (D.I. 44 at 13)[10]  That is assertedly because "BCG fails to allege facts showing plausibly that, but for GameStop's purported cancellations, the parties *would have agreed* on 'the anticipated profit improvement[s] . . . which would determine BCG's [variable] fees.'"  (*Id*. (quoting D.I. 28 at ¶ 29) (emphasis added); *see also* D.I. 28 at ¶ 43 (BCG alleging in Count I that "[a]s a direct and proximate result of GameStop's failure to perform its obligations under the SOW, BCG has been damaged" to the tune of $30 million))

The Court rejects this argument.  A plausible claim is all that is needed here, and there are allegations in the FAC that surely meet this bar.  The text of the SOW itself and the FAC's allegations about the parties' history together is evidence that further good faith negotiations might plausibly have led to agreement on additional projected profit improvements (and related variable fee payments).  The FAC alleges that BCG and GameStop had numerous discussions over a fourth-month period in 2019; these negotiations are alleged to have been "grounded in good faith" and resulted in the SOW.  (D.I. 28 at ¶¶ 7, 12)  As a result of those negotiations, the SOW included various detailed terms providing a framework for further negotiations about

---

[10]        In its opening brief GameStop also asserted that, to the extent that the FAC alleges a breach of contract based on it having made late payments to BCG, the FAC also failed to plausibly assert damages flowing from any such breach.  (D.I. 44 at 14-15)  But in its answering brief, BCG confirmed that it is not asserting breach of contract as to any purportedly late payments made by GameStop.  (D.I. 50 at 16 n.5)  So the Court need not examine that issue any further.

projected profit improvements.  If the parties were able to reach agreement on all of those many

details by negotiating in good faith throughout 2019, then it seems at least plausible[11] that (had

GameStop not cancelled future thermometer meetings) they might *also* have reached agreement

on additional projected profit improvement figures thereafter.  (Tr. at 157)

### e.    Conclusion

For the reasons set out above, BCG has plausibly alleged a breach of contract claim

regarding breach of a Type II preliminary agreement.  This type of claim is viable in Count I and

can move forward.

### 2.    Failure to Pay Variable Fees After Agreement Had Been Reached

The Court now turns to the second type of alleged breach of contract that BCG presses in

Count I:  GameStop's alleged failure to pay certain variable fees after agreement on those fees

had been reached.[12]  Here though, and even giving BCG every benefit of the doubt, the Court

---

[11]    During oral argument, GameStop's counsel argued that the damages-related allegations here were insufficient because it was "*very possible* that the parties could have negotiated in good faith [had they actually held the above-referenced thermometer meetings] and never reached an agreement, in which case there would be no damages for [GameStop's] failure to attend meetings." (Tr. at 103-04 (emphasis added))  But of course, BCG need only make *plausible* allegations in its FAC; that other "possible" inferences can be drawn from the facts alleged does not make the allegations implausible.

[12]    The parties appear to agree that even if the SOW contains a Type II agreement as to the duty to negotiate in good faith over predicted profit improvements and the payment of variable fees, the SOW may still include other provisions, independent of that duty, that can be enforced via a breach of contract claim.  (D.I. 52 at 1 (GameStop asserting that it "doesn't challenge the SOW's enforceability" and instead only "challenges any claim that GameStop was required to reach an agreement with BCG on 'projected profits that GameStop was anticipated to achieve'"); Tr. at 67-72 (GameStop's counsel noting that "to the extent there is any [T]ype [II] agreement, it would be an agreement to agree on predicted profit improvements" as the "proper way to look at the contract is not to say that the entire contract is an agreement to agree" and that "if the [SOW] contains multiple obligations, all of these are enforceable"))  The Court assumes without deciding that this is so.

concludes that there are just simply not enough facts pleaded to give GameStop fair notice of this type of claim.

