IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE BOSTON CONSULTING GROUP, INC., a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>GAMESTOP CORP., a Delaware corporation,<br><br>Defendant. | C.A. No. 22-00363-CJB<br><br>**JURY TRIAL DEMANDED** |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff The Boston Consulting Group, Inc. ("BCG") hereby alleges against Defendant GameStop Corp. ("GameStop") as follows:

**INTRODUCTION**

1. This action arises out of GameStop's bad faith refusal to pay fees owed to BCG under a written agreement.

2. Once a highly profitable company, GameStop's profits and financial prospects had fallen precipitously by the mid-2010s, and by 2019 GameStop was on life support. Hemorrhaging customers and unable to grow its business, GameStop reported net operating losses of almost $800 million in 2018, including a $970.7 million "goodwill impairment charge" to account for the loss of value from its brand. Due to these huge losses, GameStop eliminated its dividend and by August 2019, GameStop's common shares had fallen to $3.32 per share from its prior high of approximately $55. Already one of the most heavily shorted stocks relative to its float in early 2019, GME (GameStop's ticker symbol) became the most heavily shorted stock in the United States by the first quarter of 2020.

3. GameStop's 2020 10-K filing with the Securities and Exchange Commission disclosed 34 different material risk factors for investors to consider with respect to the company's operations and confirmed the grim picture of the company's financial performance. In the report,

1

GameStop also compared the value of its shares to that of the S&P 500 and an index of comparable specialty retailers over the previous five years, showing that GameStop significantly underperformed its peers and the marketplace as a whole. To put the decline in perspective, an investor who purchased $100 of GameStop's common stock on January 30, 2015 would have had only $14.64 five years later. Investors in a cross-section of other comparable specialty retailers, however, would have nearly doubled their initial investment:[1]



4. In addition to its mounting financial losses, GameStop was also in a period of significant operational turmoil. GameStop had three different Chief Executive Officers in 2018 alone in addition to other executive changes.

5. Realizing that the company was in need of significant help, GameStop engaged BCG in 2019 to evaluate its operations and develop solutions that would enable a corporate transformation to improve its chances of continued viability. Together, BCG and GameStop identified an ambitious target of generating an additional $200 million or more in profit per year going forward, based on their agreed-upon plan to make substantial changes across numerous aspects of GameStop's business.

6. Negotiations regarding the details of this massive profit expansion program were conducted primarily between BCG and Daniel Kaufman, GameStop's Executive Vice President,

---

[1] GameStop's 2020 10-K filing is available here: https://sec.report/Document/0001326380-20-000022/

Chief Administrative & Legal Officer, who became the company's Executive Vice President & Chief Transformation Officer in May 2019. Like many of GameStop's other executives, however, Mr. Kaufman is no longer with the company. Mr. Kaufman left GameStop in 2020 after 18 years of employment there.

7.  In August 2019, after BCG had worked alongside Mr. Kaufman and other GameStop leaders for approximately four months, the parties memorialized their relationship by executing a written contract, entitled "Statement of Work for BCG Support of GameStop's profit expansion program" (the "SOW").[2] Under the SOW, BCG would provide support to GameStop in connection with ten (10) different workstreams, spread across a broad range of business areas and opportunities. The parties also had the option of identifying additional savings opportunities and profit improvement initiatives (also known as levers) along the way, which could be incorporated into an existing workstream or allocated to a newly-created workstream, as agreed upon by the parties.

8.  Pursuant to the SOW, BCG analyzed the existing structure and operations of the GameStop business, worked with GameStop personnel to formulate strategies for setting the company on a more sustainable path going forward, and provided detailed plans for reinvigorating and improving the profitability of the company, all of which were tethered to specific proposals and projected profit improvements. Given the significant challenges facing GameStop at the time, the scope of BCG's work was extensive and involved nearly every area of GameStop's operations.

