IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE BOSTON CONSULTING GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 22-363-CJB |
| GAMESTOP CORP., | ) ) | |
| Defendant. | ) ) | |

Joseph L. Christensen, CHRISTENSEN & DOUGHERTY LLP, Wilmington, DE; Edward Totino, Nancy Nguyen Sims, Michael T. Boardman, BAKER & MCKENZIE LLP, Los Angeles, CA; Attorneys for Plaintiff.

John M. Seaman, E. Wade Houston, Christopher Fitzpatrick Cannataro, ABRAMS & BAYLISS LLP, Wilmington, DE; Trey Cox, GIBSON, DUNN & CRUTCHER LLP, Dallas, TX; Attorneys for Defendant.

**MEMORANDUM OPINION**

February 13, 2024
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

In this case filed by Plaintiff The Boston Consulting Group, Inc. ("Plaintiff" or "BCG") against Defendant GameStop Corp. ("Defendant" or "GameStop"), presently pending before the Court is Defendant's motion to partially dismiss the operative Second Amended Complaint ("SAC") with prejudice (the "Motion"), filed pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 84) For the reasons set forth below, the Motion is GRANTED-IN-PART and DENIED-IN-PART.

The Court[1] writes briefly here and for the parties, who are well familiar with the relevant facts. It does so assuming familiarity with its prior March 29, 2023 Memorandum Opinion (the "March 29 MO"), which addressed Defendant's previously-filed motion to dismiss the First Amended Complaint ("FAC"). (D.I. 76) And it does so by making use of the familiar standard for assessing a Rule 12(b)(6) motion, *see Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also* (D.I. 76 at 5-6 & n.3), and by considering relevant aspects of Delaware contract law as necessary, *see* (D.I. 76 at 6-7 & n.4 (citing cases)). To the extent that certain factual allegations in the SAC are relevant to the Court's decision, the Court will set them out below.

There is only one count in the SAC: Count I's claim for breach of contract, made pursuant to Delaware law. (D.I. 80 at ¶¶ 47-52) Below, the Court will briefly explain why it agrees that Count I can go forward past the pleading stage in many respects (but why, as to its

---

[1] The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 11)

allegations regarding three particular initiatives, those theories of breach of contract are insufficiently pleaded):

- In the March 29 MO, the Court explained that Plaintiff had sufficiently set out a claim in the FAC against Defendant for failing to pay certain variable fees relating to the contract at issue (i.e., the Statement of Work ("SOW")) between the parties—to the extent that Plaintiff was alleging that Defendant breached the portions of the SOW that amounted to a "Type II agreement" under Delaware law. (D.I. 76 at 12-24) Now, in the SAC, there are a number of allegations that the Court interprets as being related to these "Type II agreement" breach allegations—i.e., assertions that, as to certain initiatives, the parties never came to the required written agreement on projected profit improvements, and that this was because Defendant breached its duty to negotiate in good faith regarding those matters. Among others, the Court reads Plaintiff's allegations in paragraph 41 n.7 (regarding the "price increases in Europe" and "CompuCon" initiatives) and 42-44 (regarding the "Org Go-Gets" and "PO Tech Rollout" and the "many other initiatives discussed at the 2021 Thermometer Meetings") as being about this kind of Type II agreement claim. (D.I. 80 at ¶¶ 41 n.7, 42-44) The Court also reads the allegations in paragraph 51(b)-(c) (which make reference to Defendant's alleged failure to negotiate in "good faith" on projected profit improvements) as also being generally directed to this Type II agreement claim. (*Id.* at ¶ 51(b)-(c)) The Court does not understand Defendant to be challenging the SAC's Type II breach allegations, (D.I. 90 at 2, 15), and so those allegations survive here.[2]

- The Court reads Plaintiff's allegations in paragraph 41 and paragraph 45 as being about a different type of breach of contract claim—a claim that Defendant breached the SOW by failing to pay certain variable fees on initiatives where the parties had *reached a written agreement* on projected profit improvements and the necessary inputs relating thereto. (*See* D.I. 26 (hereafter, "SOW") at §§ 4.2.12 & 4.2.13; *see also* D.I. 90 at 1) The Court knows that these allegations are about *this*

---

[2] To the extent Defendant asks the Court to dismiss Plaintiff's allegations set out in paragraphs 51(b)-(c) of the SAC on the ground that they amount to allegations of "GameStop not paying variable fees that the parties never agreed on[,]" (D.I. 85 at 11-12), the Court declines, because it simply reads those allegations as being a part of Plaintiff's Type II agreement claim.

