**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE BOSTON CONSULTING GROUP, INC.,
a Massachusetts corporation,

              Plaintiff,

      v.

GAMESTOP CORP., a Delaware corporation,

              Defendant.

C.A. No. 1:22-00363-CJB

RE: D.I. 168

PUBLIC VERSION FILED
APRIL 1, 2024

**DEFENDANT GAMESTOP CORP.'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Trey Cox
John S. Adams
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3256
tcox@gibsondunn.com

Dated: November 30, 2023

John M. Seaman (#3868)
E. Wade Houston (#6289)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
Telephone: (302) 778-1000
seaman@abramsbayliss.com
houston@abramsbayliss.com
cannataro@abramsbayliss.com

*Attorneys for Defendant GameStop Corp.*

## TABLE OF CONTENTS

I.    Nature and Stage of Proceedings ..........................................................................1

II.   Summary of Argument ..........................................................................................2

III.  Statement of Facts...................................................................................................2

    A.    The parties executed the SOW in August 2019. .......................................2

        1.    *The parties agreed to a compensation model with a "fixed"
            component and a potential "variable" component tied to
            GameStop's employee incentive plan.* .........................................2

        2.    *The parties agreed to a rigorous approval process for
            initiatives and their associated PPI.* ...........................................3

        3.    *The parties agreed their projections would reflect their
            expectations of actual, sustainable results.*..................................5

    B.    BCG implemented a "streamlined" approval process, which led to
        quick sign off of numerous initiatives, but difficult questions about
        later projects..............................................................................................6

        1.    *BCG followed a "streamlined" approval process that did
            not include GameStop Leadership on the front end.*....................6

        2.    *BCG began to issue invoices in 2019.* ........................................7

    C.    In January 2020, GameStop sought to begin finalizing the
        remainder of the work under the SOW, and the parties discussed
        ways to restructure BCG's fees................................................................8

        1.    *Between January and March 2020, BCG was only able to
            provide tentative, best estimates, that were subject to
            change for the various unsigned initiatives it expected to
            complete.* ......................................................................................8

        2.    *In January 2020, the parties began discussing how to
            restructure BCG's fees schedule, and by March they
            agreed to cancel all future Thermometer Meetings.* .................10

    D.    By March 2020, BCG knew that COVID affected its projections. ......................11

        1.    *BCG initially acknowledged the obvious impact of COVID
            on initiatives.*.............................................................................11

        2.    *BCG decided some initiatives should be "treat[ed] as
            signed off," with no accounting for COVID.* .............................12

E.     GameStop earnestly tried to reach agreement. ......................................................13

     1.     *The parties resumed Thermometer Meetings.* ..............................................13

     2.     *The parties discussed various proposals, but couldn't reach final agreement.* ......................................................................................14

     3.     *GameStop offered to reach a "holistic" agreement above the $28 million Target in the SOW.* ........................................15

IV.    ARGUMENT ...............................................................................................................16

V.    CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Amirsaleh v. Bd. of Trade of City of New York, Inc.*,
    2009 WL 3756700 (Del. Ch. Nov. 9, 2009), *rev'd on other grounds*, 2011 WL
    3585598 (Del. 2011) .................................................................................16, 17

*CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*,
    2011 WL 353529 (Del. Ch. Jan. 28, 2011) ...........................................................17

*In re Condado Plaza Acquisition LLC*,
    620 B.R. 820 (Bankr. S.D.N.Y. 2020).....................................................................19

*Cox Comm'cns, Inc. v. T-Mobile US, Inc.*,
    273 A.3d 752 (Del. 2022) .......................................................................................16

*Cross & Cross Properties. Ltd. v. Everett Allied Co.*,
    886 F.2d 497 (2d Cir. 1989) ...................................................................................19

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
    624 A.2d 1199 (Del. 1993) .....................................................................................17

*Judge v. City of Rehoboth*,
    1994 WL 198700 (Del. Ch. Apr. 29, 1994) ...........................................................17

*PharmAthene, Inc. v. SIGA Techs., Inc.*,
    2011 WL 4390726 (Del. Ch. Sept. 22, 2011), *aff'd in part*, 67 A.3d 330 (Del.
    2013) ................................................................................................................16, 17

*REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*,
    2018 WL 1109650 (Del. Ch. Feb. 28, 2018) .........................................................16

*SIGA Techs., Inc. v. PharmAthene, Inc.*,
    67 A.3d 330 (Del. 2013) .........................................................................................19

*The Boston Consulting Grp., Inc. v. GameStop Corp.*,
    2023 WL 2683629 (D. Del. Mar. 29, 2023) ......................................................1, 16

## I.   Nature and Stage of Proceedings

This case concerns a statement of work ("SOW") under which GameStop already paid $22 million to BCG.  The SOW contained a Type II agreement addressing BCG's variable fees, if any.  The Type II agreement required that the parties negotiate in good faith to reach final agreement on projected profit improvements for GameStop's business, which would influence the variable fees GameStop might owe BCG for its consulting services.  After the parties did not agree on those projections, BCG sued contending that GameStop breached the SOW by not accepting BCG's projections for GameStop's business.