In part, this is because the relevant allegations of breach are made in only one sentence, which is essentially repeated three times in the FAC. In paragraph 13, for example, BCG claims that "[i]n many cases, GameStop has refused to pay BCG's fees even after agreeing to the projected profit improvements." (D.I. 28 at ¶ 13) In paragraph 33, BCG again similarly asserts that "GameStop has failed to pay all fees due and owing, however, even despite their specific agreement as to the underlying projected profit improvements for certain workstreams." (*Id*. at ¶ 33) And then in the body of Count I, BCG states that GameStop breached the SOW by "failing to pay BCG's fees, even for work that resulted in projected profit improvements that the parties have expressly agreed upon[.]" (*Id*. at ¶ 42(a)) This is the sum total of BCG's allegations on this point.

This one basic type of assertion, which amounts to little more than "You failed to pay me fees that you agreed to pay," is so devoid of any meaningful factual content that it fails to provide GameStop with even a basic understanding of the alleged wrong. As GameStop notes, "BCG never identifies which workstreams were involved, what was purportedly agreed to or how, or any other facts providing fair notice of the basis for this claim." (D.I. 44 at 9-10; *see also* Tr. at 101) And that is surely true. But even putting that aside, the FAC additionally fails to let GameStop know if these allegations relate to written or oral "agreement[s]" to pay. During oral argument, the Court asked this question of BCG's counsel, who responded that the FAC means to allege "both": i.e., that in "some cases it's oral agreements at meetings that were never followed up on and paid and some other cases I think there are sign off sheets that are signed with a signature with GameStop on them that we never received payment for." (Tr. at 163-64;

25

*see also* Tr. at 101)  Whether the purported agreements at issue were written or oral may well make a big difference as to whether GameStop can be legally bound.  (*See* SOW at ¶ 4.2.13)  Yet GameStop would have no basis to know whether oral or written promises are at issue here (or anything else about the substance of the alleged promises) from simply reading the FAC.  (D.I. 52 at 8)

Under these circumstances, the Court concludes that Count I does not sufficiently plead a claim for breach of contract as to agreed-upon variable fees owed.  *See, e.g.*, *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008) ("The bare allegations that Defendants 'failed to make timely payments' and 'failed to properly account' to Plaintiffs . . . are, without more, conclusory.  They are unsupported by any specific facts indicating what particular payments were late, when they were due and made, how such late payments give rise to a claim . . ., or how such a claim translates into damages."); *iCARD Stored Value Sols., L.L.C. v. West Suburban Bank*, No. 4:07-CV-1539 CAS, 2008 WL 619236, at *2 (E.D. Mo. Mar. 3, 2008) (concluding that a claim for breach of contract should be dismissed, where the claim asserted that the contract required the defendant to "perform certain services" but the defendant "refused" to do so, because the pleading failed to provide any further factual allegations as to what acts amounted to breach) (internal quotation marks and citation omitted).

### B.    Implied Covenant of Good Faith and Fair Dealing (Count II)

Lastly, the Court assesses GameStop's arguments as to Count II's claim for a breach of the implied covenant of good faith and fair dealing.

"The covenant [of good faith and fair dealing] is best understood as a way of implying terms in [a contractual] agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434,

441 (Del. 2005) (internal quotation marks and citations omitted). "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id*. at 442 (internal quotation marks and citations omitted). The elements of a claim for the breach of the implied covenant of good faith and fair dealing are that there be "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Jeter v. RevolutionWear, Inc*., C.A. No. 11706-VCG, 2016 WL 3947951, at *6 (Del. Ch. July 19, 2016) (internal quotation marks and citations omitted); *see also Kyle v. Apollomax, LLC*, 987 F. Supp. 2d 519, 527 (D. Del. 2013). Parties are liable for breaching the covenant when "their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442 (citation omitted).

Applying the covenant, however, "involves a cautious enterprise," in which one "generally cannot base a claim for breach . . . on conduct authorized by [an] agreement." *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010) (internal quotation marks and citation omitted). To be sure, the Delaware Supreme Court "has recognized 'the occasional necessity' of implying contract terms to ensure the parties' 'reasonable expectations' are fulfilled." *Dunlap*, 878 A.2d at 442 (citation omitted). "This quasi-reformation, however, 'should be [a] rare and fact-intensive' exercise, governed solely by 'issues of compelling fairness[,]'" *id.* (citation omitted), and one that is only "rarely invoked successfully[,]" *Kuroda*, 971 A.2d at 888. For example, the "implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec*, 991 A.2d at 1127. And "[o]nly when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they

thought to negotiate with respect to that matter' may a party invoke the covenant's protections."
*Dunlap*, 878 A.2d at 442 (citation omitted).