9.  The SOW provided that BCG would be compensated on the greater of a fixed fee or a variable fee based upon projected profit improvement for each workstream. BCG's variable fee was not predetermined and was not capped as to the vast majority of the workstreams. Rather, with one limited exception, which GameStop specifically negotiated, BCG's compensation was tied directly to the projected profit improvements resulting from its work (*i.e.*, the best possible estimate of each initiative's expected impact as compared to a baseline as it existed at the time the

---

[2] A copy of the SOW has previously been filed under seal as Dkt. No. 26 and is hereby incorporated by this reference.

decision to launch such initiative was made). In other words, BCG's variable fees were based upon projected profit improvements, **not** actual profit improvements. Indeed, the SOW provided that even 2019 profit improvements, and BCG's resulting fees, were based upon projections even though that year was already underway by the time the SOW was signed.

10. The concept of basing BCG's variable fees on projected improvements rather than actual results was negotiated and agreed upon by the parties specifically to ensure that BCG and GameStop's incentives were aligned. This structure was intended to: incentivize BCG to significantly improve profits; prevent BCG from taking credit for and/or being penalized for external factors outside the parties' control; and protect BCG from additional factors, such as GameStop's execution risk, *i.e.*, GameStop failing to take the actions necessary to implement the plan and achieve the predicted results.[3]

11. In reliance on the SOW, and on GameStop acting in good faith, BCG spent tens of thousands of hours working on this project and it overachieved, identifying and creating plans to capture substantially more profit improvement opportunities than what had been targeted in the SOW and what was contemplated in the SOW's original scope.

12. Mr. Kaufman, in addition to negotiating the SOW, had served as the primary point of contact for GameStop and worked closely with BCG to manage the project until his departure on June 1, 2020. With Mr. Kaufman at the helm for GameStop, the parties had a healthy working relationship, grounded in good faith, and were able to and did agree upon baselines and profit improvement projections as required by the SOW.

13. Eventually, after Mr. Kaufman left GameStop, GameStop began failing and refusing to perform as required by the SOW. Specifically, under the leadership of GameStop's new Chief Financial Officer, Jim Bell, GameStop failed and refused to participate in good faith in meetings to discuss and confirm profit improvement projections and refused to pay significant

---

[3] Under Section 3.3 of the SOW, GameStop was allowed to temporarily withhold up to $2.8 million in fees related to annual run-rate profit improvements (APPI) if the parties lacked visibility into sustainability and scalability of certain of the initiatives that contribute to APPI.

amounts of BCG's fees, despite there being no legitimate dispute over the profit improvement projections, BCG's full performance of its obligations under the SOW, and the resulting fees owed. BCG's work unequivocally fulfilled its obligations under the SOW, resulting in significant projected profit improvements, but GameStop failed and refused to acknowledge these profit improvements or negotiate them in good faith. In many cases, as detailed below in paragraph 41, GameStop refused to pay BCG's fees even after agreeing to the projected profit improvements.

14. As detailed below in paragraphs 42-45, GameStop has also taken unreasonable positions in breach of its duty to negotiate projected profit improvement values in good faith and otherwise, on certain workstreams unilaterally demanding discounts on fees owed with no justification rather than pay BCG's valid invoices when due, and on other workstreams refusing to provide BCG with data and access necessary to enable BCG to calculate its fees under the SOW, and sometimes even refusing to participate in contractually-obligated meetings to confirm profit improvement projections and BCG's resulting fees. For these reasons and others discussed below, GameStop has breached the SOW, causing BCG damages in unpaid fees according to proof at trial.

## THE PARTIES

15. BCG is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts. BCG is a world-renowned business management consulting firm that is recognized as a leading provider of innovative business solutions with a collaborative approach to complex business issues across a wide range of industries.

16. GameStop is a Delaware corporation with its principal office located in Grapevine, Texas. As described above, prior to engaging BCG, GameStop was in a financial and strategic tailspin. Its stock price had cratered, it had cycled through a series of executives, and had a heavy debt burden that was coming due.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and by virtue of GameStop residing in this state.

## FACTS COMMON TO ALL COUNTS

### The Parties Negotiate and Execute a Detailed Statement of Work

19. On or about August 20, 2019, BCG and GameStop signed the SOW. This written agreement formalized multiple months of collaboration between the parties and memorialized the terms for their continued work on a large program aimed at transforming the operations of GameStop and improving its earnings and profits.