*type* of breach of contract claim, and not a *Type II agreement* claim, because in these paragraphs, Plaintiff makes clear that the referred-to-initiatives are ones as to which Defendant "participated in the Thermometer Meetings in *good faith* [and] the parties agreed on values for profit improvement projections[,]" or as to which the parties had "formally *confirmed in writing*" the key terms. (D.I. 80 at ¶¶ 41, 45 (emphasis added)) The initiatives referred to in these paragraphs are the "Range—Accessories," "ThinkGeek," "Pre-Owned Tech," "RFP All Print," "Price Increases in European stores" and "Bandai Namco" initiatives (the "agreed" initiatives). (*Id.*; *see also* D.I. 90 at 1)

- Defendant moves to dismiss Plaintiff's breach of contract claim relating to these agreed initiatives. It does so on the ground that the SAC does not sufficiently allege that the parties actually reached a *written agreement* on the relevant matters (i.e., as to projected profit improvements and as to subsidiary inputs such as "baselines, key assumptions, the amounts of the credits to be made to each of TYPPI, NYPPI and APPI from the subject initiative(s) and, as applicable, specific testing and validation procedures applicable to the subject initiatives(s)"), as is required by the SOW. (D.I. 85 at 6-9; D.I. 95 at 1-5; *see also* SOW at §§ 4.2.12 & 4.2.13) Here, the Court disagrees with Defendant that the allegations do not plausibly allege the existence of the required written agreement. That is because in these paragraphs, Plaintiff sufficiently asserts that the parties *did* come to an agreement in writing as to all of the types of terms required by the SOW. It does so not only by alleging that "the parties agreed on values for profit improvement projections" for these initiatives, but also: (1) as to the five initiatives described in paragraph 41, by noting that the parties "memorialized these oral agreements . . . in follow-up e-mail correspondence, and [asserting that] the agreements were not disputed by GameStop"; and (2) as to the Bandai Namco initiative described in paragraph 45, by asserting that the key terms were "formally confirmed in writing." (D.I. 80 at ¶¶ 41, 45; *see also id.* at ¶¶ 32, 35) To the extent that Defendant faults these allegations for not separately setting out what the written, agreed-upon terms were for the projected profit improvements and subsidiary inputs for each initiative, (D.I. 85 at 8-9), it is asking for more detail than the Federal Rules require. Federal Rule of Civil Procedure 8, not Federal Rule of Civil Procedure 9(b), controls as to these allegations. (D.I. 90 at 9 (Plaintiff noting that it is "not necessary [pursuant to Rule

4

8] in a pleading for breach of contract to allege every minute detail . . . related to" an initiative))  A reasonable reading of Plaintiff's allegations indicates that here, Plaintiff is asserting that all such inputs were in fact agreed to in writing.  (D.I. 90 at 10)  And Plaintiff has otherwise given us sufficient facts about the agreements relating to these initiatives—i.e., as to what initiatives are at issue (those listed in the paragraphs), as to who from Defendant made the agreement (Defendant's then-Chief Financial Officer, Jim Bell) and, in many cases, how the written agreement was accomplished (via e-mails).[3]  Any argument by Defendant that the manner in which the parties allegedly came to the required written agreement is insufficient to create a contract is a matter for the factfinder to resolve later in the case.  *Cf. Petroplast Petrofisa Plasticos S.A. v. Ameron Int'l Corp.*, Civil Action No. 4304-VCP, 2011 WL 2623991, at *8 (Del. Ch. July 1, 2011).