BCG argues in substance that GameStop acted unreasonably by not delivering the highly contingent variable fees that BCG wanted.  But the standard for BCG's claim is radically less favorable to BCG than the reasonableness or quasi-fiduciary standard that BCG wishes it had.  A Type II agreement's good-faith negotiation requirement does not require that any final agreement be reached.  *The Boston Consulting Grp., Inc. v. GameStop Corp.*, 2023 WL 2683629, at *9 n.9 (D. Del. Mar. 29, 2023).  Instead, the requirement asks only that the parties not to act in bad faith.

The Court should grant summary judgment for GameStop because GameStop did not act in bad faith.  BCG has conceded (twice, in writing) that GameStop acted in "good faith."  BCG's documents and admissions show that the parties did not agree on projected profit improvements for two main reasons.  First, BCG's projections failed to account for COVID's negative impact on GameStop's business.  Meanwhile, BCG internally developed COVID-adjusted projections that BCG withheld from GameStop.  Second, BCG avoided the SOW's mandatory approval processes for agreeing on projected profit improvements.  BCG cannot blame *GameStop* for not granting the approvals that BCG did not properly seek.  BCG avoided the SOW's approval processes because they targeted variable fees of $10 million less than BCG's undisclosed internal target.  BCG, not GameStop, acted in bad faith.

## II.  Summary of Argument

As a matter of law, BCG cannot prove that GameStop committed a bad-faith breach of the parties' Type II agreement.  Rather, BCG admitted, in both its negotiations with GameStop and in its Second Amended Complaint that GameStop acted in good faith.  GameStop acted in good faith when it appropriately accounted for COVID's negative impacts on its business in connection with its projected profits.  By March 2020, BCG's proposed projections were not final, and BCG could not unilaterally decide to ignore the impact of COVID.  Finally, for BCG's claim to succeed, BCG must avoid key elements of the SOW, but the duty to negotiate in good faith toward a final agreement under a Type II agreement (like the SOW) cannot impose obligations beyond what the preliminary agreement contemplated.  The Court should grant GameStop's Motion.

## III. Statement of Facts

### A.  The parties executed the SOW in August 2019.

GameStop engaged BCG to assist with its ongoing business transformation project: "Project Reboot"[1]—the name for GameStop's overall plan to transform its business.[2]

#### 1.  *The parties agreed to a compensation model with a "fixed" component and a potential "variable" component tied to GameStop's employee incentive plan.*

Under the parties' Statement of Work ("SOW"), BCG earned a "Fixed Fee" of $16.5 million and could earn additional "Variable Fees" based on performance.[3]  The parties agreed that the Variable Fees owed—"if any"—would 

As BCG had urged, the SOW also aligned to GameStop's employee Short-Term Incentive

---

[1] Ex. 500 (Bell Deposition) at 32:5-34:14, 38:18-39:12.

[2] Ex. 500 (Bell Deposition) at 32:5-34:14, 38:18-39:12; *see also* Ex. 1 at 1.

[3] Ex. 1 § 2.3.  The parties have stipulated to the authenticity of all documents.  D.I. 134.

[4] Ex. 1 § 3.  BCG later described this at-risk compensation model as resulting in "high exposure," "back-end weighted performance fees, infrequent measurement," "[l]oose" governance, and "no meaningful milestone or performance payment."  Ex. 501.

(STI) plan to align the parties on the same performance metrics.[5]

BCG could receive variable fees and GameStop employees could receive bonuses, depending on the percentage attainment of the ultimate predicted profit improvement ("PPI") targets by agreeing to pursue initiatives that resulted in PPI.[6]  For BCG, each category of PPI also had a corresponding amount of variable fees.  For example, if the parties agreed on $100M in NYPPI—100% of the target—then, BCG would be entitled to 100% of the variable fees allocated to NYPPI.  In that example, ██████████████████████████████████████ ██████████.[7]  In an appendix attached to the SOW, example calculations show BCG's target compensation for achieving 100% of all targets was $28 million.[8]

### 2. *The parties agreed to a rigorous approval process for initiatives and their associated PPI.*

The SOW created a rigorous approval process for determining and agreeing upon PPI.[9]

*First*, the SOW required BCG and GameStop to agree jointly and *in writing* on: any "initiatives" or "levers" for profit improvement;[10] ██████████████████████████████████████████

---

[5] Ex. 1 § 2.  The agreed-upon performance metrics were variations of "predicted profit improvement": (1) "TYPPI" – PPI expected to be generated in 2019; (2) "NYPPI" – PPI expected to be generated in 2020; and (3) "APPI" – PPI expected to be generated year-over-year beginning in 2021.  Ex. 1 §§ 2.2.1, 2.2.3, 2.2.4.  The SOW then set targets for each category: (1) "TYPPI" – $30 million; (2) "NYPPI" – $100 million; (3) "APPI" – $200 million.  Ex. 1 §§ 2.2.1, 2.2.3, 2.2.4.

[6] Ex. 1 §§ 2.3, 4.1, 4.2.

[7] Ex. 1 §§ 2.3.1, 2.3.2.

[8] Ex. 1, Appendix A.