In Count II, BCG is asserting that when GameStop failed to negotiate in good faith over the payment of variable fees, that failure amounted to a breach of the implied covenant of good faith and fair dealing.[13]  In other words, Count II asserts that the SOW does not contain any provisions prohibiting GameStop from engaging in a bad faith failure to negotiate projected profit improvements and future variable fees owed.  But as set forth above, the parties *did* anticipate that this type of good faith provision was needed in the SOW.  And the SOW *did* give BCG the "express contractual right" to require GameStop to engage in such good faith negotiations.  This all indicates that the SOW clearly covers the type of conduct that is addressed in Count II.  (D.I. 50 at 17 (BCG noting that it does "not necessarily disagree" that the SOW contains provisions relating to what is alleged in Count II and that, if so, "enforcement of an implied covenant is unnecessary"))[14]  In such cases, where it cannot be plausibly alleged that there is any gap to fill in the contract via the purportedly implied contractual terms, dismissal of

---

[13]     More particularly, BCG alleges that GameStop was guilty of such a breach by "failing to participate in Thermometer Meetings in good faith (and in some cases, at all), refusing to finalize in good faith the projected achievement rate to TYPPI, NYPPI, and APPI resulting from BCG's services under the SOW, raising spurious defenses to payment, and demanding unsupported deductions from the agreed-upon metrics upon which BCG's fees were based in order to hold payment of BCG[']s fees in limbo and prevent final resolution of the project[.]" (D.I. 28 at ¶ 46)

[14]     The Court acknowledges that a party may plead in the alternative in federal court. (D.I. 50 at 17); *see Williams v. Progressive Direct Ins. Co.*, Civil Action No. 22-510-MAK, 2022 WL 4482726, at *10 (D. Del. Sept. 27, 2022).  But such "in the alternative" allegations must still at least be plausible.  *Juju, Inc. v. Native Media, LLC*, Civil Action No. 19-402-CFC, 2020 WL 3208800, at *6 n.3 (D. Del. June 15, 2020), *report and recommendation adopted*, 2020 WL 4001059 (D. Del. Jul. 15, 2020).  And for the reasons set out above, BCG's claim in Count II is not.

this type of claim is appropriate. *See, e.g.*, *Truinject Corp. v. Nestle Skin Health, S.A.*, C.A. No. 19-592-LPS-JLH, 2020 WL 70981, at *15-16 (D. Del. Jan. 7, 2020) (dismissing claims for alleged breaches of the implied covenant of good faith and fair dealing under Delaware law, where the contract clearly addressed the issues said to give rise to the asserted breaches of the covenant); *cf. Buck v. Viking Holding Mgmt. Co. LLC*, C.A. No. N20C-08-249-AML (CCLD), 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021) (same).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's Motion should be GRANTED-IN-PART and DENIED-IN-PART. More specifically, the Motion is DENIED as to Count I's allegation of breach of contract as to a Type II preliminary agreement contained in the SOW. The Motion is GRANTED as to Count I in all other respects and also as to Count II.

BCG sought the opportunity to further amend the FAC if any portion of the Motion were successful. (D.I. 50 at 18) The Court does not see how BCG could plead a claim as to Count II in light of the analysis set out above, and so it appears that any further attempt to do so would be futile. But as to BCG's attempted claim in Count I for, *inter alia*, breach of contract due to the failure to pay agreed-upon variable fees owed, BCG may be able to further state such a claim. Therefore, and because amendment should be permitted freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), BCG will be permitted an opportunity to file a further amended complaint to address this type of claim by no later than 14 days from today's date.

An appropriate Order will issue.