20. The SOW identified four (4) categories of financial improvement areas: (1) a Financial Year 2019 Target of $30 million ("This Year Predicted Profit Improvement" or "TYPPI"); (2) a 2019 Adjusted Operating Earnings Target Amount of $253 million[4]; (3) a Financial Year 2020 Target of $100 million ("Next Year Predicted Profit Improvement" or "NYPPI"); and (4) a going-forward Run Rate target of $200 million ("Annualized run-rate Predicted Profit Improvement" or "APPI"). As the names indicate, three of the four areas were based on profit improvement projections.

21. These financial improvement projections were to be based upon work arising out of ten (10) workstreams spread across multiple areas of GameStop's business. The workstreams were intended to focus the parties' efforts and included:

---

[4] This target was set as an incentive for GameStop employees and did not factor into BCG's compensation.

6

(1) **Video Game Ecosystem, Original Equipment Manufacturer (OEM)/Publisher Partnerships**, to identify new revenue models and partnership structures to improve GameStop's economic position and collaboration with OEM's and game publishers;

(2) **Org Efficiency & Effectiveness**, to unlock both cost and operational improvements through a combination of organizational levers such as improved spans of control, a more effective reporting structure, and redesigned roles and responsibilities, among others;

(3) **Category Performance Improvement (CPI)**, to drive improvements in category profit through changes in category strategy and customer value proposition, cost, vendor funding (including allowances, payment terms, etc.), brand mix, assortment expansion and rationalization, sales trajectory, and other variables that impact overall profitability;

(4) **Pre-owned Electronics Strategy**, to assess the strategic fit and viability of GameStop's pre-owned/refurbished electronics business, develop strategies to accelerate growth, test those strategies across stores, and support their implementation;

(5) **Indirect Procurement**, to drive savings in procurement spending through improved negotiations with suppliers and vendors, demand management, operational improvements, and other levers;

(6) **Pricing**, to facilitate GameStop's ability to capture additional profit through revamped pricing strategies, including revised pricing algorithms, markdown optimization, historical look at promotions, and other optimization levers;

(7) **Global Enterprise**, to identify and facilitate savings and profit improvement through a broad range of levers similar to the ones above, but applied to GameStop's global portfolio (ex-USA) of regions and countries, specifically in Europe;

(8) **Loyalty**, to design and help implement customer loyalty strategies to monetize GameStop's customer relationship;

(9) **Innovation**, to provide analytical and strategic assistance with respect to new innovation initiatives, putting in place tools and metrics to help GameStop better internalize innovation capabilities; and

(10) **Omnichannel**, under which BCG would use its expertise to identify additional work that would be most beneficial to GameStop based on its needs and the level of urgency. Ultimately, the parties later agreed as to the specific scope of the Omnichannel work.[5]

22. Under each of these workstreams, the parties agreed upon specific initiatives, from which the parties were required by the SOW to calculate and agree upon projected profit improvements. These projections -- **not** actual realized profits -- would determine the amount of BCG's fees.

23. In addition to the ten enumerated workstreams, Section 3.1 of the SOW provided that the project would be flexible and that additional initiatives and/or workstreams would likely be identified as the program progressed and would be incorporated into the SOW.

24. Under the SOW, BCG's compensation was to be the greater of: (1) the fixed fee set forth in the contract, or (2) a variable fee, which was to be calculated based upon the projected profit improvements identified for each workstream of TYPPI, NYPPI, and APPI. BCG's fees were not capped for any profit improvement area other than the Video Game Ecosystem, OEM/Publisher Partnerships workstream, which limited each of TYPPI, NYPPI and APPI to $40,000,000, given GameStop's view that this workstream could be extremely impactful. Additionally, NYPPI (i.e. 2020 projected improvement) was in total capped at $140 million, which has provided a material benefit to GameStop because projected profit improvements for 2020 greatly exceeded the $140 million cap.

25. The SOW provided that BCG's fixed fee was to be invoiced on a monthly basis, including amounts owed for work dating back to May 2019, when BCG's work actually began. Indeed, BCG worked for four months before the formal signing of the SOW with the understanding that the SOW would soon be finalized and executed. Once BCG qualified for payment of the variable fee (because it exceeded the fixed fee), any fixed fee amounts already paid by GameStop would be credited against the variable fees due. Stated differently, the SOW provided that BCG,

---

[5] Omnichannel was later split into a separate Statement of Work. Fees under that agreement are not at issue in this action.

at a minimum, would be paid its fixed fee, and would also be entitled to additional variable fees based on projected profit improvements.