- However, Defendant does have a winning argument on another ground as to the breach allegations regarding three initiatives listed in paragraph 41 (i.e., the Pre-Owned Tech, RFP All Print and Price Increases in European stores initiatives).  (D.I. 85 at 9; *see also* D.I. 80 at ¶ 41)  That is because Plaintiff affirmatively pleads that as to these initiatives, Defendant only agreed in writing as to "portions" of profit improvement projections—i.e., those relating only to APPI.  (D.I. 80 at ¶ 41)  The SOW requires that the parties reach written agreement on "the amounts of credits to be made to *each of* TYPPI, NYPPI and APPI" for each initiative.  (SOW at § 4.2.13 (emphasis added))  And yet here, Plaintiff flatly states that the parties only agreed as to one of those three sets of items.[4]  So Plaintiff has pleaded itself out of a claim of

---

[3]  *See Eastman Chem. Co. v. AlphaPet Inc.*, Civ. Action No. 09-971-LPS-CJB, 2011 WL 5402767, at *12 (D. Del. Nov. 4, 2011), *report and recommendation adopted by* 2011 WL 6148637 (D. Del. Dec. 9, 2011) (concluding, as to a breach of contract claim, that the claim was plausibly pleaded, where although the plaintiff might have provided more factual information, it had at least identified the subject matter of the breach claim and had pleaded sufficient facts about the individuals and circumstances integral to the claim).

[4]  To the extent Plaintiff suggests that the SOW's Section 4.2.13 does not require a written agreement as to *each of* these three items in order for a contractual right to trigger, (D.I 90 at 11), the Court disagrees.  The agreement is unambiguous on this front:  "[n]o projections of the dollar amount of contributions of a proposed initiative" will be made "unless and until, in each instance, the Parties have completed a sign-off process that culminates in written agreement on baselines, key assumptions [and] the amounts of the credits to be made to *each of* TYPPI,

5

>breach as to these three initiatives regarding a "we agreed upon all required terms"-type of breach of contract claim. And Plaintiff cannot assert a Type II agreement breach of contract claim regarding these initiatives, since Plaintiff affirmatively alleges that Defendant engaged in "good faith" negotiations as to the initiatives. (D.I. 80 at ¶ 41; *see also* D.I. 95 at 6) So no breach of contract claims as to these initiatives can move forward.

For the foregoing reasons, the Court concludes that Defendant's Motion should be GRANTED-IN-PART and DENIED-IN-PART. More specifically, the Motion is GRANTED with prejudice as to Plaintiff's claims of breach of contract regarding Count I's allegations as to the Pre-Owned Tech, RFP All Print and Price Increases in European stores initiatives. It is DENIED in all other respects.

The Court will not permit any further amendment of the pleadings. Such amendment would be futile, as Plaintiff has now had three separate chances to plead viable breach of contract claims, (D.I. 1; D.I. 28; D.I. 80), and the Court has now twice adjudicated motions to dismiss as to Plaintiff's efforts. *Cf. Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 74 (3d Cir. 1994) (noting that when a pleading party has multiple chances to plead a claim before a court and cannot do so, this indicates that further efforts may be futile); *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, Civil Action No. 19-1334-RGA-CJB, 2021 WL 2036671, at *20

---

NYPPI and APPI from the subject initiative(s)[.]" (SOW at § 4.2.13 (emphasis added)) "Each" clearly means "every thing, person, etc. in a group of two or more[.]" *Each*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/each (last visited Feb. 12, 2024); *see also Each*, Dictionary.com, https://www.dictionary.com/browse/each (last visited Feb. 12, 2024) ("every one of two or more considered individually or one by one"). To the extent that Plaintiff asserts that "each of" does not mean "all of" those three projections, (D.I. 90 at 11 ("'Each of' does not and cannot mean that no payment need be made unless there is agreement on 'all of' the projections.")), the Court disagrees that the meaning of "each of" is ambiguous in this context, and it cannot see how an objective, reasonable third party would read this contractual provision in any other way. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 338 (Del. 2022); *see also* (D.I. 76 at 7 n.4).

6

(D. Del. May 20, 2021) (noting that "because the Court has already previously considered these claims and found them deficient, and then Plaintiffs submitted two additional complaints unsuccessfully attempting to shore these claims up, it is clear that permitting further amendments of these claims would be futile"), *report and recommendation adopted in relevant part by* 2021 WL 4350591 (D. Del. Sept. 24, 2021). And any further amendment would be unduly prejudicial to Defendant, as the parties are in the midst of the summary judgment process and are preparing for trial later this year; the pleading stage of the case is and needs to be over. *Cf. Invista N. Am. S.A.R.L. v. M&G USA Corp.*, 35 F. Supp. 3d 583, 612 (D. Del. 2014).

An appropriate Order will issue.