[9] During the negotiation period, BCG repeatedly emphasized the need for alignment of incentives and a rigorous approval/governance process to ensure realistic, sustainable projections.  Ex. 502; Ex. 503; Ex. 504; Ex. 505; Ex. 506.  From the outset, it was clear that GameStop had concerns about actual results and that the SOW needed to address "sustainable value creation."  Ex. 505.  To that end, BCG touted a "Transformation Management Office" comprised of various roles, including Management's role to "[c]hallenge and control" and "[t]ake final decision on critical issues," and the Finance's team role to "[a]pprove changes to gates and/or impact."  Ex. 507; *see also* Ex. 508.  BCG described the program process as having a "lifecycle" with three "moments of truth," with signoffs operating as a gating mechanism.  Ex. 507.  BCG stated "reaching Gate 3 is crucial," noting "Management approval is required."  Ex. 507.

[10] Ex. 1 § 1.2.



████████████████████████[11] and ████████████████████████████████████

████████████[2]

*Next*, BCG and GameStop agreed to then generate predictions for each initiative, including resulting PPIs. But, to ████████████████████ the predictions for each initiative were not approved

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████[3] Under the SOW, calculations of PPI "shall be in **writing**" for final sign-off by both parties.[14]

*Finally*, after sign-off, the parties could adjust an initiative's PPIs in their ██████████████

████████████ based on incorrect assumptions or operational constraints learned after the fact.[15] Those adjustments were contemplated to occur at the ████████████████████████ i.e., February 1, 2020, before finalizing invoices at the end of February 2020.[16]

The SOW further specified that the decisions and agreements contemplated could not be reached by just anyone. ████████████████████ was required to be included to: ████████

████████████████████████████████████████████████████

████████████████████████████[17] ████████████████████

████████;[18] review and approve levers identified by the parties;[19] and "decide whether to

---

[11] Ex. 1 § 4.2.7.
[12] Ex. 1 § 4.2.12.
[13] Ex. 1 § 4.2.12; Ex. 1 § 4.2.13.
[14] Ex. 1 § 4.2.12.
[15] Ex. 1 § 4.1.
[16] Ex. 1 § 4.1, 3.3 (finalizing invoices by February 2020); Ex. 509 (Robinson 30(b)(6) (Volume I) Deposition) at 136:14-18 (Retail fiscal year is roughly February through end of January).
[17] Ex. 1. § 4.2.9.
[18] Ex. 1. § 4.2.9.
[19] Ex. 1. § 1.2.

pursue such levers."[20]

The SOW expressly defined "GameStop Leadership" to ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████[21]  Throughout the term of the SOW, no one was confused on this issue, and BCG repeatedly acknowledged its understanding that "part of the official sign off process is to have Jim physically sign a sheet of paper."[22] GameStop's Chief Financial Officer was Jim Bell; its Chief Transformation Officer was Dan Kaufman.

### 3. *The parties agreed their projections would reflect their expectations of actual, sustainable results.*

The parties reiterated (three times) that predictions and PPI—though made before actual results—are ████████████████████████████████████████████████████ ███████████████  The parties contemplated agreeing to the PPI amounts at the time they agreed ████████████████████ but they also agreed they could ███████████ ████████████████████████████████████████████████████████████████ █████████████████[24]  All predictions were required to be made ███████████ ███████████████[25]

To ensure predictions aligned with the ████████████████████████ the parties further incorporated provisions to address a ████████████████████

_____

[20] Ex. 1. § 1.2; *see also* Ex. 510 (Harris Deposition) at 337:15-22 ("I would use the word 'lever,' 'initiative,' 'opportunity,' interchangeably.").
[21] Ex. 1. § 4.2.9.
[22] Ex. 511; Ex. 507; Ex. 508; Ex. 512; *see also* Ex. 513 (Cromer Deposition) at 41:1-24 (it was the finance department's role to "validate the impact of initiatives"); Ex. 514 (Update showing "Sign off Process"); Ex. 515 ("Aligning on the baseline is a Thermometer Committee decision.").
[23] Ex. 1 § 4.2.1, § 4.2.2, § 4.2.3.
[24] Ex. 1 § 4.1.
[25] Ex. 1 § 4.1.

███████████."[26]  This allowed the parties to use ███████████

███████████████.[27]

### B. BCG implemented a "streamlined" approval process, which led to quick sign off of numerous initiatives, but difficult questions about later projects.

#### 1. BCG followed a "streamlined" approval process that did not include GameStop Leadership on the front end.

With the SOW in place, BCG undertook what-it-called a "streamlined" approach.[28]  Rather than allowing GameStop Leadership to review, approve, and decide upon specific initiatives and baselines in writing, BCG began working with lower level GameStop employees before initiatives were approved by GameStop Leadership.[29]  BCG deemed the "gating" process contemplated for approval as "cumbersome" and "formal" compared to what happened in practice.[30]  No written agreement was reached about what opportunities to pursue.[31]

After an indeterminate group of employees began working on an initiative, an ad-hoc group might decide to "execute" on an initiative.[32]  This happened during informal, daily and weekly meetings that occurred among various GameStop and BCG employees.[33]  There is no record to establish if or when particular initiatives were "executed."[34]  Contrary to the SOW, BCG believed

---

[26] Ex. 1 § 4.1.

[27] Ex. 1 § 4.1.

[28] Ex. 513 (Cromer Deposition) at 102:7-103:20, 111:12-112:5.

[29] Ex. 513 (Cromer Deposition) at 43:18-24, 44:12-45:18, 59:4-62:2; see also Ex. 513 (Cromer Deposition) at 73:13-74:15, 76:10-25, 80:23-81:2, 106:1-24, 107:20-23, 109:14-19; Ex. 516 (Mostaghimi Deposition) at 41:11-43:20.