26. Section 4.2.5 of the SOW provided that projected profit improvements "will be determined by projecting the tangible financial benefit of organizational changes, improved vendor funding and costs, assortment changes, price adjustments and other levers, into standard financial variables applicable to measurement of profitability (e.g., volume, sales, margin rate, supplier funding, decreased write offs, investment impact, etc.), and then subtracting any recurring costs and expenses associated with capturing those benefits (e.g., profit decreases due to SKU rationalization, etc.)."

27. Section 4.3 of the SOW provided detailed methodologies for calculating projected profit improvements that would determine BCG's resulting variable fee for each workstream.

28. To ensure that profit improvement projections could be achieved and accurately calculated, the SOW further required that GameStop cooperate with BCG in the delivery of services, including to "provide data about [GameStop's] needs, business, operations, personnel, customers, technology and/or [GameStop] data, as necessary for BCG to successfully deliver the Services," provide access to GameStop's computer networks and software, to "provide timely iteration, feedback and approval of goals, timelines, requirements and outputs," and to "provide such other reasonable assistance as necessary for BCG to successfully deliver the Services." An integral part of the delivery of the services to GameStop was for BCG to have the data and access necessary to determine the projected profit improvements for the initiatives it proposed so that the projected value of the initiatives could be evaluated and BCG's variable fees could be determined. Therefore, GameStop's obligation to cooperate with BCG in the delivery of the services by providing data to BCG was crucial.

29. Section 4.2.9 of the SOW further required that the parties hold regular sessions "(i) to address validation, approvals, testing and commencement and execution of the various initiatives so that all of the foregoing can be handled in a timely manner and (ii) to address financial target and planning coordination." These sessions were commonly referred to during the project

as "Thermometer Meetings" and were the vehicle through which BCG and GameStop's leadership would confirm projected profit improvements under the SOW. At all Thermometer Meetings, the SOW mandated the attendance of GameStop's Chief Transformation Officer and Chief Financial Officer (or their designees), as well as the GameStop officer responsible for execution of the initiative being discussed. The purpose of these meetings was to discuss in good faith and, as required by the SOW, agree in good faith upon financial baselines for each workstream and the *projected* profit improvement to each workstream, which would, among other things, determine BCG's fees. Thus, as explained above, to minimize any disputes about factors outside of either party's control, BCG's fees were to be assessed based upon agreed-upon *projected* profits that GameStop was projected to achieve against agreed-upon baselines, not actual profits realized. GameStop could not simply disagree with the projections to avoid paying fees as doing so would not be in good faith and would breach GameStop's obligation to cooperate with BCG. GameStop was obligated to present legitimate reasons for any disagreements, supported by relevant data, that could then be discussed and evaluated by the parties in good faith, so that they could reach an agreement on the calculations. GameStop's failure to do so would, and does, constitute a breach of at least Sections 4.1 and 4.2 of the SOW which require GameStop to negotiate with BCG in good faith as to any areas of dispute with respect to the projections.

### The Parties Work in Good Faith Under the SOW

30.     BCG performed all or substantially all of its obligations under the SOW and, if any of its obligations were not performed, they were excused. Indeed, BCG dedicated substantial resources and spent tens of thousands of hours working with GameStop across the various workstreams to analyze, develop, and support the implementation of strategies across multiple areas of GameStop's business to increase profits.

31.     As a result of these efforts, BCG not only met initial agreed-upon expectations for profit improvement, it exceeded them. As just one example, BCG designed and implemented strategies to improve and monetize the customer relationship, including revamping GameStop's customer loyalty program and adjusting the company's marketing initiatives to maximize its

impact with high-spending customers. Prior to BCG's involvement, GameStop's loyalty program was in a steep decline, with its membership base dropping by 20% per year. BCG transformed the loyalty membership program, reversing the trend and increasing membership sign-ups by more than 40% above the baseline. This revamp of the loyalty program resulted in a projected annual run-rate profit improvement of over $59 million for the Pro Members initiative alone, well beyond the original expectation.