[30] Ex. 513 (Cromer Deposition) at 58:5-59:13.

[31] Ex. 510 (Harris Deposition) at 117:5-9. 338:17-339:9 ("I don't know" if there was a particular process that was followed for adding initiatives).  One notable exception is for the "OmniChannel" Workstream, for which the parties entered into a supplemental, written statement of work.  Ex. 513 (Cromer Deposition) at 221:4-222:6; Ex. 517.

[32] Ex. 513 (Cromer Deposition) at 106: 1-24, 107:20-23, 109:14-19.

[33] Ex. 513 (Cromer Deposition) at 59:14-60:3; Ex. 510 (Harris Deposition) at 252:9-253:22.

[34] Ex. 510 (Harris Deposition) at 84:5-10, 117:5-19, 147:3-148:10, 123:5-124:11; Ex. 513 (Cromer Deposition) at 236:18-24.

those decisions to "execute" could be made before Jim Bell (the CFO) signed off on the final initiative.[35]   And BCG concedes that if GameStop decided not to implement an initiative, then there would be no projected profit improvements.[36]

BCG explained, "[s]ign off only happens at the end, in Thermometer Committee.  Early on, we just enter our best estimates . . . "no need for finance signoff."[37]  When particular scrutiny was expected, it was a "good idea to share the draft values with the senior leadership."[38]

Critically though, Thermometer Meetings with Bell were sometimes held before and sometimes after a so-called decision to "execute" had been reached.[39]  Yet BCG agreed GameStop could still challenge assumptions made in calculating predicted profit improvements at the pre-alignment meetings, even if the so-called "decision to execute" had already been made.[40]

Once COVID hit in March 2020, BCG acknowledged "we're happy to postpone [the meeting], shorten the agenda" even when Bell wanted to keep the meeting as scheduled.[41]  Ultimately, by May 2020, both parties agreed that the "thermo process should stop."[42]

### 2. *BCG began to issue invoices in 2019.*

BCG issued invoices in September November, and December 2019.  After a slight delay, GameStop paid the fixed-fee invoices in December 2019.  That same month, BCG also issued its first variable fee invoice.

---

[35] Ex. 510 (Harris Deposition) at 132:7-17.

[36] Ex. 510 (Harris Deposition) at 84:11-85:16; *see also* Ex. 510 (Harris Deposition) at 112:21-113:16 (agreeing GameStop could elect to not pursue an identified opportunity); Ex. 510 (Harris Deposition) at 124:13-125:11 (stating the parties would "have to look at the SOW" to determine when a decision to pursue an initiative becomes final), 130:20-131:17 (same).

[37] Ex. 243.

[38] Ex. 243.

[39] Ex. 513 (Cromer Deposition) at 120:17-121:23, 122:19-123:22.

[40] Ex. 513 (Cromer Deposition) at 133:23-134:3; Ex. 510 (Harris Deposition) at 39:8-12 (It was acceptable for GameStop to not agree with projections until they received more information).

[41] Ex. 518.

[42] Ex. 111.

Numerous initiatives were brought for final signoff in January 2020.[43]  Jim Bell approved 58 initiatives by the end of January with only a few minor "haircuts" to PPI values presented by BCG.[44]

Consistent with the SOW, and as necessary for GameStop's internal STI plan—i.e., to pay employee end-of-year bonuses—GameStop finalized its Thermometer using the PPI signed off through January 2020.  Overall, GameStop recorded less than 100% attainment for its internal STI Metrics.

### C. In January 2020, GameStop sought to begin finalizing the remainder of the work under the SOW, and the parties discussed ways to restructure BCG's fees.

#### 1. *Between January and March 2020, BCG was only able to provide tentative, best estimates, that were subject to change for the various unsigned initiatives it expected to complete.*

In early January 2020, as Thermometer Meetings continued, Bell asked for a meeting to follow up on the expected value projections, "so he can budget [BCG's] variable fees as well as for STI."[45]  In late January 2020, Dan Kaufman again sought clarity from BCG about the remainder of the SOW, asking BCG to "[l]ay out clearly [its] best guess of the value they will get . . . and our fees" as well as potential changes to the fee structure, like a monthly fixed fee.[46]

On January 29, 2020, BCG then sent its tracker document with a list of 58 "unsigned" initiatives that are "in progress," noting the PPI amounts were BCG's ███████████ and ███████████████████████████[47]  BCG explained that even the scheduled sign off dates were "tentative," and the schedule extended into June 2020 and beyond.[48]  BCG explained, to figure out

---

[43] Ex. 519.

[44] Ex. 64; Ex. 520 (saying it was a "[b]it of a tough thermometer . . . [s]igned off almost all of it so far, actually"); Ex. 521; Ex. 522; Ex. 523.

[45] Ex. 524.

[46] Ex. 525.

[47] Ex. 64.