32. BCG and GameStop worked hand-in-hand on each initiative to develop profit improvement projections. Indeed, the values presented at Thermometer Meetings for final sign-off were jointly calculated and previously discussed and confirmed by the BCG analysts and their GameStop counterparts assigned to a particular initiative. As a result, the final sign-off process that occurred at Thermometer Meetings was, for the most part, merely formally confirming numbers that had already been developed in collaboration with GameStop.

33. Thermometer Meetings were conducted, often on a weekly basis, throughout 2019 and early 2020. As a result, the parties confirmed dozens of profit improvement projections and BCG's resulting fees.

34. Because BCG's efforts, in connection with and as approved by GameStop's project team, empirically and conclusively established specific projected profit improvements, BCG met the threshold to recover variable fees under the SOW and sent invoices to GameStop for certain variable fees. Under Section 3.5 of the SOW, these invoices were required to be paid within 30 days.

35. GameStop has paid the fixed fees owed to BCG under the SOW, has agreed that BCG is entitled to variable fees, and has paid portions of BCG's variable fees. However, GameStop has failed to pay all variable fees due and owing, despite the GameStop project team's approval of projected profit improvements prior to the submission of those projected profit improvements to Thermometer Meetings and despite Jim Bell's specific agreement as to the projected profit improvements for certain workstreams, as described further below.

### GameStop Cancels Meetings and Refuses to Discuss Profit Improvement Projections In Good Faith

36. While the parties had worked together cooperatively and in good faith to calculate and confirm profit improvement projections for nearly a year, GameStop began failing to meet its obligations under the SOW under Jim Bell's management in 2020.

37. Despite having already confirmed profit improvement projections on multiple initiatives, GameStop withheld payment on approved invoices for multiple months, including payment for fixed fees which were agreed-upon upfront. In some cases, GameStop failed to pay BCG's invoices for over eight months. While BCG is not seeking damages for these late payments, they demonstrate that the change in GameStop's management of the project from Dan Kaufman to Jim Bell coincided with the commencement of GameStop's failure to cooperate on the project and failure to act in good faith.

38. By mid-2020, the parties had begun working and holding meetings remotely due to COVID-19, which did not materially interfere with the parties' ability to meet or otherwise discuss projected profit improvements in good faith. Nonetheless, GameStop requested that the parties pause additional Thermometer Meetings because GameStop could not dedicate the necessary time to them due to other unrelated issues involving activist investors and debt refinancing. At the time, over one hundred million dollars in projected profit improvements had been calculated through work with GameStop personnel but those numbers had not yet been formally confirmed by GameStop executives at Thermometer Meetings, which caused tens of millions of dollars in variable fees due to BCG to be delayed. Nevertheless, BCG agreed in good faith to delay Thermometer Meetings temporarily with the understanding that they would resume shortly to resolve projections and fees owed for both completed work and other initiatives that remained in progress.

39. In October 2020, after repeated requests by BCG, GameStop finally agreed to resume Thermometer Meetings to discuss profit improvement projections for outstanding initiatives. In advance of those meetings, BCG requested that GameStop provide missing data and

information on multiple initiatives, including negotiations with Microsoft, store closures and real estate work. GameStop claimed that it would provide the required data, but never did, thereby failing to act cooperatively or in good faith as required by the SOW.

### GameStop Resumes Thermometer Meetings And Agrees On Some But Not All Outstanding Projections

40. After multiple more weeks of Jim Bell and GameStop postponing meetings and otherwise refusing to schedule them, the parties finally resumed Thermometer Meetings on December 15, 2020. At this December 15 meeting, and subsequent meetings in January and February 2021, BCG presented projected profit improvements to GameStop's leadership team, including Jim Bell, Mark Robinson, and Todd Gathings, for work that had been completed under the SOW and generally discussed and agreed upon with GameStop personnel but not yet formally confirmed by Mr. Bell at a Thermometer Meeting.