[48] Ex. 526.

the full scope of initiatives, "It ought to be in various spreadsheets and trackers and—or decks that were used . . ."[49]

By mid-February 2020, rather than winding down and generally finalizing invoices, BCG estimated remaining fees would be an *additional* approximately $20 million (above the $22 million already invoiced).[50] Contrary to the SOW and BCG's post-hoc litigation position, BCG's estimates at the time tied to initiatives that were not final and had an indeterminate timeline.[51] Through mid-March 2020, BCG continued to estimate that the various initiatives that were not yet ready for sign off would result in additional invoices totaling about $20 million.[52] And BCG knew that these non-final projected values would be challenged.[53]

Contrary to BCG's pleading, BCG's actual updates to GameStop continuing into March 2020 explained that all "the forward-looking items are highly WIP so subject to change . . . especially true for European numbers, given the recent movement on that side of the pond."[54] Even so, GameStop's Chief Transformation Officer (Dan Kaufman) was surprised when he received BCG's estimated fees in mid-March 2020 and expressed to BCG that he wanted to be sure the "value is real and captured."[55]

---

[49] Ex. 510 (Harris Deposition) at 338:1-339:9 (stating he is unaware of a particular process for adding initiatives and that there are no formal, signed writings approving additional initiatives).

[50] Ex. 527.

[51] Ex. 528 (showing, videogame strategy, loyalty, pre-owned tech, real estate, and store hours TBD timeline for future sign off); Ex. 510 (Harris Deposition) at 172:14-173:12 (projections are not locked in for in-progress initiatives), 174:21-175:16 (Exhibit 64 shows the in-progress initiatives will be agreed upon on a future date).

[52] Ex. 529; *see also* Ex. 530; Ex. 531 (unsigned estimates sent on March 10, 2020); Ex. 33 (stating to "[p]osition it as rough estimates" when sending projected values); Ex. 265 (presentation to GameStop CEO on March 10 showed "best estimates" for values).

[53] Ex. 532.

[54] Ex. 533; *see also* Ex. 534.

[55] Ex. 82.

At the end of March, after the onset of COVID, BCG continued to tell GameStop that the next invoices would likely be ready in May and August 2020, and those would total about $20 million.[56]  It wasn't until late May 2020 that BCG first revised its estimated projections up by an incremental $8 million to an additional $28 million (or more) of fees—beyond what had already been agreed and invoiced.[57]

> **2.  *In January 2020, the parties began discussing how to restructure BCG's fees schedule, and by March they agreed to cancel all future Thermometer Meetings.***

Already by January 2020, the parties began discussing modifications to the SOW fee structure.[58]  The parties considered a fixed fee or holistic resolution to avoid the laborious Thermometer sign-off process.[59]

BCG explained it discussed potentially restructuring the fee structure to help with cash flow issues and to work out a payment plan, expressing its willingness to engage in "settlement discussions" in lieu of further Thermometer meetings.[60]  BCG acknowledged that Dan Kaufman (GameStop's Chief Transformation Officer) █████████████████████████████████



███████████"[61]  And BCG continued to discuss the potential to ███████████████ ████████████████████████████"[62]  By March 13, 2020, BCG stated it ████████████ ████████████████████████████████[63]

By the end of March 2020, the parties agreed that the Thermometer process did not work

---

[56] Ex. 133.

[57] Ex. 222.

[58] Ex. 535.

[59] Ex. 510 (Harris Deposition) at 326:12-327:15, 329:2-6, 329:15-18 (settlement negotiations would have been in lieu of Thermometer Meetings).

[60] Ex. 510 (Harris Deposition) at 326:12-327:15, 329:2-18.

[61] Ex. 6.

[62] Ex. 536.

[63] Ex. 537; *see also* Ex. 133.

and cancelled all Thermometer Meetings going forward.[64]

### D. By March 2020, BCG knew that COVID affected its projections.

#### 1. *BCG initially acknowledged the obvious impact of COVID on initiatives.*

By no later than March 11, 2020, COVID became a widely known phenomenon. That day, BCG sent GameStop "Urgent Operational Topics" addressing preserving sales, maintaining business continuity, and identifying COVID impacts on store labor and store hours.[65]  BCG advised retailers, including GameStop, that they should immediately reassess budgets and manage cash, tighten controls, delay payment terms, restructure credit terms, and delay capex events.[66]

Within days, by March 16, 2020, at least one BCG consultant recognized, ███████████

██████████████████████████████████████████████████████████

███████████████[67]  BCG acknowledged the immediate impact of COVID on the unsigned initiatives, stating it is █████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████"[68]

BCG acknowledged (at least internally) that ████████████████████ and that ██████████████████████████████████████████████████████████[69]

In fact, by the end of March 2020, BCG's own internal documents reflect that almost every initiative would likely be impacted by COVID.[70]  BCG's total value projections noted they were

---

[64] Ex. 538.

[65] Ex. 65; Ex. 539.

[66] Ex. 65; *see also* Ex. 510 (Harris Deposition) at 183:5-12 (In March of 2020 there was great uncertainty that companies needed to prepare for).

[67] Ex. 540.

[68] Ex. 541 (emphasis added).

[69] Ex. 542.

[70] Ex. 543; *see also* Ex. 544.