41. Where GameStop participated in the Thermometer Meetings in good faith, the parties agreed on values for profit improvement projections for multiple outstanding initiatives. For example, Mr. Bell confirmed that BCG's projections for the Range – Accessories initiative under the Global Enterprise workstream were correct. Mr. Bell also confirmed the profit improvement projections for the work done to facilitate an effective wind down of GameStop's "ThinkGeek"[6] operations. In addition, Mr. Bell confirmed portions of profit improvement projections for multiple other initiatives such as APPI generated by the Pre-Owned Tech, "RFP All Print," and Price Increases in European stores initiatives. The parties subsequently memorialized these oral agreements from the Thermometer Meetings in follow-up email correspondence, and the agreements were not disputed by GameStop. As a result, BCG invoiced

---

[6] ThinkGeek was a separate retail component of GameStop's business that sold collectibles and other novelty items. BCG revised GameStop's pricing strategy with respect to a clearance sale of ThinkGeek inventory, which resulted in significant projected profit improvements from the plan proposed by GameStop.

based on these agreements. GameStop, however, has refused to pay the fees it had already confirmed were owed.[7]

42. As to other initiatives, Mr. Bell was combative and rejected projected profit improvement calculations for unexplained reasons, refusing to discuss them cooperatively or in good faith. For example, for the "Org Go-Gets" initiative, Mr. Bell rejected calculations of $2,800,000 in NYPPI and $3,900,000 in APPI generated by BCG's work, numbers which were properly calculated with GameStop's assistance and participation in accordance with the terms of the SOW. Instead, Mr. Bell unjustifiably sought to haggle, offering reduced amounts for NYPPI and APPI without providing facts or data supporting the demanded reductions in violation of the obligation imposed by the SOW to work together with BCG in good faith. On the other hand, BCG tried repeatedly to work together with GameStop in good faith by repeatedly following up to request the information and data allegedly supporting GameStop's positions. GameStop refused to respond and did not provide the information or data requested.

43. By way of example, for "PO Tech Rollout" and "store hours" work, Mr. Bell requested that NYPPI generated by BCG's work be discounted by approximately 20% based upon a supposed Retail Mobility Index, despite there being no basis for such a reduction in the SOW or logically. Mr. Bell stated that he would share this index with BCG to allow for independent verification and validation of the figures, but failed to provide it or any information regarding it despite multiple follow-up requests.

44. For many other initiatives discussed at the 2021 Thermometer Meetings, Mr. Bell either simply refused to agree with the projections presented – which, as explained above, had generally been jointly calculated with the GameStop team – without additional explanation, or

---

[7] In other cases, including as to work done related to price increases in Europe and the renewal of GameStop's agreement with CompuCom, BCG invoiced for fees based on improperly reduced amounts demanded by GameStop as part of settlement negotiations and in an effort to compromise. BCG therefore seeks the full value of fees owed on these initiatives since, had the parties negotiated in good faith based on the available data as required by the SOW, they would have agreed that the full values were correctly calculated.

promised to later provide additional information that would support a reduction but failed to do so. Rather than provide such information, Mr. Bell stopped communicating with BCG and refused to attend further Thermometer Meetings to address the remaining unresolved initiatives as required by the SOW. Had these meetings been held and conducted in good faith with the parties working together as required by the SOW, the parties would have reached agreement on the profit improvement projections, as they had in the past and as they did with respect to negotiating the complexities of the SOW itself. Once these profit improvement projections were agreed upon, under the terms of the SOW, the variable fees would be due and owing to BCG for an amount certain.

45. GameStop has also failed and refused to pay BCG fees even for work done pursuant to certain initiatives and portions thereof that GameStop previously formally confirmed in writing. For example, on January 29, 2020, Mr. Bell unilaterally slashed the value of APPI for BCG's work to improve the terms of GameStop's revenue sharing agreement with Bandai Namco, a publisher of many popular games, and then signed-off on the reduced amount. Mr. Bell did not support this 25% reduction with any facts or data, and BCG did not agree to it. But, despite agreeing to pay fees based upon 75% of the appropriate APPI calculation, GameStop still refused to pay even the reduced amount.

46. GameStop's conduct has breached its obligations under the SOW to work cooperatively and in good faith with BCG and has resulted in BCG being damaged by not receiving fees owed under the SOW, which remain due and owing as of the filing of this Second Amended Complaint.

## COUNT I

### Breach of Contract

47. BCG hereby repeats and re-alleges the allegations set forth in Paragraphs 1 through 46 as if set forth fully herein.

48. BCG and GameStop formally entered into the SOW on or about August 20, 2019, although substantial performance occurred before that date that the parties agreed would be covered under the SOW.