"subject to COVID outcomes."[71]   And BCG knew that Jim Bell (GameStop's CFO) would be
reluctant to approve any additional value until the effects of COVID were known—i.e., presenting
Bell with outdated materials would be problematic.[72]   Bell explained, for example, the impact on
the loyalty initiative and that the "underlying premise is night and day environment" once
customers stopped coming to stores.[73]   Bell specifically asked BCG to prepare an analysis of
scenarios about how COVID might affect projections.[74]

Before the end of March, the parties were already setting up a meeting to work through
projections "in light of COVID."[75]   Internally, BCG worked on revising its projections and noting
that values were "subject to COVID outcomes."[76]   BCG developed a plan to present numbers
addressing the impact of COVID through downward adjustments.[77]

BCG promised updates to specific initiatives to address changes due to COVID.[78]   And
BCG told GameStop that some Workstreams would essentially be paused until after COVID.[79]

### 2. BCG decided some initiatives should be "treat[ed] as signed off," with no accounting for COVID.

Then in early April, BCG internally began to re-think its plan to evaluate the impact of
COVID, beginning with the Loyalty initiative; deciding instead that, ██████████████████
████████████████[80]   After running a series of scenarios that show a ████████████████████

---

[71] Ex. 545; Ex. 546.

[72] Ex. 547.

[73] Ex. 513 (Cromer Deposition) at 194:15-195:2; *see also* Ex. 548 (Delayed initiatives include pre-owned, store hours, store labor, real estate, trade cap, and print rfp).

[74] Ex. 538.

[75] Ex. 549.

[76] Ex. 550; Ex. 551; Ex. 552; Ex. 553; Ex. 554; Ex. 555.

[77] Ex. 556; Ex. 557 (noting BCG is in process of re-calculating projections to account for COVID for conversation with Bell).

[78] Ex. 262 (discussing change to Trade Cap to account for pause in Trade ins).

[79] Ex. 558.

[80] Ex. 559.



██████████," BCG decided the information (requested by Jim Bell) was ██████████

██████████,"[81]

With its models in hand, showing potential downsides, BCG went back to GameStop but did not share the data, instead claiming BCG wanted more input from GameStop "[b]efore starting the actual modeling."[82]  BCG outlined two potential "scenarios," without showing any resulting impact on projections.[83]  At this point, in mid-April, after discussing the impact of COVID with GameStop and running numerous internal models, BCG added the caveat that these revisions would be "for settlement purposes only."[84]  Even so, BCG was "happy to discuss" with GameStop ██████████,"[85]



GameStop told BCG that the scenarios did not ██████████ ██████████[86]  GameStop provided several specific issues, including how ██████████ and how sales forecasts are not ██████████ meaning the scenarios failed to show how the business had been ██████████[87]

### E. GameStop earnestly tried to reach agreement.

#### 1. *The parties resumed Thermometer Meetings.*

In October 2020, after attempts at holistic resolution proved unproductive, BCG asked about resuming Thermometer Meetings, but also wanted to add in new workstreams that had occurred since March 2020.[88]  While BCG internally prepared updated Thermometer Meeting

---

[81] Ex. 560.
[82] Ex. 75.
[83] Ex. 75.
[84] Ex. 75; *see also* Ex. 513 (Cromer Deposition) at 211:6-212:7.
[85] Ex. 513 (Cromer Deposition) at 188:6-22, 189:12-190:16.
[86] Ex. 561.
[87] Ex. 561.
[88] *See* Ex. 120.

materials that addressed potential impacts of COVID, those materials were removed from the final versions shared with GameStop.[89]  BCG took the position (as summarized in its interrogatory response) that—despite no prior agreement from GameStop Leadership and that it described its previous estimates as highly tentative and subject to change—projections had previously been "locked in" and requesting updates to projections to account for COVID was not in good faith:



### 2. *The parties discussed various proposals, but couldn't reach final agreement.*

Bell articulated reasons he disagreed with particular projected profit improvements, although BCG questioned whether his disagreements were adequately "substantiated."[91]  After the first Thermometer Meeting in December, Bell sent an update with various proposals and offered compromises.[92]

Additional Thermometer Meetings occurred in January, when BCG described Jim Bell as appearing "to be more willing to deal with us reasonably"[93] and "[m]uch more reasonable this time around."[94]  In February, the parties had yet another meeting, after which BCG stated, "we [had] another Thermometer session on Monday, and they seemed to become more reasonable."[95]

---

[89] *Compare, e.g.*, Ex. 562, *with* Ex. 563, *and* Ex. 564, *with* Ex. 565, *with* Ex. 566.
[90] Ex. 573 (BCG Response to Interrogatory 19).
[91] Ex. 513 (Cromer Deposition) at 251:15-19.
[92] Ex. 567; *see also* Ex. 516 (Mostaghimi Deposition) at 64:11-19, 65:12-18.
[93] Ex. 568.
[94] Ex. 569.
[95] Ex. 570.

### 3. *GameStop offered to reach a "holistic" agreement above the $28 million Target in the SOW.*

In late February 2021, after GameStop elected a new board of directors, Jim Bell announced his resignation, and then he reached out to BCG to setup a call.[96]  BCG suggested that the call would be "instead of our Thermometer meetings on Monday."[97]

On March 1, 2021—after five additional Thermometer Meetings had occurred since December 2020—GameStop proposed to pay BCG another $11 million (in addition to the $22 million had already paid under the main body of work).[98]  GameStop emphasized this was more than the $28 million "target" originally anticipated in the SOW.