49. As alleged above, the SOW formalized the scope and terms of BCG's work, including that the parties would work together in good faith to determine projected profit improvements for the various workstreams identified in the SOW, as judged against agreed-upon baselines (*i.e.*, TYPPI, NYPPI, and APPI). BCG's fees were the greater of the fixed or variable fee, as described above. GameStop was then required to pay BCG's fees for its services within 30 days of receiving an invoice.

50. As described above, BCG achieved projected profit improvements that exceeded the threshold to receive variable fees. Indeed, GameStop has already paid a portion of such variable fees.

51. GameStop has breached the SOW, with no legitimate excuse or justification, by, among other things:

   a. failing to pay BCG's fees, even for work that resulted in projected profit improvements that the parties have expressly agreed upon including those initiatives discussed in Paragraph 41, *supra*;

   b. failing to pay BCG's fees for work that resulted in projected profit improvements that GameStop disputed but failed to support its dispute with any supporting data and failed to work together with BCG in good faith to agree upon the projected profit improvements;

   c. failing to pay BCG's fees for work that resulted in projected profit improvements that GameStop has never disputed at all and that would have been agreed to had good faith discussions taken place;

   d. failing and refusing to provide necessary data, feedback and approvals of projected profit improvements as required by the SOW and as necessary to confirm projected profit improvements thereby, among other things, failing

16

      to work together with BCG in good faith to agree upon the projected profit improvements and hindering BCG's ability to invoice its fees to GameStop; and

    e. failing and refusing to discuss in good faith and confirm profit improvement projections or even attend contractually-required Thermometer Meetings related to work that remained pending after February 2021 to validate projected profit improvements and BCG's fees thereby, among other things, failing to work together with BCG in good faith to agree upon the projected profit improvements and hindering BCG's ability to invoice its fees to GameStop.

  52. As a direct and proximate result of GameStop's failure to perform its obligations under the SOW, including failure to discuss, work together and agree on profit improvement projections in good faith and failure to pay fees based upon confirmed profit projections, BCG has been damaged. Had GameStop worked together with BCG in good faith, projected profit improvements would have been agreed upon for each and every Workstream under the SOW. This would have resulted in variable fees being invoiced by BCG and owed to it by GameStop for each Workstream. In other words, the parties would have reached an agreement on projected profits and variable fees owed for each and every work stream but for GameStop's bad faith conduct. GameStop's breaches have resulted in significant damages to BCG under the SOW, including owed but unpaid fees. The amount of BCG's damages cannot be exactly determined at this time due to GameStop's refusing to furnish to BCG the data necessary to determine certain projected profit improvements, refusing to attend Thermometer Meetings, and otherwise hindering and interfering with BCG's ability to calculate the full amount of its fees owed, but will become calculable once discovery is completed in this action and proven at trial.[8]

---

[8] BCG does not replead its second claim for breach of the covenant of good faith and fair dealing contained in its First Amended Complaint given the Court's order dismissing that claim with prejudice. (*See* D.I. 77.) BCG stands on its dismissed First Amended Complaint as to this second claim or breach of the covenant of good faith and fair dealing and preserves the claim for appeal.

## PRAYER FOR RELIEF

WHEREFORE, BCG prays for judgment and relief against GameStop as follows:

1. For judgment in favor of BCG and against GameStop;

2. For damages according to proof in an amount in excess of the jurisdictional requirements;

3. For prejudgment and post-judgment interest at the maximum legal rate;

4. For costs of suit; and

5. For any other and further relief that the Court may deem just and proper.

Dated: April 12, 2023                    Respectfully submitted,

*/s/ Joseph L. Christensen*

Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com


Edward Totino (*pro hac* vice)
Nancy Nguyen Sims (*pro hac vice*)
Michael T. Boardman(*pro hac vice*)
BAKER & MCKENZIE LLP
10250 Constellation Blvd.
Suite 1850
Los Angeles, California 90067
Tel: +1 310 201 4728
Fax: +1 310 201 4721
edward.totino@bakermckenzie.com
nancy.sims@bakermckenzie.com
michael.boardman@bakermckenzie.com

*Attorneys for Plaintiff*
*The Boston Consulting Group, Inc.*