BCG acknowledged GameStop's offer as ██████████████ proposed its own responsive counteroffer, *and* proposed to cancel further Thermometer Meetings.[99]  Notably though, BCG disagreed with GameStop's characterization of the $28 million target contained in the SOW, pointing to a $35 million cap on BCG's costs instead.[100]

As it turns out, these mismatched expectations were not new.  When the parties executed the SOW on August 20, 2019, BCG privately expected $39,000,000 in fees,[101] despite the express, written target of $28,000,000 in BCG fees contained in the SOW.  In fact, BCG entirely disavowed the "targets" contained in the SOW, stating they are "Not a BCG target."[102]

GameStop continued to try to reach an agreement with BCG, participating in numerous

---

[96] Ex. 571.

[97] Ex. 571.

[98] *See* Ex. 122; *see also* Ex. 513 (Cromer Deposition) at 262:22-263:12.

[99] *See* Ex. 51; *see also* Ex. 513 (Cromer Deposition) at 198:18-24 (admitting that when the CEO made the offer he, "genuinely wanted $11 million to resolve the issues between GameStop and BCG").

[100] Ex. 51.

[101] Ex. 23; Ex. 572; *see also* Ex. 510 (Harris Deposition) at 197:5-16, 201:20-202:1.

[102] Ex. 510 (Harris Deposition) at 206:6-208:1, 216:2-217:16, 222:5-14.

phone calls and emails until at least October 2021.[103]  But in April and June 2021, BCG issued invoices for approximately $21 million in additional fees.[104]  And despite saying it would treat the "loyalty" initiative as signed off to avoid potential reductions due to COVID, BCG's invoice inflated the projections more than 30% for the "run rate" and nearly 40% for the 2020 PPI, above the highest range projected in March 2020.[105]

## IV. ARGUMENT

As a matter of law, BCG cannot prove that GameStop committed a bad-faith breach of the parties' Type II agreement.  BCG admittedly "does not claim that the SOW required that the parties actually *had to end up agreeing* on certain variable fee-related profit projections.  BCG knows that the SOW allowed for the possibility that the parties would not agree on that score."  *GameStop*, 2023 WL 2683629, at *9 n.9.[106]  "The consequences of Type II agreements are straightforward: they do not bind parties to anything more than the obligation to negotiate the open issues in good faith . . . within the agreed framework."  *Cox Comm'cns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 762 (Del. 2022) (internal quotation marks omitted).

Under Delaware law, a party acts in good faith if it does not act in bad faith.  *See, e.g.*, *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 4390726, at *22 (Del. Ch. Sept. 22, 2011), *aff'd in part*, 67 A.3d 330 (Del. 2013).  Stated differently, "good faith and bad faith are two sides of the same coin."  *REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*, 2018 WL 1109650, at *4 (Del. Ch. Feb. 28, 2018); *id.* ("Therefore, when one fails to act in a manner that one reasonably believed, or should have believed, was in the best interest of the Company, one is failing to act in

---

[103] *See, e.g.*, Ex. 574; Ex. 575; Ex. 576.

[104] Ex. 2; Ex. 238.

[105] Compare Ex. 2; Ex. 238, *with* Ex. 577; *see also* Ex. 534.

[106] BCG appears to premise GameStop's purported violation of their Type II agreement on the belief that, if GameStop had acted in good faith, the parties would have reached agreement regarding the PPI amounts BCG asserts.  As the Court already explained, that cannot be so.  *Id.*

good faith and, consequently, one is acting in bad faith."); *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) ("Put another way, 'good faith' conduct can only be understood by reference to 'bad faith' conduct." (discussing *Dunlap v. State Farm Fire & Casualty Ins. Co.*, 878 A.2d 434 (Del. 2005))), *rev'd on other grounds*, 2011 WL 3585598 (Del. 2011).

"'[B]ad faith' is not simply bad judgment or negligence, but rather . . . the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *CNL-AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC*, 2011 WL 353529, at *9 (Del. Ch. Jan. 28, 2011) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1209 n.16 (Del. 1993)). "Thus, a party seeking to prove that 'motivated by a culpable mental state' or 'driven by an improper purpose' that 'rise[s] to a high level of egregiousness.'" *SIGA*, 2011 WL 4390726, at *22 (quoting *Judge v. City of Rehoboth*, 1994 WL 198700, at *2 (Del. Ch. Apr. 29, 1994), and *Amirsaleh*, 2009 WL 3756700, at *5).

BCG admits that GameStop acted in good faith. BCG's Second Amended Complaint (D.I. 80) admits that GameStop participated in meetings in good faith, and BCG responded to GameStop's March 2021 offer, acknowledging it was ███████████████[107] And that is no surprise: GameStop paid $22 million in fees under the SOW,[108] signed off on PPI for copious initiatives, attended countless meetings over the course of two years, and offered an additional $11 million in fees to BCG for fees totaling $5 million above the SOW's 100% target amount.[109] In

---

[107] Ex. 51.
[108] Ex. 51.
[109] Ex. 51.

December 2020 through February 2021, GameStop made proposals that BCG was at least willing to accept in part, and BCG even described Jim Bell as being more "reasonable."[110]

BCG must show that GameStop acted in bad faith by rejecting BCG's proposed PPIs, which intentionally did not account for the disruption of COVID to GameStop's business. That GameStop sought to account for COVID's negative impacts on its business in connection with its projected profits is not bad faith. To begin, the SOW required projections to match the amounts GameStop actually expected to hit its P&L.[111] The amounts were to be what the parties "reasonably believed." And the SOW provided for revisions based on unforeseen circumstances up until the time invoices were to be ███████████████[112]

By March 2020, BCG's projections were not final—BCG described them as tentative works in progress with multi-month timelines to complete. So at the outset of COVID, GameStop asked for, and reiterated the need for, BCG's projections to take into account changed business circumstances and the uncertainty of the world during COVID. BCG undeniably understood the negative influence of COVID on GameStop's business: Internally, BCG worked on revising its projections and noted that values were "subject to COVID outcomes."[113] BCG developed a plan to present numbers addressing the impact of COVID through downward adjustments.[114]

Despite telling GameStop repeatedly that it would incorporate COVID into its analysis,[115] BCG ultimately refused to do so.[116] Instead, BCG unilaterally decided that initiatives should be

---

[110] Ex. 568; Ex. 569; Ex. 570.

[111] Ex. 1 § 4.2.1, § 4.2.2, § 4.2.3.

[112] Ex. 1 § 3.3.

[113] Ex. 550; Ex. 551; Ex. 552; Ex. 553; Ex. 554; Ex. 555.

[114] Ex. 556; Ex. 557 (noting BCG is in process of re-calculating projections to account for COVID for conversation with Bell).

[115] Ex. 262 (discussing change to Trade Cap to account for pause in Trade ins).

[116] *See, e.g.*, Ex. 559.

treated as final and stated it was somehow not in good faith for GameStop to even request updates or alterations to projections.[117]

The parties' agreement about how the profit-improvement projections needed to account for COVID's disruption of GameStop's business cannot evidence GameStop's bad faith. Instead, GameStop properly exercised its business judgment by refusing to accept BCG's proposed projections which inexplicably failed to account for COVID.

Last, for BCG's claim to succeed, BCG must escape the SOW's mandatory approval procedures. It cannot. Specifically, BCG's claim relies on the premise that PPI were "locked in," and not subject to "updates" or "alteration" because a "decision to execute" had been made.[118] Open issues in a Type II agreement are subject to the architecture of the preliminary agreement. *See, e.g.*, *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 345 (Del. 2013) ("[W]here parties bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement . . . ." (internal quotation marks omitted)); *Cross & Cross Props. Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) ("The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract."); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 835 (Bankr. S.D.N.Y. 2020) ("Contractual 'good faith' obligations cannot be invoked to change the explicit terms of an agreement . . . ." (internal quotation marks omitted)).

BCG's claim departs from the SOW in at least the following ways:

> The SOW had specific safeguards built in—a process for approvals. "[T]o assure mutual clarity," the SOW required written approval from GameStop Leadership regarding what initiatives to pursue, what the baselines would be, and when to

---

[117] *See, e.g.*, Ex. 559.
[118] Ex. 573 (BCG Response to Interrogatory 19).

"execute." Ex. 1 § 4.2.12; Ex. 1 § 4.2.13. Written approvals exist, yet BCG faults GameStop for failing to negotiate in good faith about the ultimate PPI amounts.

The SOW set specific target amounts of PPI for BCG to achieve and set corresponding fees to be paid of $28 million. Ex. 1, Appendix A. GameStop offered $33 million. But from the outset, BCG had its own internal expectations that far surpassed those agreed-upon amounts. Ex. 23; Ex. 572; see also Ex. 510 (Harris Deposition) at 197:5-16, 201:20-202:1. BCG repudiated the SOW targets and negotiated based on its own internal expectations.

BCG made a unilateral decision to "treat as signed off" certain initiatives. But the SOW required GameStop Leadership to approve decisions. Ex. 1. § 1.2; Ex. 1 § 4.2.9.

The SOW contemplated all invoices would generally be finalized by February 2020, coinciding with the end of GameStop's fiscal year and the conclusion of its employee bonus program. Ex. 1 § 4.1, 3.3. But by March 2020, when COVID hit, BCG estimated that its next rounds of invoices would not be ready until at least May or August 2020. Negotiations continued well into the following year, without resolution.

Perhaps most tellingly, in March 2020 (before COVID even became an issue), GameStop was still trying to understand the full scope of what BCG believed were the "initiatives" for which it would receive fees. At that point—after invoices were intended to be generally finalized—BCG could only send a highly tentative list that was subject to change.[119] It was far beyond the timeline contemplated under the SOW, it was far beyond the expected targets in the SOW, and the initiatives and baselines had not been approved by GameStop Leadership under the SOW. That the parties departed (drastically) from the SOW is not the fault of GameStop or BCG. However, the agreement BCG alleges should have been reached is far beyond what the SOW contemplated, and the duty to negotiate in good faith toward a final agreement under a Type II agreement (like the SOW) cannot impose obligations beyond what the preliminary agreement contemplated. Summary judgment should be granted for that reason, too.

### V. CONCLUSION

The Court should grant GameStop's motion for summary judgment.

---

[119] Ex. 533; *see also* Ex. 534.

OF COUNSEL:

Trey Cox
John S. Adams
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3256

Dated:  November 30, 2023

*/s/  Christopher Fitzpatrick Cannataro*
John M. Seaman (#3868)
E. Wade Houston (#6289)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
Telephone: (302) 778-1000
seaman@abramsbayliss.com
houston@abramsbayliss.com
cannataro@abramsbayliss.com

*Attorneys for Defendant GameStop Corp.*

21